# United States Court of Appeals

## *for the*

# First Circuit

UNITED STATES,

*Appellee,*

v.

DAVISTON JACKSON, a/k/a Matty,

*Defendant-Appellant.*

UNITED STATES,

*Appellee,*

v.

DAQUAN CORBETT, a/k/a Chinx,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF MAINE, BANGOR, IN CASE NO. 1:22-CR-00023-
SDN-1, HONORABLE STACEY D. NEUMANN, U.S. DISTRICT JUDGE

## BRIEF FOR DEFENDANT-APPELLANT
## DAQUAN CORBETT

JON L. SCHOENHORN
JON L. SCHOENHORN & ASSOCIATES, LLC
*Attorneys for Defendant-Appellant*
  *Daquan Corbett*
108 Oak Street
Hartford, Connecticut 06106
(860) 278-3500

CP COUNSEL PRESS    (800) 4-APPEAL • (392280)

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

REQUEST FOR ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . v

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE AND PROCEDURE HISTORY . . . . . . . 3

STATEMENT OF THE FACTS OF THE CASE . . . . . . . . . . . . . . . . . . 4

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

<u>ARGUMENT</u>

I.   THE TRIAL COURT ERRED WHEN IT DENIED THE
     DEFENDANT'S MOTION TO SUPPRESS EVIDENCE DERIVED
     FROM A MOTOR VEHICLE STOP BY THE MAINE STATE
     POLICE UNDER THE "COLLECTIVE KNOWLEDGE
     DOCTRINE." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     A. No Probable Cause or Reasonable Suspicion Existed at the Time
     to Justify the Stop of the Jeep. . . . . . . . . . . . . . . . . . . . . . 15

     B. Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

     C. The Collective Knowledge Doctrine Expressly Does Not Apply to
     "Walled Off" Motor Vehicle Stops.. . . . . . . . . . . . . . . . . . . . 21

     D. The Troopers Lacked Probable Cause to Prolong the Stop or
     Search the Vehicle with the Police Dog . . . . . . . . . . . . . . . . . 29

II.  IT WAS PREJUDICIAL ERROR FOR THE COURT BELOW TO
     ADMIT EVIDENCE OF THE FIREARM IN THE BROCKTON
     MASSACHUSETTS MOTOR VEHICLE STOP. . . . . . . . . . . . . . 36

     A. The photographs were unfairly prejudicial to Mr. Corbett. . . 37

B. Admission of the photographs was not harmless error. . . . . . 40

III. THE TRIAL COURT ERRED IN APPLYING THE "DANGEROUS WEAPON" SENTENCING ENHANCEMENT UNDER U.S.S.G. § 2D1.1(b)1. . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

A. Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

B. Section 2D1.1(b)(1) Does Not Apply Where Any Firearms are Traded for the Purchase of Drugs in Lieu of Cash. . . . . . . . . . . 46

C. The Defendant's Sentence Must Be Vacated. . . . . . . . . . . . . . 56

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Addendum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADD1

# TABLE OF AUTHORITIES

## FEDERAL CASES

United States v. Corbett 2024 U.S. District Lexis 121461 . . . . . . . . . . 14

*United States v. Piñeiro-Castro* (U.S. Dist. LEXIS 121461 D.P.R. 2024). .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 32

*Bailey v. United States,* 516 U.S. 137 (1995) . . . . . . . . . . . . . . . . . . . . . . 52

*Crawford v. Washington,* 541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . . . . . 19

*Florida v. Harris,* 568 U.S. 237 (2013) . . . . . . . . . . . . . . . . . . . 35, 36, 37

*Gall v. United States,* 552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . 45

*Goldberg v. Kelly,* 397 U.S. 254 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Illinois v. Andreas,* 463 U.S. 765 (1983) . . . . . . . . . . . . . . . . . . . . . . . . 22

*Illinois v. McArthur,* 531 U.S. 326 (2001) . . . . . . . . . . . . . . . . . . . . . . 15

*Muscarello v. United States,* 524 U.S. 125 (1988) . . . . . . . . . . . . . . . . . 54

*Navarette v. California,* 572 U.S. 393 (2014) . . . . . . . . . . . . . . . . . . . . . 15

*Ornelas v. United States,* 517 U.S. 690 (1996) . . . . . . . . . . . . . . . . . . . . 20

*Rodriguez v. United States,* 575 U.S. 348 (2015) . . . . . . . . . . . . . . . . 34, 35

*Scott v. Harris,* 550 U.S. 372 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Terry v. Ohio,* 392 U.S. 1 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 23

*United States v. Chavez,* 534 F.3d 1338 (10th Cir. 2008) . . . . . . . . . . . 25

*United States v. Arvizu,* 534 U.S. 266 (2002) . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Ayala-Vazquez,* 751 F.3d 1 (2014) . . . . . . . . . . . . . . . . 45

*United States v. Azor,* 881 F.3d 1 (1st Cir. 2017) . . . . . . . . . . 31, 32, 33, 34

*United States v. Balser,* 70 4th 613 (1st Cir. 2023) . . . . . . . . . . . . . *passim*

*United States v. Bianco,* 922 F.2d 910 (1st Cir. 1991) . . . . . . 46, 47, 48, 50

*United States v. Blankenship,* 382 F.3d 1110(11th Cir. 2004) . . 28, 30, 31

*United States v. Brito,* 427 F.3d 53 (1st Cir. 2005) . . . . . . . . . . . . . . . 46

*United States v. Brown,* 621 F.2d 48 (1st Cir. 2010) . . . . . . . . . . . . . . 18

*United States v. Candelaria-Silva,* 162 F.3d 698 (1st Cir. 1998) . . . . . . 39

*United States v. Colon,* 250 F.3d 130 (2d Cir. 2001) . . . . . . . . . 24, 25, 28

*United States v. Cook,* 277 F.3d 82 (1st Cir. 2002) . . . . . . . . . . . . . . 23

*United States v. Corbett,* 715 F.Supp. 3d (D. Me. 2024) . . . . . . . . . . 3, 13

*United States v. Corcimiglia,* 967 F.2d 724 (1st Cir. 1992) . . . . . . . . . . 49

*United States v. Curran,* 926 F.2d 59 (1st Cir. 1991) . . . . . . . . . . . . . 40

*United States v. Edwards,* 885 F.2d 377 (7th Cir. 1989) . . . . . . . . . . . 28

*United States v. Esle,* 743 F.2d 1465 (11th Cir. 1984) . . . . . . . . . . . . 28

*United States v. Flores-De-Jesus,* 569 F.3d 8 (1st Cir. 2009) . . . . . . . . 50

*United States v. Foley,* 871 F.2d 235 (1st Cir. 1989) . . . . . . . . . . . . . 38

*United States v. Fulmer,* 108 F.3d 1486 (1st Cir. 1997) . . . . . . . . . 40, 41

*United States v. Gardner,* 602 F.3d 97 (2d Cir. 2010) . . . . . . . . . . . . . 52

*United States v. Gurka, 605 F.3d 40 (1st Cir. 2010)* . . . . . . . . . . . . . . 53

*United States v. Hasting,* 461 U.S. 499 (1983) . . . . . . . . . . . . . . . . . 40

*United States v. Hensley,* 469 U.S. 221 (1985) . . . . . . . . . . . . . . . 22, 23

*United States v. Hussain,* 835 F.3d 307 (2d Cir. 2016) . . . . . . . . . . . . 26

*United States v. Massenburg,* 654 F.3d 480 (4th Cir. 2011) . . . . . . . . . 25

*United States v. Matlock,* 415 U.S. 164 (1974) . . . . . . . . . . . . . . . . . 18

*United States v. McDonald,* 121 F.3d 7 (1st Cir.1997) . . . . . . . . . . . . . 44

*United States v. Meade,* 110 F.3d 190 (1st Cir. 1997) . . . . . . . . . 21, 23, 26

*United States v. Miranda-Martinez,* 790 F.3d 270 (1st Cir. 2015) . . 48, 53

*United States v. Ouellette,* 985 F.3d 107 (1st Cir. 2021) . . . . . . . . . . . 45

*United States v. Ramirez,* 473 F.3d 1026 (9th Cir. 2007) . . . . . . . . . . . 28

*United States v. Rivera,* 448 F.3d 82 (1st Cir. 2006) . . . . . . . . . . . . . . . 46

*United States v. Rose,* 104 F.3d 1408 (1st Cir. 1997). . . . . . . . . . . . . . . 39

*United States v. Ruiz-Huertas,* 792 F.3d 223 (1st Cir. 2015) . . . . . . . . . 45

*United States v. Santiago-Pérez,* 666 F.3d 57 (1st Cir. 2012) . . . . . . . . 37

*United States v. Shareef,* 100 F.3d 1491 (10th Cir. 1996) . . . . . . . . 24, 28

*United States v. Valez,* 796 F.2d 24 (2d Cir. 1986) . . . . . . . . . . . . . . . . 24

*United States v. Varoudakis,* 233 F.3d 113 (1st Cir. 2000) . . . . . . . . . . 37

*United States v. Vasco,* 564 F.3d 12 (1st Cir. 2009). . . . . . . . . . . . . . . . 46

*United States v. Ventresca,* 380 U.S. 102 (1965) . . . . . . . . . . . . . . . . . 21

*United States v. Winchenbach,* 197 F.3d 548 (1st Cir. 1999) . . . . . . . . 26

*Watson v. United States,* 552 U.S. 74 (2007) . . . . . . . . . . . . . . . . . 51, 53

*Whiteley v. Warden,* 405 U.S. 560 (1971) . . . . . . . . . . . . . . . . . . . . 21, 23

*Whren v. United States,* 517 U.S. 806 (1996) . . . . . . . . . . . . . . . 15, 18, 27

**STATE CASES**

*Commonwealth v. Privette,* 491 Mass. 501 (2023) . . . . . . . . . . . . . . . . . 25

**STATUTES**

18 U.S.C. § 924(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

18 U.S.C. § 3557. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

21 U.S.C. §§ 841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 6, 7

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Evid. 401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

U.S. Const. Amend. IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

U.S. Const. Amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

18 U.S.C. § 3742. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

U.S.S.G § 2D1.1(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S.S.G. § 2D1.1 cmt. n.11(A). . . . . . . . . . . . . . . . . . . . . . . . . . . 55

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Federal Rule of Appellate Procedure 34(a)(2) and First Circuit Rule 33.0(a), Defendant Appellant submits that oral argument will assist the Court in resolving this appeal because of the constitutional and statutory interpretation questions presented.

# JURISDICTIONAL STATEMENT

This is a direct appeal by defendant-appellant Daquan Corbett from a judgment of conviction and imposition of sentence after a non-jury trial in the United States District Court for the District of Maine (Stacey D. Neumann, U.S.D.J.). The United States Court of Appeals for the First Circuit has jurisdiction under 28 U.S.C. § 1291 (appeals from final judgment), 18 U.S.C. § 3557 (review of sentence), 18 U.S.C. § 3742 (appeals from sentence), and Fed. R. App. Proc. 4(b) (appeals from criminal convictions).

Following the trial, the district court entered judgment on October 28, 2025, sentencing Mr. Corbett to 276 months of incarceration and five years of supervised release. [Def. Appx. A-42-43] On November 5, 2025, Mr. Corbett timely filed his notice of appeal to this Court, thereby complying with the provisions of Fed. R. App. Proc. 4(b)(1)(A).

## STATEMENT OF THE ISSUES

I. Did the Court Err When it Denied the Defendant's Motion to Suppress Evidence from the September 12, 2020 Motor Vehicle Stop under the "Collective Knowledge" Doctrine?

II. Did the Court Err in Admitting Prejudicial Evidence of Firearms from a Motor Vehicle Stop in Brockton, Massachusetts?

III. Did the Court Err in Applying a 2-level Dangerous Weapon Enhancement under Section 2d1.1(b)(1) of the United States Sentencing Guidelines?

## STATEMENT OF THE CASE & PROCEDURAL HISTORY

On February 9, 2022, a grand jury returned an indictment against Daquan Corbett, charging him with violations of 21 U.S.C. §§ 841(a)(1) and 846. ECF Docs. 55, 75.  A magistrate judge detained him pursuant to Rule 5 of the Federal Rules of Criminal Procedure on February 15, 2022. ECF Doc. 137. The defendant entered pleas of not guilty at that time. ECF Doc. 167. Initially the case was assigned to Hon. Lance E. Walker, U.S.D.C. who presided over various pretrial proceedings. ECF Doc. 339. On September 5, 2024, Hon. Stacey E. Neumann, U.S.D.C. replaced Judge Walker. ECF Doc. 810.

On February 15 and on March 3, 2022, respectively, the government returned superseding indictments against Corbett and others. ECF Doc. 91, 225. Mr. Corbett filed a motion to suppress evidence obtained during a September 12, 2020 traffic stop. ECF Doc. 592 [Def. Appx. at ("A-") 60]. A joint suppression hearing was held before Judge Walker on December 11 and 12, 2023, which subsequently were denied in a written memorandum of decision on February 7, 2024. 715 F. Supp. 126 (D. Me. 2024) (Def. Addendum "Add." at 1).

On November 26, 2024, Mr. Corbett waived his right to a trial by jury. ECF Doc. 887. A bench trial before Judge Neumann took place between  December 3, 2024 and December 16, 2024. On January 21, 2025, the court issued a written memorandum of decision, finding Mr. Corbett guilty on Count 1 of the indictment, as to 21 U.S.C. §§ 841(a)(1) and 846. ECF Doc. 916.  The government filed its sentencing memorandum on July 3, 2025. ECF Doc. 1035. The defendant filed his sentencing memorandum on September 29, 2025. ECF Doc. 1055. On October 17, 2025, the government  filed a memorandum for a variant sentence. ECF Doc. 1067. On October 28, 2025, following argument, the Court sentenced Mr. Corbett as noted above. ECF Doc.1068. He filed his Notice of Appeal on November 5, 2025. ECF Doc. 1072.

## STATEMENT OF THE FACTS OF THE CASE

The government alleged that Daquan Corbett participated in a drug distribution conspiracy with Daviston Jackson and others operating in Maine and Massachusetts. Multiple cooperating witnesses identified two leaders, "Matty" and "Chinx," who supplied controlled substances and "fronted" drugs to others for redistribution. 12/03/24 Tr.

114; 12/03/24 Tr. 29. The court found that Corbett was known as "Chinx," and Jackson as "Matty." 12/16/24 Tr. 7.

The government relied on phone records, social media, rental records, GPS data, and cooperating witnesses. Evidence linked Corbett to phone number (857) 498-4048, while both "Chinx" and "Matty" were associated with (207) 631-3939. 12/12/24 Tr. 160; 12/13/24 Tr. 67. Text messages from these phones included apparent drug orders. 12/10/24 Tr. 86, 91. Facebook records contained numerous references to "Chinx." 12/10/24 Tr. 214, 216. Cooperators listed "Chinx" as a contact. 12/04/24 Tr. 207; 12/05/24 Tr. 168.

### Evidence Regarding the Identity of "Chinx"

Witnesses described obtaining drugs from "Chinx," often through text communication directing them to locations, including a Sanford Street address known as "shoes off." 12/03/24 Tr. 41; 12/05/24 Tr. 153–55. Justin Warmen testified that he purchased heroin, cocaine, and fentanyl from "Chinx," sometimes reselling the drugs. 12/03/24 Tr. 28–30, 42–43. His phone contained contacts for "Chinx." *Id.* at 33–38. Nicole Ferree testified that she contacted "Chinx" to obtain crack cocaine, but acknowledged she never saw Corbett with drugs. 12/03/24

Tr. 100, 114, 132. Carol Gordon testified that she distributed drugs with "Chinx," who sold crack, heroin, and methamphetamine, and that dozens of customers obtained drugs monthly through them. 12/03/24 Tr. 152–65. During a police call at her residence, "Chinx" was present, and firearms were brought to that location for him. *Id.* at 170–76.

Facebook messages referenced "Chinx" as a drug source, including texts like "chinx gave me and wayne a free pack." 12/03/24 Tr. 218. Additional messages referred to reliance on "Chinx" for supply and pricing, including "I pay 9 a finger from Chinx." Id. at 40.

Law enforcement extracted phone data showing communications with contacts labeled "Chinx," including directions to meet at "shoes off." 12/03/24 Tr. 203–05. Phones contained multiple "Chinx" contacts, suggesting use of different numbers. Id. at 207.

Nikolas Raines testified that he worked with "Chinx," identifying Corbett in court, and received drugs from him multiple times per week over several months. 12/03/24 Tr. 228, 254. Raines stated that "Chinx" supplied fentanyl and obtained drugs from Massachusetts. Id. at 252–56. He also testified to transactions involving traded firearms with "Chinx." Id. at 18–19, 259–62. Shelby Loring testified she was involved

in the drug trade with "Chinx," but later stated that "Chinx" referred to different people rather than a single person and that she never personally received drugs from Corbett. 12/05/24 Tr. 140–41, 231, 236–37.

Other witnesses linked "Chinx" to distribution networks. Blaine Footman testified that "Chinx" supplied drugs to his sister. 12/10/24 Tr. 102. Joshua Jerrill testified that "Chinx" supplied large quantities of fentanyl and methamphetamine, handled significant cash transactions, and participated in firearm exchanges. 12/10/24 Tr. 197–205. Nicole Footman testified she heard references to people waiting for "Chinx" to arrive. 12/10/24 Tr. 53.

Sarah McBreairty testified that she worked with "Chinx," identifying him as Mr. Corbett. She obtained drugs from him, and communicated with him regarding supply and bail money for her sister. 12/11/24 Tr. 101–24. She described "fronting" arrangements, receipt of fentanyl, and exchanging firearms with "Chinx." Id. at 139–41. She said that drugs found in her possession came from "Chinx." Id. at 163.

Aaron Rodgers and James Valiante both testified that "Chinx" was their supplier in the aforementioned drug conspiracy, who provided

methamphetamine and fentanyl and operated through intermediaries. 12/11/24 Tr. 69; 12/11/24 Tr. 105–22.

## Law Enforcement Investigation

DEA agents used GPS data and surveillance to track a phone associated with "Chinx" to locations including Sanford Street. 12/10/24 Tr. 86–87; 12/13/24 Tr. 46–48. Surveillance placed Mr. Corbett at that location using a rental vehicle. 12/13/24 Tr. 39–44.

Phone forensic analysis identified thousands of references to "Chinx" in communications data, though analysts could not determine who was operating specific phones. 12/10/24 Tr. 216–17, 219.

## Stop and Seizure on the Maine Turnpike

On September 12, 2020, two Maine State Police troopers, at the request of DEA Agent Klutzarwitz, conducted a pretextual traffic stop of Corbett's rented Jeep on Interstate 95 in Saco, Maine. 12/12/24 Tr. 188. During roadside questioning of Mr. Corbett (the passenger) was identified and Mr. Jackson, who was driving at the time of the stop, a police K-9 sniff was performed around the vehicle, and the animal allegedly alerted to a bag containing a large amount of cash. The troopers seized the cash and the DEA later obtained a warrant for

Corbett's ICloud account. 12/13/24 Tr. 120–24. The trooper who made the stop later testified at trial that the stated traffic violation was a pretext and he was acting at the behest of the DEA. 12/13/24 Tr. 35. This stop was the subject of a 2023 suppression hearing. Additional information concerning same is set forth in the first issue raised in this appeal, *infra*.

## SUMMARY OF THE ARGUMENT

1. The trial court erred by denying the defendants' respective motions to suppress. Maine State Police were not working in collaboration with the Drug Enforcement Agency when they were instructed to conduct a "walled-off" stop of a Jeep traveling on Interstate 95 occupied by the defendant. There was no independent objective justification for the stop because the Maine trooper who initiated the stop of the car was not called as a witness and the stated grounds for this pretextual stop was not supported by empirical or credible facts based on hearsay. Moreover, at the time, the federal agents conducting the investigation did not possess independent probable cause or reasonable suspicion to justify the stop even if state law enforcement was cooperating.

2.  The trial court erred in allowing the state to introduce prejudicial information from a separate Brockton, Massachusetts motor vehicle stop, because the firearm recovered from the defendant's vehicle was not connected to the conspiracy, but nevertheless played a role in the judge's final decision.

3.  The trial court's imposition of a two-level enhancement of the defendant's sentence pursuant to United States Sentencing Guideline § 2D1.1(b) for "possessing" a firearm in connection with a narcotics trafficking offense as an aggravating factor was procedurally unreasonable because any testimony concerning firearms was limited to their use as currency to barter for the purchase of drugs. The intent of the Guidelines to make "possession" of firearms during a drug trafficking offense an aggravating factor is based on the inherent danger that dangerous weapons increase the threat of violence.

<u>**ARGUMENT**</u>

**I. THE TRIAL COURT ERRED WHEN IT DENIED THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE DERIVED FROM A MOTOR VEHICLE STOP BY THE MAINE STATE POLICE UNDER THE "COLLECTIVE KNOWLEDGE DOCTRINE."**

Prior to trial, both Mr. Corbett and his co-defendant, Daviston Jackson, filed separate motions to suppress evidence uncovered during a warrantless stop and seizure by Maine State Police of a Jeep in which they were traveling that occurred on the Maine Turnpike near Saco, Maine on September 12, 2020, Def. Appx. ("A"- 60); J.A. Appx. at 64. A hearing was held on December 11 and 12, 2023 before Judge Walker, where the government presented the testimony of Agent Bryan Klutzartz and State Police Sergeant Adam Schmidt. The only officer who actually observed the Jeep's operation on the highway and who activated his emergency lights to stop it – Trooper Matthew Williams – notably was absent from the hearing, apparently due to illness.

In a written memorandum of decision issued on February 7, 2024, Judge Walker made the following findings, that are set forth verbatim:

Before this stop, DEA was investigating Corbett and Jackson.[1] In May 2020, Agent Klutzaritz applied for a search warrant from this Court to collect communication content from a cellphone that he suspected Jackson used. See Gov't's Ex. 1. His affidavit explained that the Maine State Police seized methamphetamine from a Cooperating Defendant who said that it was for Jackson. *Id.* at 6. A woman identified Jackson as "Matti" and told Agent Klutzaritz that "Matti" sold narcotics from her apartment. Id. at 7. She also explained that "Matti" worked with "Chinx," and that the group was associated with Ronald Spencer's apartment in Bangor, Maine. *Id*. Later, Agent Klutzaritz reviewed text messages from a co-conspirator's cellphone, and he saw drug-related text messages with an individual who identified himself as "Matty." *Id*. at 8. Agent Klutzaritz obtained this search warrant, and he reviewed the cellphone's text messages, concluding that it was likely being used by "Matti" and "Chinx" to facilitate drug trafficking. See Gov't's Ex. 2 at 9. Next, Agent Klutzaritz applied for and obtained a search warrant permitting DEA to track the cellphone's location. Gov't's Ex. 2 at 15.

---

[1] The defendant submits that at that time, the DEA did not know who Mr. Corbett was, and were investigating some unidentified person nicknamed "Chinx." Therefore, this factual finding is clearly erroneous.

In June 2020, Agent Klutzaritz obtained search warrants to recover text messages for two cellphones used by a coconspirator. Gov't's Ex. 3 at 8. Having reviewed those messages, Agent Klutzaritz requested and obtained a search warrant to monitor the location of a cellphone associated with "Chinx." *Id*. at 12. On September 10, 2020, Agent Klutzaritz saw that the phone was traveling from Quincy, Massachusetts, to Bangor, Maine. Gov't's Ex. 4 at 1. Suspecting that the vehicle would go to Spencer's residence in Bangor, Agent Klutzaritz set up surveillance there, and he saw a 2020 Jeep Cherokee with Florida license plates park down the street. *Id*. The Jeep was rented by Corbett. Two men exited the Jeep and entered the residence. *Id*. at 2. The next day, the cellphone traveled to Aroostook County, where Agent Klutzaritz suspected that "Chinx's" organization was supplying people with narcotics and potentially firearms in exchange for cash. On September 12, the cellphone was moving south on I-95, toward Massachusetts. Gov't's Ex. 5 at 1. Agent Klutzaritz contacted the Maine State Police and asked them to execute a "walled-off" stop in which the Maine State Police would identify a traffic infraction as a pretext to stop the Jeep without compromising the integrity of the DEA's investigation.

*United States v. Corbett*, 715 F. Supp. 3d 120 (D. Me. 2024)( Add. at 1 ).

Both defendants claimed in their motions to suppress that Trooper Williams lacked probable cause or reasonable suspicion to justify the "walled-off" stop, and objected to the hearsay testimony of Schmidt or introduction of Williams' incident report without the witness.

Although the court found the hearsay "credible" without hearing from Williams, ultimately he did not decide whether there was an actual  motor vehicle violation to justify the stop; instead relying on the "collective knowledge doctrine" solely based on Agent Klutzaritz's request to stop the car.

As the defendant more fully explains below, the "collective knowledge" doctrine did not apply here because Williams and Schmidt were not involved in any "collective" law enforcement action. They were deliberately kept in the dark. In fact, Williams was given no information whatsoever from Klutzaritz to justify the stop, and his incident report – admitted over objection – relied on what defendant claims was a false pretext that did not suggest that a "walled off" investigation involving a narcotics investigation was occurring. This stop literally negated the concept of a joint investigation.

**A. No Probable Cause or Reasonable Suspicion Existed at the Time to Justify the Stop of the Jeep.**

The fourth amendment vests individuals with the right to be free from "unreasonable searches and seizures." U.S. Const. Amend. IV.  Its primary focus centers on what is reasonable under the circumstances. *Illinois v. McArthur*, 531 U.S. 326, 330 (2001). The fourth amendment also permits brief investigative stops of motor vehicles "when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014).  A motor vehicle stop, like any other warrantless seizures of individuals pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968),  is reasonable only if there is probable cause or reasonable suspicion to believe an offense – even a traffic violation – is in progress or "afoot." *Whren v. United States*, 517  U.S. 806, 819 (1996).

At the outset, the government notified the defendants that Trooper Williams would not be testifying at the suppression hearing, without explaining why.[2]  Instead, the government called the "back up"

---

[2] More than eight months later, the government disclosed to the defense in an e-mail that at the time of the stop (and apparently also at the time of the suppression hearing) that Williams suffered from Post Traumatic

trooper, Corporal Schmidt, who arrived later with his K-9 "Ido." Schmidt testified that, at the time of the stop, he was assigned to patrol duties in York County, including traffic enforcement. (12/12/23 Tr. 176). He described the seizure of the Jeep Cherokee and the defendants on the Maine Turnpike (I-95) as a "pretextual stop," while also explaining, over objection, that Trooper Williams claimed to have observed traffic violations—allegedly speeding five miles above the posted limit and an unsafe lane change — that provided the pretextual basis for the stop. (12/12/23 Tr. 186–187). Schmidt arrived on the scene after Williams stopped the car, and positioned his cruiser behind Williams' after the Jeep pulled onto the shoulder. (12/12/23 Tr. 204, 206). He approached on the passenger side and spoke with Mr. Corbett while Williams interacted with Jackson, who was driving. (12/12/23 Tr. 185). In response to questioning that had nothing to do with any alleged traffic violations, Mr. Corbett stated they were returning to the Boston area after visiting a friend and hiking near Augusta. Schmidt found this

---

Stress Disorder ("PTSD") which "negatively impact[ed] his ability to recall events and that PTSD was likely affecting his short-term and long-term memory in September 2020." ECF Doc. 837, 844.

suspicious because Corbett could not identify the names of the hiking trails. Schmidt also heard Williams ask both defendants about travel details, including where the two were coming from and the purpose of their travels in Maine. (12/12/23 Tr. 185–186). The defendants were not informed of a drug investigation, but Williams communicated his (phony) reason for the traffic-related stop (i.e. speeding and lane change). (12/12/23 Tr. 187).

Approximately nine minutes after stopping the defendants' car, Williams requested that Schmidt deploy his K-9, "Ibo," to conduct an exterior sniff of the vehicle. Schmidt described performing a systematic exterior sniff, beginning at the front of the vehicle and proceeding around it. During the first pass, the dog exhibited behavioral changes (or "head snap") near the driver's door, intensified nasal breathing, and jumping behavior. (12/12/23 Tr. 187–188). On a second pass, the dog showed similar alert behaviors, which Schmidt interpreted as indicating the presence of a narcotics odor. (12/12/23 Tr. 188).

Because of the unavailability of Williams, and over the defendants' objections, Schmidt was permitted to provide hearsay testimony about what Williams claimed was the basis for the stop.

17

Schmidt was also permitted to testify, over objection, by reading from Williams' report. 12/12/2023 Tr. 179-820.

Schmidt "arrived shortly after the car came to a stop," *Id.* at 181, and "wasn't there for all of the observations." *Id.* at 182. He also reviewed dashcam video from Williams' cruiser and agreed it was "generally consistent" with the hearsay report he reviewed. *Id.* His role was limited to "backup officer and also as a [K9 officer], if it was needed." *Id.* at 183. In other words, Schmidt conceded he possessed no personal knowledge to justify the stop or the deployment of his dog. Instead, he testified about his "understanding" of Williams' thought process for which he lacked any personal knowledge. *Id.* at 182-84.[3]

---

[3] The defendant readily concedes that hearsay as defined in the Federal Rules of Evidence does not "operate with full force at hearings before the judge to determine the admissibility of evidence." *United States v. Matlock*, 415 U.S. 164, 172-73 (1974); *see also, United States v. Brown*, 621 F.3d 48, 54 n. 5 (1st Cir. 2010)) ("the weight assigned to hearsay testimony, if any, will depend on the court's assessment of its reliability"). But a modified rule is not the same as a total absence of one. This is not a situation where a police officer relied on hearsay from a third party or informant to take some action in support of an arrest. Here the entire basis for this pretextual motor vehicle stop depended on the challenged hearsay statements and report of an absent officer, who alone could provide the basis for a legitimate motor vehicle stop. Judge Walker's finding that the report and hearsay was "credible," therefore, without the benefit of cross-examination, constituted an abuse of

Schmidt had "limited involvement" in the investigation. He only knew that a DEA agent told him to "assist Trooper Williams in a back-up capacity … looking for a white Jeep SUV with a Florida registration plate." 12/12/23 Tr. at 180. Schmidt's testimony, to the extent it relied upon Williams's report, was "not based on his firsthand knowledge," but solely on layers of hearsay. *Piñeiro-Castro*, 2024 U.S. Dist. Lexis

---

discretion here. Neither the report nor the hearsay comments made to Schmidt could justify the court's acceptance as "truth" what the absent Williams said was an objective basis to stop the Jeep, beyond the fact that it violated the fourth amendment to further a DEA investigation. However, whether the sixth amendment's confrontation clause itself applies to pretrial suppression hearings has never been decided, and a separate pretrial hearing to determine whether evidence obtained in violation of the fourth amendment under the exclusionary rule did not exist and was not contemplated at the time of the adoption of the Bill of Rights. As Justice Scalia noted in *Crawford v. Washington*, 541 U.S. 36, 52 n. 3 (2004), "Any attempt to determine the application of a constitutional provision to a phenomenon that did not exist at the time of its adoption . . . involves some estimation . . . that is hardly a reason not to make the estimation as accurate as possible." In any event, an essential element of the fifth amendment's due process clause at any hearing where liberty or property is at stake, necessarily includes the opportunity to confront adverse witnesses. *Goldberg v. Kelly*, 397 U.S. 254 (1970). Fundamental due process decidedly was absent when Schmidt was permitted to read from another officer's eyewitness account of the incident. In fact, it defies credulity to suggest that any fact-finder could decide a key factor such as whether a defendant's fourth amendment rights were violated on contested evidence without a government eyewitness to the events.

121461 (D.P.R. 2024) at *11. In any event, the district court ultimately did not reach the question whether a constitutionally adequate justification existed for a traffic stop based on this hearsay. Instead it upheld all of the State Police conduct, including the identification of Mr. Corbett by his license, the deployment of "Ibo" the police dog, and the seizure of cash, without hearing from Williams.[4]

## B. Standard of Review

This Court reviews a district court's denial of a motion to suppress both for legal and factual errors. Legal conclusions are reviewed *de novo*; while factual findings are reviewed for clear error. *United States v. Balser*, 70 F.4th 613 (1st Cir. 2023). Determining whether reasonable suspicion for the stop exists likewise is subject to *de novo* review. *United States v. Arvizu*, 534 U.S. 266, 275 (2002). *See also, Ornelas v. United States*, 517 U.S. 690, 699 (1996) ("[A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal.") Historical fact determinations are subject to the further

---

[4] Because the district court ultimately did not rely on the pretextual (arguably baseless) motor vehicle violations to justify the stop, interrogation or search of the vehicle, and therefore this Court can presume that an independent basis for these intrusions did not exist.

caveat that police camera footage of the encounter necessarily takes precedence over the testimony of the officers because a court cannot ignore what is plain before its eyes. See *Scott v. Harris,* 550 U.S. 372, 378 & n. 5 (2007) (police video of incident "speak[s] for itself ."

**C. The Collective Knowledge Doctrine Expressly Does Not Apply to "Walled Off" Motor Vehicle Stops.**

The defendant submits that Agent Klutaritz was operating on a series of "hunches" without any probable cause or reasonable suspicion to make a motor vehicle stop at that time. Therefore, the stop itself cannot be justified by his generic request for local assistance. If he believed he had at least a reasonable suspicion to stop the Jeep, there was no need to ask the State Police to develop their own "lawful" basis for the stop.

The collective (or imputed) knowledge doctrine provides that police officers may "rely upon each other's knowledge of facts" and use information obtained by colleagues involved in an investigation to "[support] a finding of probable cause" or reasonable suspicion. *United States v. Meade*, 110 F.3d 190, 193 (1st Cir. 1997), citing *United States v. Ventresca*, 380 U.S. 102, 111 (1965); *Whiteley v. Warden*, 405 U.S. 560

(1971); and *United States v. Hensley*, 469 U.S. 221, 230-33 (1985).

"[W]here law enforcement authorities are cooperating in an investigation . . . the knowledge of one is presumed shared by all." *Illinois v. Andreas*, 463 U.S. 765, 772 n. 5 (1983). This doctrine applies when a police officer involved in an investigation possesses sufficient information to justify a stop based on reasonable suspicion or probable cause. *Hensley*, *supra*, 469 U.S. at 230-33. But the collective knowledge doctrine does not give *carte blanche* to law enforcement officers intent on getting other non-involved officers to engage in stops simply by making a request without the requisite probable cause or reasonable suspicion. Otherwise the exception would swallow the rule.

The Supreme Court in *Whitely v. Warden* established the modern standard for the collective (or "imputed") knowledge doctrine. In that case, a Wyoming jury convicted Whitely, *inter alia*, of breaking and entering. A state trooper arrested Whitely after hearing a local sheriff's office radio broadcast mentioning him. *Id.* at 563. The sheriff who sent that alert did so based on an uncorroborated tip from an unnamed source. *Id.* at 562. The Supreme Court reversed the conviction after concluding that the arrest violated the fourth and fourteenth

amendments. *Id.* at 568-69. In reaching this determination, the court first held that the actual arresting officers must form an "independent judgment" that probable cause existed. *Id.* at 564. Otherwise, it "would discourage resort to the procedures for obtaining a warrant." *Id.* at 566. If police officers are held to a "less stringent" standard than judges, obtaining a warrant becomes a useless exercise. *Id.*

Besides the requirement for "independent judgment," the collective knowledge doctrine applies only to "cooperating" officers. *Whitely, supra*, 405 U.S. at 564; *Meade, supra*, 110 F.3d at 193. Investigators must share sufficient information to "[support] a finding of probable cause" or reasonable suspicion if the requesting agency has sufficient information to justify the stop and search in the first place. *Whitely*, 405 U.S. at 567; *Hensley*, 469 U.S. at 230-33. Cooperating officers are those who "are present at the scene and directly involved" in a stop or arrest. *See United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002). When a "cooperating officer" receives information to support an arrest or *Terry* stop, that information is imputed to the officer who initiates the seizure. *Meade, supra*, 110 F.3d at 193.

This rule does not apply to officers otherwise uninvolved in an investigation, who simply are tasked with doing the bidding of the DEA without any understanding of the purpose. "[S]ometimes [an officer's] authority to arrest a suspect is based on facts known only to his superiors or associates." *United States v. Valez*, 796 F.2d 24, 28 (2d Cir. 1986). But Schmidt – who was obviously superior to Williams – possessed no additional facts. Other circuit courts have held that the doctrine does not apply unless police officers are working "closely together on a scene." *See generally United States v. Shareef*, 100 F.3d 1491, 1504 (10th Cir. 1996) (collecting cases).

> A primary focus in the imputed knowledge cases is whether the law enforcement officers initiating the search or arrest, on whose instructions or information the actual searching or arresting officers relied, had information that would provide reasonable suspicion or probable cause to search or arrest the suspect.

*United States v. Colon*, 250 F.3d 130, 135-36 (2d Cir. 2001) (911 operator's knowledge not imputed to officer who made motor vehicle stop).

Here, that did not happen. Klutzaritz was in possession of no evidence that the occupants of the Jeep Cherokee possessed drugs for

sale or distribution or were engaging in criminal activity at the time he instructed the Maine State Police to make a stop. At the time, the DEA did not know who Mr. Corbett was, and lacked probable cause that he communicated with anyone about selling or distributing drugs on that date, or was engaged in narcotics trafficking activity. All Klutzaritz knew was that a phone that was the subject of a tracking search warrant was traveling along Interstate 95. Since Klutzaritz did not have  specific articulated information that could be imputed to Trooper Williams, this became a random unlawful seizure. Since the district court made no finding that Williams possessed an independent objective basis to justify the stop, the stop, search and seizure violated the fourth amendment.

This Court in *United States v. Balser*, 70 F.4th at 622, looked at courts from other jurisdictions and described the two ways that the "collective knowledge doctrine" operates: vertical and horizontal. *Id.* at 619-20, *citing United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir. 2011); *United Staes v. Chavez*, 534 F.3d 1338, 1345-46 (10th Cir. 2008); and *Commonwealth v. Privette*, 491 Mass. 501 (Mass. 2023).

Vertical collective knowledge exists, as explained in *United States v. Meade, supra*, where "a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to make the arrest, [courts] 'impute' to the arresting officer the directing officer's knowledge." Horizontal collective knowledge cases "aggregate information available to . . . all the officers involved in the investigation." *Balser, supra, quoting United States v. Winchenbach*, 197 F.3d 548, 555 (1st Cir. 1999). As the Second Circuit noted in *United States v. Hussain*, 835 F.3d 307, 316 n. 8 (2d Cir. 2016), in applying "horizontal knowledge," the actual facts underlying reasonable suspicion or probable cause must be communicated to the officer prior to making the stop and search.

But whether the flow of information and instructions here went up, down or sideways, none of it applies to the actions of the Maine troopers who stopped Mr. Corbett on Interstate 95. For one thing, Agent Klutaritz admits he did not share any facts or suspicions about his investigation with the state police, nor did he instruct them to make a stop or arrest. How could he? He himself lacked sufficient information beyond a hunch that anyone traveling in the Jeep Cherokee with

26

Florida plates on September 12, 2020 was engaged in criminal activity at that moment. Second, he specifically eschewed an articulated basis to make an arrest, instructing troopers instead to conduct an independent "walled-off stop" based on their own observations – a classic pretext or ruse. Williams and Schmidt received no briefing about the nature of the DEA investigation. To the contrary, they were given instructions "to conduct a stop of the vehicle," for the purpose of identifying the occupants. 12/12/2023 Tr. 116-17. Third, Williams was not a participant in the DEA's investigation and knew nothing about what federal officers knew or suspected. Therefore, neither the government nor the district court could rely on any variant of the collective knowledge doctrine because the DEA itself lacked a sufficient legal or factual basis to instruct any officer in Maine to stop the Jeep.

Yet, as the Supreme Court made plain in *Whren, supra*, the subjective intent to conduct a motor vehicle stop – even if purely pretext – is still "reasonable" if there is probable cause that a motor vehicle offense justifying the stop occurred, even if for a minor infraction like driving a few miles over the speed limit. But Judge Walker had no basis from which to make that determination because the government failed

to call the one person who claimed to have observed this "violation" – Trooper Williams. Williams' cruiser's dashboard camera video (divided into Exhibits 7 and 9 because of its length) does not show the Jeep traveling even one mile over the speed limit, and it defies credulity to suggest that Williams was able to discern this alleged transgression while he accelerated to make the stop – even for an "unsafe lane change" which he later admitted was false.

Other circuits have reached a similar conclusion that the collective knowledge doctrine only applies where officers are engaged in a joint investigation, even without explicit communication among them. *See e.g. United States v. Colon*, 250 F.3d 130, 135-36 (2nd Cir. 2001); *Shareef, supra*, 100 F.3d at 1504 and n. 6; *United States v. Edwards*, 885 F.2d 377, 382-83 (7th Cir. 1989); *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007); *United States v. Esle*, 743 F.2d 1465, 1476 (11th Cir. 1984), *overruled on other grounds by United States v. Blankenship*, 382 F.3d 1110, 1122 n. 23 (11th Cir. 2004).

**D. The Troopers Lacked Probable Cause to Prolong the Stop or Search the Vehicle with the Police Dog.**

Even assuming *arguendo* that Williams and Schmidt possessed probable cause to stop and question the defendants, they lacked probable cause to deploy Ibo and conduct a search of the vehicle, thereby improperly prolonging the so-called motor vehicle stop for an unnecessarily long period of time. If the stop was for traffic purposes, it was over after two minutes. If it was to identify the occupants, it took maybe another 30 seconds. Both defendants were removed from the vehicle despite the absence of a motor vehicle violation, frisked and held separately. Asking them about their travel plans was unrelated to any legitimate law enforcement action since no motor vehicle violations were actually observed except for the hearsay statements by Schmidt. The defendants explained they were hiking near Bangor with a friend, and it is truly absurd to believe that not knowing the names of a trail raised suspicions. When asked, who would remember trail names (let alone pronounce them) like Mount Agamenticus or Mount

Megunticook?[5] But nothing about that answer justified employing the dog to sniff around the car, and use that as a justification to search it. With respect to any "cooperation" or joint activity with Agent Klutzaritz, Schmidt and Williams asked noone from the DEA to come to the scene, and Klutzaritz did not ask to join them. Instead, Trooper Williams called Klutzaritz to report when he and Schmidt completed a search of the vehicle, and seized the cash. 12/12/2023 Tr. at 200, 202.

Ultimately, Klutzaritz never participated in the Terry stop, nor did anyone else with the DEA. *See id.* at 51 ("Q: Did you follow the vehicle, sir?" A: No."). The only information that Klutzaritz sent Williams involved GPS coordinates from a phone that Klutzaritz believed was involved in the investigation. *Id.* at 47. Klutzaritz told the officers "where the last ping would come in, what location it was, and when the last ping was expected." *Id.* at 55.

At no point did Klutzaritz provide any information to impute probable cause or reasonable suspicion to Schmidt or Williams. It

---

[5] *See*, THE MAINE 25 – AN ICONIC HIKING BUCKET LIST, https://www.mainehikes.org/hikes/maine-hiking-bucket-list-25-iconic-trails-to-explore?srsltid=AfmBOoraxdNx14CHcle0fyPfk-dHPop5ti170IVUN5QmOtl0ERGplPu4 (last accessed April 17, 2026).

required, at a minimum, conveyance of "basic information" which is "sufficient to attribute" probable cause to Schmidt and Williams to justify the stop and the search of the vehicle. *Balser, supra*, 70 F.4th at 622 (collective doctrine applied where directing DEA officer told arresting officer that suspect had drugs and was driving on the highway). As *Balser* makes clear, however, review of the determination to make a motor vehicle stop "looks to the collective information known to the law enforcement officers *participating in the investigation* rather than isolate the information known by the individual arresting officer." *Id*. at 619, *quoting United States v. Azor,* 881 F.3d 1, 8 (1ˢᵗ Cir. 2017). Without any such information, Schmidt and Williams had no legal basis to stop or search the vehicle.[6]

---

[6] Because of a complete lack of shared information justifying a motor vehicle stop as part of a narcotics investigation, Williams at trial later testified he was instructed to develop his own probable cause to justify the stop. 12/13/24 Tr. at 53; 12/12/24 Tr. at 209-10 ("And so you decide to pull it over because it went five miles over the speed limit, correct?") Williams conducted a "walled-off" stop, in which he devised the pretext of two traffic violations: speeding five miles per hour over the speed limit, *id*. at 210, and an "unsafe lane change" by merging less than 100 feet in front of a car traveling in the adjacent lane. *Id*. at 220. (He acknowledged there was no basis for the lane change violation under Maine law. *Id*. While Williams later at trial claimed the Jeep drove five miles over the speed limit, he had no knowledge about the real reason

This case stands in stark contrast to *United States v. Azor, supra*, where Maine State Police cooperated with DEA Task Force agents in arresting the defendant. Federal agents received information from a wiretap that the defendant was en route with a bag of Oxycodone pills between Maine and Boston, Massachusetts, and then onward to Portland, Maine. *Id.* at 6. The collective knowledge doctrine applied in that case precisely because federal officers created a "detailed and unique itinerary," including the purpose of the defendant's trip as well as the defendant's "sex and likely race." *Id.* at 8. Maine state police corroborated detailed information they received from the DEA Task Force agents and the nature of the investigation. *Id.* at 9. Because the Maine officers corroborated the information they received from the DEA, the collective action doctrine applied there. On the other hand, the district court in *United States v. Piñeiro-Castro*, *supra*, rejected the application of the doctrine where Postal Inspectors directed the Puerto Rico Police Bureau ("PRB") to stop and arrest the defendant for

---

for the stop. 12/12/2024 Tr. 211. In short, he did what the DEA told him to do.

narcotics distribution. *Id.* at \*1, 6-7. The *Piñeiro-Castro* court was unable to determine "the individual from the Inspection Service that gave the signal" to arrest, what they knew, "the identity of the arresting officers or what they knew," or "directions that PRB officers received from the Inspection Service." *Id.* at 20. Ultimately, the court found a "lack of specific evidence" to support application of  the collective knowledge doctrine and granted the defendant's motion to suppress. *Id.* at 29.

Neither Schmidt nor Williams possessed any information to justify their actions.

The stop, even if initially justified, was unreasonably prolonged by placing Jackson in the rear of a cruiser, and bringing Ibo to conduct a "sniff" around the car without reasonable suspicion that drugs were present. While reasonable suspicion "defies exact definition;" *United States v. Pavao*, 134 F.4th 649, 655 (1st Cir. 2025); it is readily apparent that these troopers knew nothing at all at the time to that justified an extension of the Terry stop to conduct a narcotics investigation. *Id.*

Schmidt readily admitted at the hearing that this encounter was a "pretext stop." 12/12/23 Tr. at 207. That admission alone demonstrates

a lack of information to justify a reasonable suspicion that the defendants were engaged in illegal activities. *See Balser*, 70 F.4th at 616. Therefore employing the dog to conduct a sniff around the car and engaging in unrelated questioning about where Mssrs. Corbett and Jackson were coming from and what they were doing there, served no purpose associated with the pretextual traffic enforcement. All Schmidt knew was that Klutzaritz directed them to stop the Jeep, and that they needed to "develop [their] own probable cause" to justify it. *Id.* at 129. Only Williams invented that reason and he was absent from the hearing. Unlike the officer in *Balser*, Schmidt possessed no information to support probable cause. Therefore, the troopers could hold the Jeep only for a brief time "to complete the mission of the stop." *Pavao*, *supra*, 134 F.4th at 655, *quoting Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015). That mission involved determining if, in fact, Jackson was driving up to five miles per hour above the posted limit on I-95.

Completing a traffic stop "typically" involves "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. These are "ordinary inquiries."

*Id.* A canine deployment is not part of such inquiry. *Id.* Dog sniffs are "not fairly characterized as part of the officer's traffic mission." *Id.* at 356. They become "unlawful" where it prolongs a stop beyond its mission. *Id.* at 357. Following the initial stop, nine minutes and thirty-six seconds elapsed until Schmidt deployed his canine to conduct a "sniff" around the car. *See* Exhibits 7 and 9 Since neither Schmidt nor Williams were privy to any information justifying a delay while the dog walked around the Jeep, that conduct was unreasonable.

While Schmidt claims that his dog alerted to the odor of drugs, no drugs or weapons were found, which raises serious questions about this animal's training and track record. *See Florida v. Harris*, 568 U.S. 237 (2013). Nevertheless, the troopers used the pretext of the stop to deploy the animal, search the car and seize $57,000.00 in cash that was later introduced at the trial. The state purpose of the "ruse" was to identify Mssrs. Corbett and Jackson, which necessarily provided the basis for the arrest, indictment and prosecution.

This case, therefore, is unlike *United States v. Cruz-Rivera*, 14 F.4th 32 (1st Cir. 2021), where the traffic stop was not *only* about a "police-observed traffic violation," which justified a lengthier seizure. *Id.*

at 46-47 (emphasis in original). There the individual officer who conducted a "walled-off" stop in that case communicated at length with a DEA task force officer, who told him about the ongoing DEA investigation of the defendant, and a prior "pursuit and investigation" *Id.* at 40. Here Schmidt and Williams were merely told to stop and identify the Jeep's occupants. 12/12/23 Tr. at 116-17. They received no other details or information.

## II. IT WAS PREJUDICIAL ERROR FOR THE COURT BELOW TO ADMIT EVIDENCE OF THE FIREARM IN THE BROCKTON MASSACHUSETTS MOTOR VEHICLE STOP

The defendant submits that the court committed prejudicial error when it admitted photographs of a firearm along with testimony by a Massachusetts police officer concerning the March 11, 2021 Brockton, Massachusetts stop of a Dodge Durango operated by Mr. Corbett, where the gun (and certain unrelated drugs) were found. 12/11/24 Tr. 6. Officer Daniel Benvie testified that on March 11, 2021, he stopped Mr. Corbett, for a traffic violation and determined that the rental vehicle's registration was expired. *Id.* at 10. Benvie searched the vehicle before it was towed, and discovered drugs and a firearm. *Id.* at 11-14. During

Benvie's testimony, the government offered  various photographs of the firearm. 12/11/2024 Tr. 15-21. The defendant objected multiple times that they constituted evidence of prior misconduct under FRE 404 and prejudicial under FRE 403. *Id.* at 15, 19, 23.  Those objections were overruled. *Id.* No evidence was ever presented that the guns or drugs recovered from the Durango were connected with the conspiracy that was the subject of the indictment.

### A. The photographs were unfairly prejudicial to Mr. Corbett

Evidence that is unfairly prejudicial is inadmissible under the Federal Rules of Evidence if its "probative value is substantially outweighed" by its prejudicial effect. Fed. R. Evid. 403. Within the context of a bench trial, this occurs where a court "render[s] a verdict on an improper emotional basis." *United States v. Varoudakis*, 233 F.3d 113, 122 (1st Cir. 2000). While such a reaction is not necessary, it is common. *Id.* at n. 6. Specifically, evidence which creates an "inflammatory effect" is unfairly prejudicial. *United States v. Santiago-Pérez*, 666 F.3d 57, 60 (1st Cir. 2012). Trial courts presumably can determine which evidence is unfairly prejudicial, and to ignore that

evidence. *United States v. Foley*, 871 F.2d 235, 240 (1st Cir. 1989). However, "this assumption can be negated in particular instances by showing that a judge was improperly influenced." *Id.*

Here, the Court's reference to this gun in its findings and at sentencing were evidence that the photographs had an inflammatory effect. Before the parties offered closing arguments, the Court stated "I think that, . . . the danger of the Court taking anything related to firearms for a reason that it's first not allowed are zero because I'm not going to do that. There has been a lot of testimony about firearms related to the alleged conspiracy here, so I'm going to allow the testimony." 12/16/2024 Tr. at 22.[7] At sentencing, the Court remarked "There were firearms, weapons involved. *We have a gun epidemic here. There were firearms involved in the conspiracy that we don't know where they are. And you were the head of that.*" 10/28/2025 Tr. 70. (Emphasis supplied). The Court's sentencing comments telescoped its particular concern about a gun "epidemic." During trial, the government argued

---

[7] Of course the "testimony" about guns all came from cooperating co-conspirators and no guns allegedly transferred to Mr. Corbett were ever recovered or introduced.

that "part of the government's theory of the case as part of this conspiracy, the guns were moving from Maine to Mr. Corbett in Massachusetts." 12/12/2024 Tr. at 9. But the Court blamed Mr. Corbett for a "gun epidemic" when there was no evidence that the gun recovered in Brockton had anything to do with the conspiracy.

It is, of course, true that photographs are less prejudicial than physical evidence. *United States v. Candelaria-Silva*, 162 F.3d 698, 705 (1st Cir. 1998). But a photograph may still be unfairly prejudicial if it depicts "evidence" that is not relevant. *See United States v. Briceno*, 550 Fed. Appx. 14, 14-15 (1st Cir. 2014) (photographs "less prejudicial" but do not eliminate unfair prejudice). Evidence is irrelevant if it does not have "any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). Here, the photographs of the firearm proved nothing about the conspiracy or that he "moved" it from Maine to Massachusetts. *Cf. United States v. Rose*, 104 F.3d 1408, 1414 (1st Cir. 1997) (photographs of 9 mm Glock relevant and nonprejudicial where they showed defendant holding firearm and defendant charged with armed robbery while carrying a similar 9 millimeter pistol).

While it is also true that there was testimony by cooperating witnesses that Mr. Corbett received guns as bartered payment for drugs, particularly involving the McBreairty sisters; . 12/05/2024 Tr. 156; 12/11/2024 Tr. 141; no evidence connected him to any actual firearm possessed in connection with the drug trafficking conspiracy; or that the McBreairtys or John Miller were connected to the firearm recovered in Brockton, Massachusetts. Indeed, it is the admission of the photographs of that gun that defendant claims was prejudicial.

**B. Admission of the photographs was not harmless error**.

Rule 52(a) of the Federal Rules of Criminal Procedure provides that an error by the trial court is harmless if "the conviction would have been obtained notwithstanding the asserted error." *United States v. Curran*, 926 F.2d 59, 63 (1st Cir. 1991) (quoting *United States v. Hasting*, 461 U.S. 499 (1983)). In other words, "if it is 'highly probable' that the error did not contribute to the verdict," the error is harmless. *United States v. Fulmer*, 108 F.3d 1486, 1498 (1st Cir. 1997).

Here, the error was not harmless because it contributed to the verdict against Mr. Corbett. The government sought to prove that Mr. Corbett moved firearms "from Maine to [himself] in Massachusetts."

12/12/2024 Tr. at 9. Government counsel argued, for example, that the evidence concerning where where the gun was purchased was probative because Mr. Corbett traveled from Northern Maine, "and that's where this gun came from." *Id.* at 11. Finally, counsel for the government stated that the uncle of one of the government's witnesses initially purchased the firearm, which "ended up in Massachusetts." *Id.*[8] Taken together, the evidence that Mr. Corbett possessed a firearm in Brockton that may have been purchased in Maine did not support the government's theory that it was connected to the charged conspiracy. The fact that the court decided that its origin had "limited probative value" and was excluded from evidence for that reason demonstrates the prejudice of the Brockton gun itself. Indeed, it had no relevance to the conspiracy whatsoever. Therefore, the defendant submits, the photographs of the Brockton firearm were prejudicial and likely contributed to the verdict.

---

[8] Judge Neumann sustained objections to a document that showed the particular gun was bought in Maine, finding it had "limited probative value" and was prejudicial under FRE 403. 12/12/24 Tr. 182.

## III. THE TRIAL COURT ERRED IN APPLYING THE "DANGEROUS WEAPON" SENTENCING ENHANCEMENT UNDER U.S.S.G. § 2D1.1(B)1.

Prior to sentencing, the court conducted a hearing on all of the objections that defense counsel made to the presentence report. The court rejected all of the objections. The court first determined that the base level for the offense was 38. She added two levels because the defendant engaged in the offense as a pattern of conduct for his livelihood, a four- level upward adjustment because of the defendant's managerial role in the conspiracy, two additional levels for obstruction of justice based on allegations Mr. Corbett intimidated at least one witness for cooperating; and two levels under § 2D1.1(b) for "possession" of a firearm. She calculated an adjusted offense level of 48 which was higher than the maximum 43 possible under the Guidelines (with a guideline range of life. 10/28/25 Tr. 19-21. With a criminal history of three, she ultimately imposed a non-Guidelines sentence of 276 months imprisonment, followed by five years of supervised release. Def. Add. ECF Doc. 1070 at 2-3.

The defendant submits that the district court erred in applying the United States Sentencing Guidelines ("U.S.S.G.") § 2D1.1(b)(1)

enhancement here because any firearms mentioned in connection with Mr. Corbett during the trial were merely a form of currency to barter for drug purchases, and were not possessed in a manner that increased a risk of violence. The pre-sentence report ("PSR") [ECF Doc. 980] recommended the two-level enhancement for possession of a firearm. Paragraph 44 indicated that one of the confidential informants used firearms to pay for a drug debt. The PSR further noted that trial testimony (and the judge's findings) included the fact that guns were traded for drugs as part of the conspiracy. ¶ 68. The defendant objected in writing to this enhancement. ECF Doc. 975 at ¶¶ 88 and 99, denying that a dangerous weapon was "used" in the conspiracy and noting that no evidence was presented that either Mr. Corbett or Mr. Jackson were seen with a firearm at any residence involved in the conspiracy.

Relying on the PSR's suggestion that the defendant's offense level calculation should include a two-level enhancement under USSG § 2D1.1(b)(1) for "possession" of a dangerous weapon, the government in its July 3, 2025 sentencing memorandum sought the enhancement as a specific offense characteristic because "a dangerous weapon (including a firearm) was possessed." Def Appx. at ECF Doc. 1035 at 3. The

defendant objected to the enhancement arguing that the witnesses who referenced guns (notably John Miller, Sarah McBreairty and Joshua Young) never observed any dangerous weapons of any sort in Mr. Corbett's hands or in his immediate vicinity. Def Add. ECF Doc. 916 at pp. 15, 16, 24, and 31 n. 28. The defense also argued that the reference to the gun found in a car operated by the defendant in Brockton, Massachusetts during a motor vehicle stop was not relevant to the conspiracy, and indeed, the defense objected to trial testimony concerning it.[9] *Id.*

To support imposition of a § 2D1.1(b)(1) enhancement, the government had the burden of showing "that a firearm possessed by the defendant was present during the commission of the offense." *United States v. McDonald*, 121 F.3d 7, 10 (1st Cir.1997). The defendant

---

[9] The government never claimed at trial that the gun found – or drugs seized – during the Brockton stop on March 11, 2021 was relevant conduct connected to the conspiracy. 12/11/24 Tr. 19-23; Gov. Ex. ## 66, 67. Therefore it does not provide an independent ground for this enhancement.

submits that the trial court erred in applying this enhancement as a

matter of fact and law.

**A. Standard of Review**

Where, preserved claims of procedural error are under review, this

Court seeks to

> ensure that the district court committed no
> significant procedural error, such as failing to
> calculate (or improperly calculating) the
> Guidelines range, treating the Guidelines as
> mandatory, failing to consider the [18 U.S.C.] §
> 3553(a) factors, selecting a sentence based on
> clearly erroneous facts, or failing to adequately
> explain the chosen sentence --including an
> explanation for any deviation from the Guidelines
> range.

*United States v. Ayala-Vazquez*, 751 F.3d 1, 29 (1st Cir. 2014)

(alteration in original), *quoting Gall v. United States*, 552 U.S. 38, 51

(2007).

> When mulling the procedural reasonableness of a
> sentence, we afford *de novo* review to the
> sentencing court's interpretation and application
> of the sentencing guidelines, assay the court's
> factfinding for clear error, and evaluate its
> judgment calls for abuse of discretion.

*United States v. Ouellette*, 985 F.3d 107, 110 (1st Cir. 2021)*,*

*quoting United States v. Ruiz-Huertas*, 792 F.3d 223, 226 (1st Cir.

2015).  This Court also reviews legal challenges to the interpretation or application of the Guidelines *de novo. United States v. Rivera*, 448 F.3d 82, 84 (1st Cir. 2006). If a defendant did not object to the enhancement at sentencing, however, review is limited to plain error. *United States v. Vasco*, 564 F.3d 12, 22 (1st  Cir. 2009), *citing United States v. Brito*, 427 F.3d 53, 66 (1st Cir. 2005).

Here the defendant clearly objected to the enhancement in writing and orally prior to sentencing, arguing that the provision did not apply. To the extent that the inapplicability of the Guideline is more broadly articulated in this appeal, the defendant urges *de novo* review rather than limiting it to plain error because of the importance of the issue.

**B. Section 2D1.1(b)(1) Does Not Apply Where Any Firearms are Traded for the Purchase of Drugs in Lieu of Cash.**

The purpose of § 2D1.1(b)(1) as an aggravating factor to enhance a sentence is based on the Sentencing Commission's conclusion that the presence of a firearm during the course of drug offenses, as a legislative fact, often increases the danger of violence during drug-related crimes. U.S.S.G. § 2D1.1(b)(1), cmt n. 11. *United States v.*

*Bianco*, 922 F.2d 910 (1st Cir. 1991). Indeed, comment 11(A) expressly states that the enhancement for weapon possession "reflects the increased danger of violence when drug traffickers possess weapons." It applies, as this Court stated in *Bianco*, "if the weapon *was present . . . .*" (Emphasis supplied).

Even when an individual defendant's sentence is based on conviction for a drug conspiracy, as opposed to a substantive offense, the question remains whether the gun was *possessed* by a co-conspirator for its possible violent use in connection with the drug trafficking enterprise; not merely as currency or barter as payment. For example, in *United States v. Wright*, 695 Fed. Appx. 585, 591 (1st Cir. 2017), the "relevant inquiry" was "not whether Wright himself possessed the firearms in question or knew that they were in the apartment . . . ; rather, the question is whether it would be 'reasonably foreseeable' to Wright that one of his co-conspirators would procure and store firearms in furtherance of the criminal conspiracy, namely, *to protect the drugs against potential robberies or rival crews or for intimidation* against individuals owing money to the conspirators."

No evidence exists that any guns attributable by Miller, McBreairty and company to Mr. Corbett were intended to protect drugs from robbery or to intimidate rivals or delinquent customers in any way. As defense counsel noted, nobody testified that Mssrs. Corbett or Jackson ever possessed a firearm. Nor was it foreseeable to Mr. Corbett that firearms would be used for protection by any alleged co-conspirators. Moreover, no evidence exists that any ammunition changed hands, undercutting the suggestion that the traded guns contained ammunition. In fact, other than the testimony of cooperating co-conspirators and drug addicts, there is no evidence that any firearms connected to Mr. Corbett in Maine ever existed.

This also is not a case where the district court could draw a reasonable inference that firearms were possessed for the purposes contemplated by § 2D1.1(b)(1) of perpetrating – or threatening – violence and intimidation. This Court generally permits such inference in situations where weapons are discovered in close proximity to drugs or at a stash house. *See, e.g., United States v. Miranda-Martinez*, 790 F.3d 270, 276 (1st Cir. 2015), *quoting Bianco, supra*, 922 F.2d at 912 ( "we have often observed that 'firearms are common tools' in drug

trafficking conspiracies involving large amounts of drugs"); *United States v. Corcimiglia*, 967 F.2d 724, 727 (1st Cir. 1992) (court "has recognized that the mere *presence of a firearm* in the same residence which is used as a site for drug transactions may allow a sentencing court to make the inference that the weapon was present for the protection of the drug operation").

Here the court's findings were limited to the government's proving that any guns relevant to the conspiracy were those delivered to Sarah McBreaity by John Miller as payment to Mr. Corbett for fronting narcotics. See Memorandum of Decision, ECF Doc. 916 at pp. 16, 22-24, 26, 31 n. 28. They allegedly were delivered to Sarah McBreaity by Miller to cover the cost of purchasing narcotics, to be passed on to the defendant. McBreaity testified she received them from the "Indian" (identified as John Miller who was Native American) to give Corbett but her role was limited to that of a "middleman" because the transaction was "mainly the Indian and Chinx's deal." 12/11/24 Tr. 141.

The financial transactional purpose was confirmed by the testimony of Joshua Young, who  delivered guns to McBreaity to help

pay Miller's debt. 12/10/24 Tr. 32-33. The district court's enhancement was grounded in this evidence.

The government's theory relied on this same evidence. Indeed Miller testified that he lawfully purchased the guns in Maine and was short funds for drugs so he transferred them as a form of currency to pay his debt. That does not satisfy the requirement of "possession" within the meaning of § 2D1.1(b)(1), because it did not increase "the danger of violence" during a drug crime – the very purpose for the enhancement. In fact, there is no evidence that the firearms in question were ever in or around any narcotics that formed the basis for the instant conspiracy.

The defendant submits that First Circuit precedent consistently applies the § 2D1.1(b)(1) enhancement in cases reserved for actual possession, constructive possession, or reasonably foreseeable possession of firearms by co-conspirators in and around illicit narcotics; s*ee Bianco, supra*, 922 F.2d at 911–12; *United States v. Flores-De-Jesus*, 569 F.3d 8, 36 (1st Cir. 2009). But it has never held that the enhancement or "possession" applies to the situation presented in this

case. Where, however, a firearm is merely transferred as a method of payment, it is being treated as property, not as a dangerous weapon. It is no more "possessed" as a weapon than if jewelry or a car were bartered for drugs instead. Indeed, since the Guideline provision refers to "dangerous weapons" and not just firearms, it would make no sense to charge the enhancement every time someone buys drugs in exchange for some item that *could be used* as a weapon even if it is not manufactured for that purpose. The fact that Commentary note 11(B) precludes the use of the enhancement under subsection (b)(2) if the defendant did not actually use or threaten the use of violence and merely "possessed" a dangerous weapon, strongly suggests the Guideline avoids double counting by equating actual threats of violence with the possession of a item used for such purpose – and not for other reasons.[10]

The defendant's position is consistent with the holding in *Watson v. United States*, 552 U.S. 74 (2007), where the Supreme Court held

---

[10] Although not relevant to the specific facts here because Mr. Corbett was a convicted felon, the restriction on the use of the term "possession" may also raise constitutional vagueness concerns because of the Second Amendment right to bear arms.

that receiving a firearm in exchange for drugs does not constitute its "use" under Title 18 U.S.C. § 924(c). The Court rejected treating participation in a gun–drug exchange as sufficient to trigger a firearm enhancement. This reasoning should apply here. If receiving a firearm for "payment" is not considered "use" under § 924(c) "enhancement", then transferring them as payment should not automatically constitute possession under § 2D1.1(b)(1) either, especially where it is not used to facilitate violence, threats or intimidation.

Similarly in *Bailey v. United States*, 516 U.S. 137 (1995), the Supreme Court looking to "ordinary or natural" meaning of terms, held under 18 U.S.C. § 924(c)(1) that mere "possession" of a firearm near the scene of drug trafficking was not "use" within the meaning of that provision. The Court explained that the provision "requires evidence sufficient to show an active employment of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." *Id*. at 143.

Of course Congress amended Section 924(c)(1)(A) to add the term "possession" before Watson was decided. *See, United States v. Gardner,*

602 F.3d 97, 101 (2d Cir. 2010). And the defendant further recognizes that this Court in *United States v. Gurka*, 605 F.3d 40, 44 (1st Cir. 2010) rejected an argument in a different context that bartering drugs in exchange for a gun did not constitute "possession" pursuant to 18 U.S.C. § 924(c)(1)(A):

> "Use" is a different word than "possess," with a different meaning. Compare Merriam-Webster's Collegiate Dictionary 1301 (10th ed.1993) (defining "use" as "to put into action or service"), with *id.* at 909 (defining "possess" as "to have and hold as property"). And the fact that the relevant possession of a firearm is limited to possession in furtherance of a drug trafficking crime is not informed by *Watson* at all.

Nevertheless whether a barter constitutes "possession" within the meaning of the relevant Guidelines remains an open question in this Circuit; *see, also, United States v. Martinez*, 557 F.3d 597, 601 (8th Cir. 2009) (Bright, J., concurring) (*Watson*'s reasoning may extend beyond § 924(c)(1)(A) to 2D1.1(b)(1)). The evidence concerning Mr. Corbett's alleged "possession" of a firearm in this case requires a similar analysis. This is particularly so where scant evidence exists here that the defendant was in physical – or constructive – possession of the bartered firearms. To the extent that some ambiguity exists concerning this claim that results in uncertainty, the defendant asks this Court to

invoke the rule of lenity. *United States v. Dion*, 37 F.4th 31, 39 (1st Cir. (2022), *citing Muscarello v. United States*, 524 U.S. 125, 138-39 (1988).

As a separate matter, the government did not argue – and the court did not find – that Sarah Breaity's admitted personal possession of guns for her own use was foreseeable to Mr. Corbett, particularly since her drug activity and that of her sister, Danielle, predated association with the defendant. Her testimony did not establish that she possessed any guns at a time when Mr. Corbett joined the conspiracy and therefore does not constitute "relevant conduct." Indeed, her testimony that Joshua Jerrill's efforts to acquire firearms on her behalf at the Maine Military Store were unsuccessful because he failed a background check, suggests that she was unable to acquire one during the conspiracy or that this transaction was known to the defendant. At "attempt" to acquire a weapon does not equate with "possession." There is, of course, no evidence Mr. Corbett ever saw her with her own guns, nor that she made him aware of them.

Since the transfer of guns from Miller through McBreaity constituted payment to Mr. Corbett for drugs previously fronted to him

– and for no other purpose – this transaction does not satisfy the

requirement for an enhancement under § 2D1.1(b). In fact, the

Guidelines commentary categorically states that the enhancement

should not apply where it is clearly improbable that the weapon was

connected with the offense for the purposes previously set forth.

U.S.S.G. § 2D1.1 cmt. n.11(A). The defendant submits that this is the

situation here, because firearms transferred solely as payment for drugs

are not connected to the offense charged in a manner that increases

danger of violence beyond what is presumed from illicit narcotics

trafficking itself.

Consequently, the court's findings were not consistent with either

the plain language of § 2D1.1(b)(1) or its purpose. Expanding the

enhancement to barter situations in the absence of  evidence that they

were "possessed" for protection or to foment violence or threats,

converted a targeted sentencing enhancement provision into a

categorical rule, contrary to its plain language  and stated purpose.

## C. The Defendant's Sentence Must Be Vacated.

Because the government failed to establish by a preponderance of the evidence that Mr. Corbett "possessed" a dangerous weapon in connection with the conspiracy within the meaning of §2D1.1(b)(1) the two-level enhancement was improper here. The sentence should be vacated and the case remanded for re-sentencing.

## IV. CONCLUSION

For the foregoing reasons, the judgment of conviction should be reversed and remanded for a new trial. In the alternative, the defendants seeks remand for resentencing without the two-level enhancement pursuant to U.S.S.G. § 2D1.1(b)(1).

THE DEFENDANT-APPELLANT

BY: *Jon L. Schoenhorn*

JON L. SCHOENHORN, His Attorney

Jon L. Schoenhorn & Associates, LLC

108 Oak Street

Hartford, CT 06106-1514

Tel. (860) 278-3500

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure § 32(a)(7)(B)(I) because it contains 10,958 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure § 32(a)(5)-(6) because it was prepared in proportionally-spaced 14-point Century Schoolbook font using the Corel WordPerfect 2021®  word processing program.

Dated: April 20, 2026 */s/ Jon L. Schoenhorn*

Jon L. Schoenhorn

## CERTIFICATE OF SERVICE

I hereby certify that on this date, the foregoing brief of the defendant-appellant was filed electronically through the Court's CM/ECF system. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.

Dated: April 20, 2026 */s/ Jon L. Schoenhorn*

Jon L. Schoenhorn

# ADDENDUM

# <u>ADDENDUM TABLE OF CONTENTS</u>

<u>Page</u>

District Court Ruling on Motions to Suppress dated February 7, 2024 .......... ADD1

Findings of Fact and Conclusions of Law ordered on January 21, 2025 ........ ADD11

Defendant Daquan Corbett's Sentencing Transcript Excerpt, dated October 28, 2025 ..................................................................................... ADD48

Defendant Daquan Corbett's Judgment, dated October 28, 2025 ................... ADD70

# *United States v. Corbett*

United States District Court for the District of Maine

February 7, 2024, Decided; February 7, 2024, Filed

Nos. 1:22-cr-00023-LEW-1; 1:22-cr-00023-LEW-2

**Reporter**
715 F. Supp. 3d 126 *; 2024 U.S. Dist. LEXIS 21079 **; 2024 WL 474527

UNITED STATES OF AMERICA v. DAQUAN **CORBETT** DAVISTON JACKSON, Defendants.

**Prior History:** *United States v. **Corbett**, 2024 U.S. Dist. LEXIS 6443, 2024 WL 150092 (D. Me., Jan. 12, 2024)*

**Counsel:** **[**1]** For DAQUAN **CORBETT**, also known as CHINX, Defendant: JOSEPH F. KROWSKI, JR., LEAD ATTORNEY, PRO HAC VICE, JOSEPH F. KROWSKI, JR., BROCKTON, MA; PETER E. RODWAY, LEAD ATTORNEY, RODWAY & HORODYSKI, PORTLAND, ME.

For DAVISTON JACKSON, agent of MATTY, Defendant: NEALE A. DUFFETT, LEAD ATTORNEY, CLOUTIER, CONLEY & DUFFETT, P.A., PORTLAND, ME; BRUCE M. MERRILL, PORTLAND, ME.

For USA, Plaintiff: JOEL B. CASEY, LEAD ATTORNEY, RAPHAELLE A. SILVER, OFFICE OF THE U.S. ATTORNEY, DISTRICT OF MAINE, BANGOR, ME; ALISA ROSS, ETHAN PLAUT, USAO, BANGOR, ME; DONALD E. CLARK FORMER, U.S. ATTORNEY'S OFFICE, DISTRICT OF MAINE, PORTLAND, ME; NICHOLAS S. HEIMBACH, USAO, PORTLAND, ME.

**Judges:** Lance E. Walker, UNITED STATES DISTRICT JUDGE.

**Opinion by:** Lance E. Walker

# Opinion

 **[*131]** <u>ORDER ON DEFENDANTS' MOTIONS TO SUPPRESS AND MOTION FOR A CONFERENCE OF COUNSEL, OR ORAL ARGUMENT ON MOTIONS TO SUPPRESS</u>

Before the Court are Daquan **Corbett** and Daviston Jackson's (collectively "Defendants") motions to suppress. Mot. to Suppress, ECF No. 592 (**Corbett**); Mot. to Suppress, ECF No. 595 (Jackson). In their motions, the Defendants request suppression of evidence from a traffic stop.

A hearing on these motions, with testimony from Drug Enforcement Administration **[**2]** ("DEA") Special Agent Bryan Klutzaritz and Maine State Police Sergeant Adam Schmidt was held on December 11 and 12, 2023.[1] After the hearing, Defendants filed a joint motion for a scheduling conference, or in the alternative, for oral argument on their motions to address Maine State Police Trooper Matthew **[*132]** Williams, who initiated the stop, but was unavailable to testify. Joint Mot., ECF No. 683.

For the reasons below, all three motions are DENIED.

**BACKGROUND**

---

[1] The hearing was held in conjunction with Defendants' other motions to suppress as well as the motion to suppress filed by James Valiante.

**ADD1**

**Corbett** and Jackson are among the seventeen individuals indicted by a federal grand jury in February 2022 for allegedly conspiring to distribute controlled substances.[2] They now move to suppress evidence from a traffic stop on September 12, 2020. Based on the testimony and exhibits, I make the following findings of fact.

Before this stop, DEA was investigating **Corbett** and Jackson. In May 2020, Agent Klutzaritz applied for a search warrant from this Court to collect communication content from a cellphone that he suspected Jackson used. *See* Gov't's Ex. 1. His affidavit explained that the Maine State Police seized methamphetamine from a Cooperating Defendant who said that it was for Jackson. *Id.* at 6. A woman identified Jackson as "Matti" **[**3]** and told Agent Klutzaritz that "Matti" sold narcotics from her apartment. *Id.* at 7. She also explained that "Matti" worked with "Chinx," and that the group was associated with Ronald Spencer's apartment in Bangor, Maine. *Id.* Later, Agent Klutzaritz reviewed text messages from a co-conspirator's cellphone, and he saw drug-related text messages with an individual who identified himself as "Matty." *Id.* at 8. Agent Klutzaritz obtained this search warrant, and he reviewed the cellphone's text messages, concluding that it was likely being used by "Matti" and "Chinx" to facilitate drug trafficking. *See* Gov't's Ex. 2 at 9. Next, Agent Klutzaritz applied for and obtained a search warrant permitting DEA to track the cellphone's location. Gov't's Ex. 2 at 15.

In June 2020, Agent Klutzaritz obtained search warrants to recover text messages for two cellphones used by a co-conspirator. Gov't's Ex. 3 at 8. Having reviewed those messages, Agent Klutzaritz requested and obtained a search warrant to monitor the location of a cellphone associated with "Chinx." *Id.* at 12. On September 10, 2020, Agent Klutzaritz saw that the phone was traveling from Quincy, Massachusetts, to Bangor, Maine. Gov't's Ex. 4 **[**4]** at 1. Suspecting that the vehicle would go to Spencer's residence in Bangor, Agent Klutzaritz set up surveillance there, and he saw a 2020 Jeep Cherokee with Florida license plates park down the street. *Id.* The Jeep was rented by **Corbett**. Two men exited the Jeep and entered the residence. *Id.* at 2. The next day, the cellphone traveled to Aroostook County, where Agent Klutzaritz suspected that "Chinx's" organization was supplying people with narcotics and potentially firearms in exchange for cash. On September 12, the cellphone was moving south on I-95, toward Massachusetts. Gov't's Ex. 5 at 1. Agent Klutzaritz contacted the Maine State Police and asked them to execute a "walled-off" stop in which the Maine State Police would identify a traffic infraction as a pretext to stop the Jeep without compromising the integrity of the DEA's investigation.

At about 1:02 p.m., Trooper Williams saw the Jeep traveling south on I-95 in Saco, Maine. Gov't's Ex. 7 at 0:36-0:40. Trooper Williams pulled onto the highway to follow the Jeep. He clocked the Jeep traveling at 75 miles per hour, five miles over the posted speed limit. *Id.* at 1:02-1:07; Gov't's Ex. 6 at 1. The Jeep passed **[*133]** vehicles in the left **[**5]** lane before making what Trooper Williams described as an unsafe lane change. Gov't's Ex. 7 at 1:43-1:47. Trooper Williams went behind the Jeep, activated his emergency lights, and stopped it. *Id.* at 2:00-2:20.

Trooper Williams went to the Jeep's passenger side, and he saw two men inside. *Id.* at 2:45. Trooper Williams identified Jackson as the driver and **Corbett** as the passenger and explained that he stopped them for speeding and for making an unsafe lane change. *Id.* at 2:45-3:30. Sergeant Schmidt arrived on the scene. Trooper Williams asked Jackson to step out of the vehicle, and he complied. *Id.* at 3:29-3:50. Trooper Williams asked Jackson if he had any weapons, and Jackson said that he had a knife, which he allowed Trooper Williams to retrieve before Trooper Williams pat-frisked him. *Id.* at 3:55-4:11. Sergeant Schmidt asked **Corbett** to step outside of the vehicle, and he pat-frisked **Corbett** for weapons. *Id.* at 4:23-5:04.

Trooper Williams and Jackson entered the police cruiser, where Trooper Williams began processing their information. Trooper Williams explained that he stopped Jackson for driving 75 miles per hour and making an unsafe lane change since he was too close to another vehicle. **[**6]** *Id.* at 4:40-5:00. Trooper Williams asked if the Jeep was a rental and if Jackson was authorized to drive it. Jackson explained that his name was not on the rental agreement and that **Corbett** rented it. *Id.* at 5:03-5:48. Trooper Williams asked Jackson where they were coming

---

[2] All seventeen individuals were indicted for conspiring to distribute and possess with the intent to distribute 50 grams or more of methamphetamine, 500 grams or more of a mixture or substance containing methamphetamine, and 400 grams or more of a mixture or substance containing fentanyl. *21 U.S.C. § 846*; *id.* *§§ 841(a)(1)*, *(b)(1)(A)(vi)*, *(viii)*.

from, and Jackson said that they went hiking yesterday, but he was not familiar with their whereabouts. *Id.* at 6:08-8:30. Jackson then explained that they were about an hour north of where they were pulled over and that **Corbett** would know where they went. Trooper Williams and Jackson exited the vehicle, and Trooper Williams asked **Corbett** where they went hiking. **Corbett** first said that he did not know where they were coming from, but he later said that they were near Augusta and that their trip was two or three days long. *Id.* at 8:42-8:55.

Sergeant Schmidt retrieved his K-9, Ibo, from his vehicle and brought him to the Jeep. *Id.* at 9:45-11:18. Ibo alerted on the Jeep's passenger side rear door within thirty seconds. *Id.* at 11:48. Trooper Williams explained that Ibo alerted, and the officers placed both men in handcuffs. *Id.* at 12:15-13:00. Trooper Williams searched the Jeep and found multiple bags of cash bundled together **[**7]** with different colored rubber bands. Trooper Williams removed Jackson's handcuffs and read him his *Miranda* rights. Gov't's Ex. 9 at 3:10-4:20. Jackson waived his rights and agreed to answer questions. Jackson said that the money was not his, and that he did not know who it belonged to. Trooper Williams asked Jackson where he worked, and Jackson said that he worked in construction, but that he was not currently working. *Id.* at 4:25-6:45. Sergeant Schmidt read **Corbett** his *Miranda* rights, and **Corbett** invoked his right to counsel. The officers seized the cash, which was later determined to be $57,225.

## DISCUSSION

Before turning to Defendants' motions to suppress, I first address the Defendants' joint motion for a conference of counsel, or in the alternative, for oral argument on their motions to suppress. Joint Mot., ECF No. 683. Trooper Williams was expected to testify at the suppression hearing, but shortly before the hearing, the Government learned that Trooper Williams was on leave for an indefinite period of time and thus unable to testify. The Government notified the Defendants' counsel shortly before the suppression hearing that Trooper Williams was not **[*134]** available to testify, and the **[**8]** Government instead called Sergeant Schmidt as a witness. At the end of the hearing, **Corbett** and Jackson requested an opportunity to cross-examine Trooper Williams. I explained that I would permit the Defendants to cross-examine Trooper Williams if he was able to testify in the immediate future, but I was not inclined to leave these motions to suppress in limbo forever. I instructed the Government to follow up with the Maine State Police about Trooper Williams' availability and update the Court by December 27, 2023. If Trooper Williams was unable to testify in the immediate future, I explained that I would take the motions under advisement because I had enough information to rule on the motions without prejudicing the Defendants. On December 27, the Government filed its notice with the Court, explaining that it contacted the State of Maine Attorney General's Office and the Maine State Police about Trooper Williams' availability and that Trooper Williams remained unavailable for an indefinite period of time. *See* Gov't's Notice Regarding Witness Availability, ECF No. 681 at 2.

Two days later, **Corbett** and Jackson filed their joint motion. They argue that Trooper Williams is central to the **[**9]** stop's legality and that his report was admitted over their objections.[3] The Defendants also attack Trooper Williams' credibility by observing that his police report did not state the real reason why he noticed the Jeep. The Defendants request that the Court schedule a conference of counsel to establish a schedule for them to independently investigate Trooper Williams' location and availability and to request and brief remedies. Alternatively, they request that I schedule oral arguments on these two motions to suppress. In response, the Government maintains that the Court has sufficient evidence, which was properly admitted, to rule on the motions.

In league with my previous remarks during the suppression hearing, I deny the Defendants' joint motion because I have sufficient evidence to decide the motions to suppress without prejudicing the Defendants.

Criminal defendants have "no presumptive right to an evidentiary hearing on a motion to suppress." *United States v. Cintron, 724 F.3d 32, 36 (1st Cir. 2013)* (citing *United States v. D'Andrea, 648 F.3d 1, 5 (1st Cir. 2011)*). A hearing "is required only if the movant makes a sufficient threshold showing that material facts are in doubt or dispute, and

---

[3] The Defendants also state that Trooper Williams' dashcam video, Gov't's Ex 7; Gov't's Ex. 9, was admitted over their objections. However, these exhibits were admitted without objection.

that such facts cannot reliably be resolved on a paper record." *United States v. Francois, 715 F.3d 21, 32 (1st Cir. 2013)* (quoting *United States v. Staula, 80 F.3d 596, 603 (1st Cir. 1996)*). The "defendant must show **[**10]** that there are factual disputes which, if resolved in his favor, would entitle him to the requested relief." *Id.* (quoting *Staula, 80 F.3d at 603*). During a suppression hearing, "apart from questions of privilege, the Federal Rules of Evidence do not apply." *United States v. Schaefer, 87 F.3d 562, 570 (1st Cir. 1996)* (citing *United States v. Matlock, 415 U.S. 164, 172-74, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974)*). Instead, "a judge presiding at a suppression hearing may receive and consider any relevant evidence, including affidavits and unsworn documents that bear indicia of reliability." *Id.*

There is sufficient evidence to decide these motions without testimony from Trooper Williams. While the Defendants **[*135]** attempt to cast Trooper Williams' report as uncredible because he did not explain that he was instructed to stop the Jeep, I find that his report is sufficiently reliable. Trooper Williams' report is consistent with his dashcam video, perhaps the most reliable source of evidence of what happened during the stop, as well as Sergeant Schmidt's testimony. To the extent that the Defendants contest Trooper Williams' proffered reasons for stopping the Jeep, namely for speeding and making an unsafe lane change, it is unnecessary to decide whether he had reasonable suspicion to stop the Jeep for these traffic infractions. As explained below, I have sufficient **[**11]** evidence to find that the stop was legal because Agent Klutzaritz had reasonable suspicion to stop the Jeep and his "directive to stop" it was "thus sufficient to attribute" his reasonable suspicion to Trooper Williams. *United States v. Balser, 70 F.4th 613, 621 (1st Cir. 2023)*.[4]

Having denied Defendants' joint motion, I turn to the merits of their motions to suppress. **Corbett** and Jackson argue that the stop was unconstitutional because it was invalid at its inception and because the officers' investigation exceeded its permissible scope and unlawfully prolonged the stop. Jackson also moves for suppression of his pre-*Miranda* statements and requests suppression of the cash seized, claiming that the officers did not have probable cause to seize it. I address each argument in turn.

**A. The Vehicle Stop**

The Defendants mount two challenges against the stop's validity. First, they argue that the stop was invalid at its inception because Trooper Williams did not have reasonable suspicion to believe that the Defendants violated a traffic regulation. Second, the Defendants argue that the officers' investigation exceeded its permissible scope and unlawfully extended the stop's duration. The Government defends the stop's validity on the grounds **[**12]** that Jackson violated traffic laws by speeding and making an unsafe lane change. Alternatively, the Government argues that the stop was legal based on Agent Klutzaritz instructing the Maine State Police to stop the Jeep. The Government also defends the officers' investigation as reasonable.

The *Fourth Amendment of the Constitution* prohibits "unreasonable searches and seizures." *U.S. Const. amend. IV*. This right "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002)*. "A traffic stop constitutes a seizure of 'everyone in the vehicle'" and "thus must be supported by reasonable suspicion that a traffic violation has occurred," *United States v. Chaney, 584 F.3d 20, 24 (1st Cir. 2009)* (quoting *Brendlin v. California, 551 U.S. 249, 255, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007)*), or **[*136]** "reasonable, articulable suspicion of an individual's involvement in

---

[4] Insofar as the Defendants suggest that Trooper Williams' report and dashcam footage should be stricken from the record because he is unavailable, they are mistaken. Such a remedy is improper for a suppression hearing, where the *Sixth Amendment* right to confront witnesses has not attached. *See United States v. Mitchell-Hunter, 663 F.3d 45, 51-53 (1st Cir. 2011)*; *see also McCray v. Illinois, 386 U.S. 300, 313-14, 87 S. Ct. 1056, 18 L. Ed. 2d 62 (1967)* (holding that the government's failure to produce an informant at a suppression hearing did not unconstitutionally deprive the defendant of his *Sixth Amendment* right to confrontation and cross-examination). I also note that the Defendants offered some of Trooper Williams' text messages into evidence, though they express no concern about these exhibits. *See* Def.'s Ex. 1 (text messages between Agent Klutzaritz and Maine State Troopers); Def.'s Ex. 2 (text messages between Agent Klutzaritz and Trooper Williams).

some criminal activity." *United States v. Dion, 859 F.3d 114, 124 (1st Cir. 2017)* (citing *Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)*).

During a lawful traffic stop, a police officer may "require the driver of a car . . . to step out of his vehicle." *United States v. Coplin, 463 F.3d 96, 102 (1st Cir. 2006)*; *see also Pennsylvania v. Mimms, 434 U.S. 106, 111, 98 S. Ct. 330, 54 L. Ed. 2d 331 & n.6 (1977)* (per curiam). A "pat-frisk may accompany an investigatory stop whenever an officer 'has reason to believe that the suspect is armed and dangerous.'" *United States v. Pontoo, 666 F.3d 20, 30 (1st Cir. 2011)* (quoting *Adams v. Williams, 407 U.S. 143, 146, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972)*); *see also Terry, 392 U.S. at 27*. The officer must have "some articulable, reasonable suspicion that the" person to be frisked "may be dangerous." *United States v. McGregor, 650 F.3d 813, 820 (1st Cir. 2011)*.

"[R]easonable suspicion must be premised upon **[**13]** 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Pontoo, 666 F.3d at 27-28* (quoting *United States v. Cortez, 449 U.S. 411, 417-18, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)*); *see also United States v. Hensley, 469 U.S. 221, 229, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985)* (explaining that there must be "specific and articulable facts" supporting reasonable suspicion). The existence of reasonable suspicion depends on the "totality of the surrounding circumstances," *Dion, 859 F.3d at 124*, with "a measurable degree of deference to the perceptions of experienced law enforcement officers," *United States v. Ruidiaz, 529 F.3d 25, 29 (1st Cir. 2008)*. Reasonable suspicion "may be based on the collective knowledge of several officers." *United States v. Cruz-Rivera, 14 F.4th 32, 44 (1st Cir. 2021)* (first citing *Hensley, 469 U.S. at 231-32*; and then citing *United States v. Barnes, 506 F.3d 58, 62-63 (1st Cir. 2007)*). Thus, courts "look to the collective information known to the law enforcement officers participating in the investigation rather than isolate the information known by the individual arresting officer." *United States v. Azor, 881 F.3d 1, 8 (1st Cir. 2017)* (citing *Illinois v. Andreas, 463 U.S. 765, 772 n.5., 103 S. Ct. 3319, 77 L. Ed. 2d 1003 (1983)*).

Authority for a traffic stop "ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States, 575 U.S. 348, 354, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015)* (citing *United States v. Sharpe, 470 U.S. 675, 686, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985)*). The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Id.* (quoting *Illinois v. Caballes, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005)*). "In carrying out the seizure's 'mission,' an officer is also permitted to undertake those 'ordinary inquiries incident **[**14]** to [the traffic] stop," "which include 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.'" *United States v. Clark, 879 F.3d 1, 4 (1st Cir. 2018)* (alteration in original) (quoting *Rodriguez, 575 U.S. at 355*). Officers may also "inquire into the driver's itinerary." *Dion, 859 F.3d at 125*. "[W]hile an officer's actions must bear some relation to the purpose of the original stop," officers may shift their "focus and increase the scope of" their "investigation by degrees if" their "suspicions mount during the course of the detention." *United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001)*. **[*137]** There "is no talismanic time beyond which any stop initially justified on the basis of [reasonable suspicion] becomes an unreasonable seizure under the *[F]ourth [A]mendment*." *United States v. Quinn, 815 F.2d 153, 157 (1st Cir. 1987)* (quoting *United States v. Davies, 768 F.2d 893, 901 (7th Cir. 1985)*). Instead, the reasonableness of a stop's duration is evaluated on a case-by-case basis. *See, e.g., United States v. Ramdihall, 859 F.3d 80, 88 (1st Cir. 2017)* (holding that an 82-minute stop was reasonable under the circumstances).

### 1. The Stop's Inception

I reject the Defendants' arguments that the initial stop was illegal because Agent Klutzaritz's reasonable suspicion that the Defendants were drug trafficking can be imputed to Trooper Williams.

This was not an ordinary traffic stop; instead, it was part of DEA's investigation into **[**15]** the Defendants. As part of his investigation, Agent Klutzaritz asked the Maine State Police to find a pretextual reason to stop the Jeep. The

First Circuit has repeatedly held that one officer's "directive to stop" someone is "sufficient to attribute" the directing officer's reasonable suspicion to the officer initiating the stop. *See, e.g., Balser, 70 F.4th at 621*; *see also United States v. Meade, 110 F.3d 190, 196-98 (1st Cir. 1997)* (imputing a directing officers' probable cause to arrest the defendant to the arresting officer when the directing officer commanded the arresting officer to "locate the brown car and arrest the third man"); *United States v. Paradis, 802 F.2d 553, 557 (1st Cir. 1986)* (holding that an arrest by an officer "admittedly lack[ing] probable cause" was constitutional because DEA agents with knowledge giving rise to probable cause instructed the officer to make the arrest). In these so-called "[v]ertical collective knowledge cases," *Balser, 70 F.4th at 619*, the directing officer must independently have reasonable suspicion. *See Meade, 110 F.3d at 193-94* ("[W]hen a law enforcement officer with information amounting to probable cause directs an officer who lacks the knowledge to make the arrest, we 'impute' to the arresting officer the directing officer's knowledge."); *see also United States v. Massenburg, 654 F.3d 480, 493 (4th Cir. 2011)* ("[T]he collective-knowledge doctrine simply directs us to substitute **[\*\*16]** the knowledge of the *instructing officer or officers* for the knowledge of the *acting officer*; it does not permit us to aggregate bits and pieces of information from among myriad officers, nor does it apply outside the context of communicated alerts or instructions."). Thus, in *Balser*, the First Circuit held that there was probable cause to stop, search, and seize the defendant's car because the directing officer had probable cause and instructed another officer to make the stop. *70 F.4th at 621*.

This stop was constitutional because Agent Klutzaritz had reasonable suspicion to stop the Jeep and he instructed the Maine State Police to stop it. Beforehand, Agent Klutzaritz successfully obtained numerous search warrants—issued upon findings of probable cause—that Jackson and **Corbett** were trafficking drugs. One of these search warrants permitted Agent Klutzaritz to track the location of a cellphone associated with "Chinx." Gov't Ex. 3. On September 10, Agent Klutzaritz monitored this cellphone's location and saw that it was traveling from Quincy, Massachusetts, to Bangor. Gov't Ex. 4 at 1. He set up surveillance at a suspected co-conspirator's residence, where he thought that "Chinx" would go. *Id.* The white **[\*\*17]** Jeep Cherokee, rented by **Corbett**, parked on that street, and two men went inside the residence. *Id.* at 2. The next day, Agent Klutzaritz saw that **[\*138]** the cellphone traveled to Aroostook County, where, based on his investigation, he suspected that they were distributing narcotics and potentially firearms in exchange for cash, before returning to Bangor. Gov't Ex. 4 at 1. Based on his investigation, Agent Klutzaritz had "a particularized and objective basis" that the Defendants used the Jeep to distribute narcotics in Maine that weekend. *Pontoo, 666 F.3d at 27* (quoting *Cortez, 449 U.S. at 417*); *see also United States v. Tom, 988 F.3d 95, 99 (1st Cir. 2021)* (holding that there was reasonable suspicion that a car's occupants were involved in a drug transaction when they had "specific knowledge" that one of the occupants "sold drugs" that day).[5]

Because Agent Klutzaritz had reasonable suspicion that the Jeep was involved in drug trafficking, his instruction to stop the Jeep conferred reasonable suspicion to Trooper Williams. *See Balser, 70 F.4th at 621*. Having concluded that the stop was valid at its inception, I turn to Defendants' arguments that the officers' investigation exceeded its permissible scope and extended the stop's duration.

### *2. The Scope of the Officers' Investigation and the Stop's Duration*

---

[5] In his reply brief, Jackson argues that Agent Klutzaritz did not have reasonable suspicion that the Defendants engaged in criminal activity while in Maine. More specifically, Jackson observes that Agent Klutzaritz was not receiving text messages from **Corbett**'s phone that weekend indicating that the Jeep was involved in drug trafficking. Reply, ECF No. 650 at 3-4. While text messages like these would have strengthened the Government's case, the absence of such messages is not fatal because "the requirement of reasonable suspicion is not a requirement of absolute certainty: 'sufficient probability, not certainty, is the touchstone of reasonableness under the *Fourth Amendment*.'" *New Jersey v. T.L.O., 469 U.S. 325, 346, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985)* (quoting *Hill v. California, 401 U.S. 797, 804, 91 S. Ct. 1106, 28 L. Ed. 2d 484 (1971)*).

**Corbett [**18]** and Jackson also argue that the officers' investigation exceeded its permissible scope and impermissibly extended the stop. More specifically, they critique the officers' decision to order them outside of the vehicle, pat-frisk them, interrogate them, and have a K-9 sniff the vehicle.

I reject Defendants' arguments that this brief stop of about nine minutes (before the K-9 alerted on the Jeep) was somehow impermissibly long. After stopping the Jeep, Trooper Williams explained why he stopped them, checked the Defendants' IDs and the vehicle's registration, and asked about the vehicle's rental status. Gov't's Ex. 7 at 2:45-5:50. All of this was among "those 'ordinary inquiries incident to [the traffic] stop.'" *Clark, 879 F.3d at 4* (alteration in original) (quoting *Rodriguez, 575 U.S. at 355*). Because officers "may, as a matter of course" require "the driver of a car lawfully stopped for a suspected traffic violation" to exit his vehicle, Trooper Williams did not exceed the permissible scope of his investigation by having Jackson exit the vehicle. *Coplin, 463 F.3d at 102*. The same is true with respect to Sergeant Schmidt asking **Corbett** to exit the vehicle. *See Maryland v. Wilson, 519 U.S. 408, 415, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997)* (holding that "an officer making a traffic stop may order passengers to get out of the car pending **[**19]** completion of the stop").

The officers' decision to pat-frisk the Defendants did not exceed the permissible scope of investigation or unlawfully extend the stop. Having been instructed to stop the Jeep because of its involvement in drug trafficking, the officers had reasonable suspicion to believe that the men were **[*139]** "armed and dangerous." *Pontoo, 666 F.3d at 30*; *see also United States v. Arnott, 758 F.3d 40, 45 (1st Cir. 2014)* (holding that a frisk was permissible when, among other facts, the "police had strong reasons to believe that the occupants" had "just concluded a drug-related transaction" and describing the "connection between drugs and violence" as "legendary").[6]

Insofar as the Defendants critique the officers for inquiring into where they were coming from, their arguments are off the mark because officers may ask about a driver's itinerary. *See Chhien, 266 F.3d at 10* (reasoning that "travel questions" "were within the ambit of" an officer's authority to detain the defendant and that "any effect they might have had on the duration of the detention" was permissible). Furthermore, the Defendants' inability to explain where they came from justified additional questions. *See United States v. Lamela, 942 F.2d 100, 102 (1st Cir. 1991)* (reasoning that "inconsistent responses to routine questions relating to the purpose of [the defendant's] **[**20]** travel" contributed to reasonable suspicion).

I discern no error from the officers' decision to have the K-9 sniff the Jeep. About seven-and-a-half minutes into the stop, Sergeant Schmidt went to get his K-9 from his vehicle. Gov't's Ex. 7 at 9:45-11:20. Within about ninety seconds, the K-9 was sniffing around the vehicle, and it alerted about twenty seconds later. *Id.* at 11:20-11:48. I cannot see how such a short period of time was unreasonable, especially in light of the officers' being told that the Jeep was likely involved in drug trafficking. Any delay related to the K-9 sniff was no "longer than reasonably needed to investigate the possible illegal activity." *Ramdihall, 859 F.3d at 88*.[7]

For these reasons, I reject the Defendants' arguments that the stop was invalid at its inception and that the scope of the officers' investigation was impermissible and unlawfully prolonged the stop. I next turn to Jackson's argument that his pre-*Miranda* statements should be suppressed.

## B. Roadside Questioning

---

[6] As I have explained in ruling on Jackson's other motion to suppress, even if a pat-frisk was unsupported by reasonable suspicion, I would conclude that such an error is harmless. *See United States v. Jackson, No. 1:22-CR-00023-LEW, 2024 U.S. Dist. LEXIS 16583, 2024 WL 357005, at *5 n.6 (D. Me. Jan. 31, 2024)*.

[7] The Defendants do not challenge the K-9's reliability. *See generally Florida v. Harris, 568 U.S. 237, 133 S. Ct. 1050, 185 L. Ed. 2d 61 (2013)*. Once the K-9 alerted, the officers had probable cause to search the vehicle, and the scope of a permissible investigation increased. *See United States v. Brown, 500 F.3d 48, 57 (1st Cir. 2007)* ("[A] reliable canine sniff outside a vehicle can provide probable cause to search the vehicle.").

Jackson seeks suppression of his pre-*Miranda* statements during the traffic stop because he was not *Mirandized*. The Government objects to suppression because Jackson was not in custody.

The *Fifth Amendment of the Constitution* provides: **[\*\*21]** "No person . . . shall be compelled in any criminal case to be a witness against himself." *U.S. Const. amend. V*. To safeguard the right against self-incrimination, the United States Supreme Court held in *Miranda v. United States* that a defendant's statements during a custodial interrogation are inadmissible during the prosecution's case in chief if the defendant was not advised of his *Miranda* rights and did not knowingly and intelligently waive his rights. *384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)*.

 **[\*140]** For purposes of *Miranda*, a defendant is in custody if a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields, 565 U.S. 499, 509, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012)* (alteration in original) (quoting *Thompson v. Keohane, 516 U.S. 99, 112, 116 S. Ct. 457, 133 L. Ed. 2d 383 (1995)*). Given this definition of custody, "*Miranda* warnings are [generally] not required during routine stops involving traffic matters." *United States v. Campbell, 741 F.3d 251, 265 (1st Cir. 2013)*; *see also Berkemer v. McCarty, 468 U.S. 420, 439, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984)* (explaining why "the usual traffic stop is more analogous" to a *Terry* stop rather than a formal arrest). But *Miranda* warnings become necessary when "a suspect has been 'subjected to restraints comparable to those associated with a formal arrest.'" *Campbell, 741 F.3d at 266* (quoting *Berkemer, 468 U.S. at 441*).

The *Miranda* custody analysis entails two steps. First, in determining whether a reasonable person would have felt at liberty to terminate the interrogation and **[\*\*22]** leave, a court considers "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *Cruz-Rivera, 14 F.4th at 48* (quoting *United States v. Melo, 954 F.3d 334, 340 (1st Cir. 2020)*); *see also United States v. Ellison, 632 F.3d 727, 729 (1st Cir. 2010)* ("[B]ut a suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of *Miranda*."); *United States v. Jones, 187 F.3d 210, 218 (1st Cir. 1999)* ("[N]o single element dictates the outcome of this analysis ...."). Second, a court considers "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Cruz-Rivera, 14 F.4th at 48* (quoting *Melo, 954 F.3d at 340*).

Suppression of Jackson's pre-*Miranda* statements is inappropriate because Jackson was not in custody. Under the first step of the custody analysis, the First Circuit has explained that public highways are "a neutral setting," so "police officers are not in a position to dominate as they are, for example, [when in] an interrogation room at a jailhouse." *Jones, 187 F.3d at 218*. *But see Cruz-Rivera, 14 F.4th at 49* ("Where, as here, the police are controlling the situation the neutrality of the site is arguably brought into **[\*\*23]** question."). Jackson interacted with two officers throughout the stop. *See United States v. Crooker, 688 F.3d 1, 12 (1st Cir. 2012)* (holding that a defendant was not in custody when, among other factors, "no more than two agents were in direct conversation with" the defendant "at one time"); *United States v. Hughes, 640 F.3d 428, 437 (1st Cir. 2011)* (reasoning that a roughly ninety-minute interview, with a twenty-minute pause to summon an EMT was "relatively short" and weighed against a finding that the defendant was in custody). While Jackson entered the police cruiser and talked with Trooper Williams, "the First Circuit has said when a police officer asks a citizen to enter a police car in connection with the traffic stop, this alone does not 'elevate the detention beyond a *Terry* stop.'" *United States v. Carr, 534 F. Supp. 3d 143, 150 (D. Me. 2021)* (quoting *United States v. Dunbar, 553 F.3d 48, 56 (1st Cir. 2009)*). Lastly, Jackson was not handcuffed when he made the pre-*Miranda* statements. Thus, Jackson makes a weak showing on the first step of the custody analysis.

 **[\*141]** Turning to the second step, Jackson fares no better because this stop, at least before Jackson was handcuffed and then *Mirandized*, was "more akin to a routine traffic stop" than the ordinary custodial interrogation. *Campbell, 741 F.3d at 266*; *see also id.* ("[W]e also have recognized that, as 'a general rule, *Terry* stops do not implicate the requirements of *Miranda*, because *Terry* stops, **[\*\*24]** though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates *Miranda* warnings.'"

(quoting *United States v. Streifel, 781 F.2d 953, 958 (1st Cir. 1986)*)). Because Jackson was not in custody, his pre-*Miranda* statements will not be suppressed.[8]

**C. Cash Seizure**

Jackson argues that the seizure of $57,255 was unconstitutional because the officers lacked probable cause that the cash was affiliated with drug trafficking. The Government argues that Jackson lacks standing to challenge the cash seizure because he repeatedly denied ownership of the cash.[9] Alternatively, the Government maintains that the officers had probable cause that the cash came from drug sales.

The *Fourth Amendment* forbids unreasonable seizures. *U.S. Const. amend IV*. This right "extends only to those places and interests in which the defendant has a reasonable expectation of privacy." *United States v. Lewis, 40 F.3d 1325, 1333 (1st Cir. 1994)*. Thus, "the defendant carries the burden of making a threshold showing that he has 'a reasonable expectation of privacy in the area searched and in relation to the items seized.'" *United States v. Stokes, 829 F.3d 47, 51 (1st Cir. 2016)* (quoting *United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988)*). This requirement that a person "have a cognizable *Fourth Amendment* interest in the place searched before seeking relief for an unconstitutional search" is referred to as standing. *See* **[\*\*25]** *Byrd v. United States, 584 U.S. 395, 410, 138 S. Ct. 1518, 200 L. Ed. 2d 805 (2018)*.

Seizures of personal property are generally "*per se* unreasonable within the meaning of the *Fourth Amendment* unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place, 462 U.S. 696, 701, 103 S. Ct. 2637, 77 L. Ed. 2d 110* **[\*142]** *(1983)*. However, "the plain view doctrine permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself." *United States v. Gamache, 792 F.3d 194, 199 (1st Cir. 2015)*. "[F]or purposes of the plain view doctrine, the relevant question is whether the officers had probable cause to believe that the seized objects were evidence of some" crime. *United States v. Sanchez, 612 F.3d 1, 5 (1st Cir. 2010)*.

Thus, officers may seize an object without a warrant when "probable cause exists [because] the incriminating character of [the] object is immediately apparent to the police." *United States v. Paneto, 661 F.3d 709, 714 (1st Cir. 2011)* (second alteration in original) (quoting *Sanchez, 612 F.3d at 5*). Officers "need not be certain of the incriminating character of an object, but, rather, must have a belief based on a 'practical, nontechnical probability' that the object is evidence of a crime." *Id.* (quoting *United States v. Giannetta, 909 F.2d 571, 579 (1st Cir. 1990)*); *see also Minnesota v. Dickerson, 508 U.S. 366, 375, 113 S. Ct. 2130, 124 L. Ed. 2d 334 (1993)*.

---

[8] As Trooper Williams was removing Jackson's handcuffs, he asked Jackson how old he was, and Jackson answered that he was twenty-four years old. Gov't's Ex. 9 at 3:20-3:25. This was before Trooper Williams read Jackson his *Miranda* rights. Having been handcuffed, Jackson was arguably in custody at this point. *See United States v. Candelario-Santana, 834 F.3d 8, 18 (1st Cir. 2016)*. "[T]he level of physical control officers exercise over a suspect 'carries the most weight' in determining whether such suspect was 'in custody' at the time of interrogation." *United States v. Davis, 773 F.3d 334, 340 (1st Cir. 2014)* (quoting *United States v. Mittel-Carey, 493 F.3d 36, 40 (1st Cir. 2007)*). Thus, to demonstrate that a suspect is not in custody after being handcuffed, the Government must "point to some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm." *United States v. Acosta-Colon, 157 F.3d 9, 19 (1st Cir. 1998)*. Because the parties have not sufficiently briefed whether Jackson was in custody after he was handcuffed and asked his age, my ruling does not extend to this one statement. If Jackson seeks suppression of his answer, I welcome his additional arguments.

[9] Because **Corbett** does not challenge the cash seizure, I express no opinion as to whether **Corbett** has standing to challenge the cash seizure.

I conclude that Jackson lacks standing to challenge the cash seizure because **[\*\*26]** he disclaimed any ownership interest in the cash. Alternatively, I find that the officers had probable cause to seize the cash.

Having disclaimed any ownership of the cash, Jackson cannot now assert a cognizable *Fourth Amendment* interest in the cash. After Jackson was unhandcuffed and Trooper Williams read Jackson his *Miranda* rights, Trooper Williams asked Jackson who the cash belonged to, and Jackson said that the cash was not his and that he did not know who it belonged to. Gov't's Ex. 9 at 4:23-5:56; Gov't's Ex. 6 at 2. Thus. Jackson does not have a cognizable *Fourth Amendment* interest in the cash. *See United States v. De Los Santos Ferrer, 999 F.2d 7, 9 (1st Cir. 1993)* ("It is well established that one who abandons or disclaims ownership of an item forfeits any claim of privacy in its contents, and that as to that person the police may search the item without a warrant."); *see also Lewis, 40 F.3d at 1333* (holding that the defendants lacked standing "because they failed to assert any privacy interest" "in support of their motion to suppress").

Even if Jackson had standing to challenge the cash seizure, the officers had probable cause that the cash came from illegal drug sales. Drawing on my analysis above, the officers had many reasons to believe that the Defendants were using the Jeep to traffic drugs **[\*\*27]** while in Maine. The discovery of a large quantity of cash, which the Defendants could not reasonably explain, further confirmed their suspicions, giving the officers a "practical, nontechnical probability" that the cash was evidence of drug-related crimes. *Paneto, 661 F.3d at 714* (quoting *Giannetta, 909 F.2d at 579*); *see also United States v. $21,510.00 in U.S. Currency, 144 F. App'x 888, 889 (1st Cir. 2005)* (per curiam) ("A large amount of hidden currency 'is strong evidence of . . . an illicit connection to drug trafficking.'" (quoting *United States v. One Hundred Forty-Nine Thousand Four Hundred Forty-Two & 43/100 Dollars, 965 F.2d 868, 877 (10th Cir. 1992)*)).

### CONCLUSION

For the foregoing reasons, **Corbett**'s Motion to Suppress (ECF No. 592); Jackson's Motion to Suppress (ECF No. 595); and the Defendant's Joint Motion for Conference of Counsel, or in the alternative, for Oral Argument on Motion to Suppress (ECF No. 683) are **DENIED**.

Dated this 7th day of February, 2024.

/s/ Lance E. Walker

UNITED STATES DISTRICT JUDGE

---

**End of Document**

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:22-cr-00023-SDN-1 |
| DAQUAN CORBETT, and | ) | 1:22-cr-00023-SDN-2 |
| DAVISTON JACKSON, | ) | |
| | ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In December 2024, the Court held a two-week bench trial in this matter. Based on the evidence presented at trial, the Court makes the following findings of fact and conclusions of law.

**PROCEDURAL STATEMENT OF CASE**

On February 9, 2022, a federal grand jury returned a six-count Indictment against seventeen individuals. Defendants Daquan Corbett and Daviston Jackson ("Defendants") were charged along with the other fifteen defendants in Count One of the Indictment with conspiracy to distribute 50 grams or more of methamphetamine, 500 grams or more of a substance containing methamphetamine, and 400 grams or more of a substance containing fentanyl,[1] from January 1, 2018, to December 31, 2021, in the District of Maine, in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1), (b)(1)(A)(vi), (b)(1)(A)(viii).

---

[1] The Indictment used the chemical name for fentanyl, N-phenyl-n-[1-(2-phenylethyl)-4-piperidinyl] propanamide.

1

**ADD11**

The matter was scheduled for jury selection and trial in early September 2024, but was continued at Defendants' request. The Court reset jury selection for November 6, 2024. On that day, Defendants moved to continue jury selection and to obtain data from the Clerk's office regarding the jury selection process, which Defendants indicated they wanted to challenge based on the racial composition of the jury. The Court granted the motion to continue and granted requests for jury selection data. On November 21, 2024, Defendants moved to dismiss the jury pool as not a fair and impartial collection of jurors. The Court orally denied the motion on November 26, 2024. ECF No. 886; *see* ECF No. 890 (subsequent written order). The same day, with the Government's consent, both Mr. Corbett and Mr. Jackson waived their right to a jury trial and executed written waivers thereof. ECF Nos. 887–88. The Court granted their request and began a bench trial on December 3, 2024, that ended on December 16, 2024.

During trial, the Court heard from forty-nine witnesses and saw hundreds of pages of exhibits. Based on that evidence, the Court makes the following findings of fact.

### FINDINGS OF FACT[2]

The evidence shows Mr. Corbett and Mr. Jackson conspired with a series of subsidiary dealers in Maine to distribute massive quantities of methamphetamine and fentanyl and other narcotics from 2018 through 2021.[3] Mr. Corbett, Mr. Jackson, and those dealers mutually understood and tacitly agreed to distribute the drugs Mr. Corbett

---

[2] These findings of fact are based on the testimony of the numerous witnesses, including many cooperating co-conspirators, that the Court found credible, as well as exhibits the court found credible and corroborating.

[3] The Court considers whether or not the Government has proven beyond a reasonable doubt each Defendant's culpability on an individual basis. However, because Mr. Corbett and Mr. Jackson participated together in the conspiracy the Court occasionally refers to them together when describing facts relating to both Mr. Corbett and Mr. Jackson.

**ADD12**

and Mr. Jackson supplied. Many of the dealers testified to the roles they played in the conspiracy—and to Mr. Corbett and Mr. Jackson's central position therein as the suppliers of those drugs.

As the Court explains further below, Mr. Corbett and Mr. Jackson conspired with numerous co-conspirators, including Danielle McBreairty, Sarah McBreairty, Nikolas Raines, Shelby Loring, Justin Warman, Carol Gordon, James Valiante, Blaine Footman, Nicole Footman, John Miller, Joshua Young, Aaron Rodgers, Joshua Jerrell, and others to distribute methamphetamine and fentanyl. Some co-conspirators, including Danielle McBreairty, Sarah McBreairty, Nikolas Raines, Shelby Loring, Justin Warman, Carol Gordon, and James Valiante purchased narcotics directly from Mr. Corbett and Mr. Jackson for the purpose of using and distributing the drugs. Some co-conspirators, including Blaine Footman, Nicole Footman, John Miller, Joshua Young, Aaron Rodgers, and Joshua Jerrell used and distributed narcotics supplied by other co-conspirators whom Mr. Corbett and Mr. Jackson had supplied. Throughout the conspiracy, Mr.

3

**ADD13**

Corbett used the alias "Chinx"[4] and Mr. Jackson used the alias "Matty."[5] The Court finds

that Chinx is Mr. Corbett and Matty is Mr. Jackson.[6]

---

[4] In their trial testimony, Nicole Ferree, Nikolas Raines, Justin Warman, Carol Gordon, and Shelby Loring identified Mr. Corbett in court as the person they knew as Chinx. On cross-examination, Ms. Loring admitted she also sometimes used the word Chinx in text and Facebook messages to refer to both Mr. Corbett and Mr. Jackson together. Sarah McBreairty and James Valiante identified Mr. Corbett as Chinx in a photo taken from Mr. Corbett's phone. Gov't Ex. 63. Sarah McBreairty also identified Chinx's voice on a voice recording on calls between Danielle McBreairty (Sarah's sister) and Chinx (at the number *6099) from the Penobscot County Jail as belonging to Chinx.

In addition, comparing GPS tracking data of Chinx's phone ending in *6099, *see infra* note 6, to physical surveillance of a vehicle rented by Mr. Corbett further corroborates Mr. Corbett's identity. The location data shows phone *6099 was in the same location as Mr. Corbett's vehicle over the period from September 10, 2020, to September 12, 2020. Indeed, on September 12, 2020, after DEA Agent Brian Klutzartiz stopped following Mr. Corbett's vehicle, police were able to relocate and stop the vehicle, and thereafter identify Mr. Corbett and Mr. Jackson as the occupants in the vehicle going southbound on Interstate 95 using the GPS tracking data. Police recovered approximately $57,000 in cash, bundled in smaller stacks of money wrapped in rubber bands, from multiple locations inside the vehicle occupied by Mr. Corbett and Mr. Jackson.

[5] In their trial testimony, Nicole Ferree, Nikolas Raines, Justin Warman, Carol Gordon, and Shelby Loring identified Mr. Jackson in court as the person they knew as Matty. In addition, Officer Michael Pina responded to Carol Gordon's house after a 9-1-1 hangup call where Ms. Gordon identified the individual with her as Matty. That individual identified as Matty then produced to Officer Pina several bank cards bearing the name Daviston Jackson.

[6] Mr. Corbett and Mr. Jackson used multiple phones throughout the conspiracy, which further corroborate their identity and their culpability. The Court finds Mr. Corbett used at least four phone numbers, with numbers ending in *6099, *7140, *3337, and *4537:

- Danielle McBreairty made eight recorded calls to number *6099 from jail, and Sarah McBreairty identified the voice on the end of *6099 as Chinx. GPS tracking of this phone aligned with the location of a car rented by Mr. Corbett and led police to the walled-off stop of Mr. Corbett (and Mr. Jackson) on September 12, 2020.
- Nikolas Raines testified Chinx gave Mr. Raines the number *7140 and Mr. Raines entered it into his contact list as "Chinx8." Carol Gordon testified Chinx used number *7140.
- Sarah McBreairty testified number *3337 belonged to Chinx.
- Justin Warman testified number *4537 belonged to Chinx.

The Court finds Mr. Jackson used at least four phones, with numbers ending in *9645, *3105, *3939, and *3243:

- Number *9645 was registered to Mr. Jackson. Number *9645 was also listed on Hertz and Enterprise car rental records for vehicles rented to Mr. Jackson. Mr. Jackson also gave number *9645 to New Hampshire State Police Trooper Geoffrey Miller during a traffic stop on May 27, 2020.

4

**ADD14**

## I.  Distributors in the Conspiracy

### A.  Nikolas Raines

Nikolas Raines first met Mr. Corbett in the fall of 2019 after Wayne Smith introduced them. During that first meeting, Mr. Raines bought crack and fentanyl from Mr. Corbett. Mr. Raines continued to buy narcotics for further distribution from Mr. Corbett a few times per week for the next few months until they had a falling out. Mr. Raines once purchased 100 grams of fentanyl from Mr. Corbett.

Mr. Raines bought drugs from Mr. Corbett at an apartment on Sanford Street in Bangor owned by Ron Spencer, referred to by multiple witnesses as "Shoes Off."[7] Gov't Exs. 30, 32A. Numerous co-conspirators also purchased drugs from Mr. Corbett and Mr. Jackson at the same "Shoes Off"/Sanford Street apartment, including Justin Warman and Shelby Loring. Indeed, Mr. Raines remembered being at the Sanford Street apartment with Ms. Loring, Mr. Corbett, and Mr. Jackson around February or March of 2020.

---

- Number *3105 was registered to Mr. Jackson. Tamara Davis testified that number *3105 was Mr. Jackson's phone number. She also saved number *3105 in her phone as "dj." In a text message on September 21, 2019, Ms. Davis referred to the person using number *3105 as "Daviston." Gov't Ex. 31B at 7. Ms. Davis testified that she was texting with Mr. Jackson and making plans to visit him in Maine throughout the day on September 20th and 21st, 2019, which is borne out by her messages with number *3105.
- Carol Gordon testified that number *3939 belonged to Matty. In response to a text message from an unknown number asking, "Who this anyway M or C?", the user of phone *3939 answered, "It's Matty." Gov't Ex. 72A at 6–7. In Danielle McBreairty's phone, number *3939 appears in her contact list as "the brothers."
- Justin Warman and Mr. Raines both testified Matty used number *3243. Mr. Raines entered number *3243 into his contact list as "Matty Chinx." Shelby Loring told Wayne Smith by Facebook message in June 2020 that number *3243 was "Matty's new number". *See* Gov't Ex. 110L. Matty gave Mr. Warman the number *3243 which Mr. Warman entered into his contact list as "Matty Chinx New."

[7] Mr. Spencer's Sanford Street apartment got its nickname because visitors had to take their shoes off before entering the apartment. The apartment door bore a sign reading "Shoes Off Outside." Gov't Ex. 30. Nikolas Raines, Shelby Loring, Carol Gordon, Justin Warman, Nicole Ferree, Sarah McBreairty, James Valiante, and Agent Brian Klutzartiz all identified a photo of the Sanford Street apartment in Government's Exhibit 32A.

**ADD15**

Mr. Raines corroborated that Mr. Corbett worked with two other people, including Mr. Jackson—who Mr. Raines knew as Matty. Through their drug dealing, Mr. Raines got to know both Mr. Corbett and Mr. Jackson. At first, Mr. Raines bought drugs only from Mr. Corbett. Later, he sometimes bought drugs directly from Mr. Jackson. If Mr. Raines had a discrepancy or a problem when purchasing the narcotics, he would reach out to Mr. Corbett, who would tell Mr. Jackson how to resolve the problem.

Mr. Corbett told Mr. Raines that Mr. Corbett got his drugs from Massachusetts and transported them to Maine by car. At one point, Mr. Raines travelled to Massachusetts to purchase narcotics from people who Mr. Corbett set him up with.

Text messages between Mr. Raines and Mr. Corbett and Mr. Jackson further support the Court's finding that Mr. Raines conspired with Mr. Corbett and Mr. Jackson to distribute narcotics.[8] Gov't Exs. 83A–C. These text conversations are replete with discussions about their drug distribution conspiracy.[9] For example, in one exchange, Mr. Raines asked Mr. Jackson for "work," which, according to the testimony of Mr. Raines and others, meant Mr. Raines was looking for drugs. Gov't Ex. 83B at 6. In another exchange, Mr. Jackson asked if Mr. Raines "came up with the bread yet," meaning Mr. Raines owed Mr. Jackson money for drugs. Gov't Ex. 83B at 7. In yet another text exchange, Mr. Raines messaged Mr. Jackson, "Yo is that ice cream still at the crib?" to which Mr. Jackson replied, "Tonight." Gov't Ex. 83B at 43. According to Mr. Raines and others, ice cream is a slang term for methamphetamine. Mr. Jackson directed Mr. Raines

---

[8] In these exchanges, Mr. Raines texted with numbers *3243 (Mr. Jackson), *3939 (Mr. Jackson), and *7140 (Mr. Corbett). *See supra* note 6. Police extracted these messages from Mr. Raines's phone, which Bangor Police Detective Steve Pelletier seized from Mr. Raines on June 17, 2020.

[9] The Court presents messages exactly as written.

**ADD16**

to "No shoes" via text message, referring to the apartment on Sanford Street where Mr. Raines purchased narcotics from Mr. Corbett and Mr. Jackson. On May 10, 2020, Mr. Jackson again told Mr. Raines by text to "Go to shoes off give him 8," Gov't Ex. 83B at 58, which Mr. Raines understood to mean he should go to the Sanford Street apartment and pay someone there $800 for a "finger" (or 10 grams) of narcotics.

Mr. Raines was arrested in Bangor on November 12, 2020.

### B. Shelby Loring

Shelby Loring met Mr. Corbett, who she knew as Chinx, through Wayne Smith, whom she dated and sold narcotics with in 2018. At that time, Ms. Loring and Mr. Smith sold fentanyl and methamphetamine. Mr. Smith told Ms. Loring that he got the drugs they sold from a person named Chinx.

At some point, Mr. Smith and Mr. Corbett stopped dealing with each other because Mr. Smith was not paying Mr. Corbett. Mr. Corbett asked Ms. Loring to take over for Mr. Smith, which she did. Ms. Loring began fronting for Mr. Corbett—meaning he would give her the drugs, and she would pay him back after she had resold the drugs. Through Mr. Corbett, Ms. Loring met Mr. Jackson—who she knew as Matty.

To pick up the drugs, Ms. Loring would call or text Mr. Corbett (and eventually Mr. Jackson) asking to "swing by." Ms. Loring would ask for "up" if she wanted methamphetamine and "down" if she wanted fentanyl. If Mr. Corbett or Mr. Jackson answered in the affirmative, Ms. Loring would go to Ron Spencer's Sanford Street apartment, "Shoes Off," to pick up the drugs. Usually, someone other than Mr. Corbett himself would be at the Sanford Street apartment to hand over the drugs. Sometimes, that person was Mr. Jackson.

**ADD17**

When Ms. Loring was dealing drugs for Mr. Corbett and Mr. Jackson, she had 15 to 20 customers to whom she sold the drugs. She often communicated with those customers through her Facebook account under the pseudonym "Shelby Diana."[10]

Government's Exhibit 110A, which runs 60 pages and shows hundreds of Facebook messages sent between January 1, 2020, and February 9, 2021, regarding Ms. Loring and Mr. Corbett ("Chinx")'s drug dealing operations, supports the Court's findings. For example, in one message on February 28, 2020, Ms. Loring wrote to a customer, "Chinxs got new stuff. It burns better and what not but the high is still really good." Gov't Ex. 110A at 4. On March 29, 2020, Ms. Loring sent two messages to two customers, a few minutes apart: "Just found a baggie with chinxs dope in it" and "Legit found a bag of chinxs dope." Gov't Ex. 110A at 8. On April 9, 2020, Ms. Loring sent a message to another customer, asking, "He wama buy any chinxs dope." Gov't Ex. 110A at 10. Two days later, she messaged, "I miss chinxs I hate being without dope." Gov't Ex. 110A at 10.

Government's Exhibits 110B–110T similarly contribute to the Court's finding that Ms. Loring conspired with Mr. Corbett and Mr. Jackson to sell their drugs. For example, in one series of messages, Ms. Loring touted her "loyalty" to her "plug" (which she and others testified refers to a person who supplies drugs), Chinx. Gov't Ex. 110B. In another message, Ms. Loring claimed Chinx was coming with an "old school pack," meaning a kind of fentanyl that hadn't been around for a while. Gov't Ex. 110C. Ms. Loring told a customer that "Niko has chinxs dope" (in reference to co-conspirator Nikolas Raines) and that she needed "to go get it asap." Gov't Ex. 110G.

---

[10] The printout of messages from Ms. Loring's Facebook account ran over 30,000 pages. Only a small subset of those messages were admitted into evidence.

**ADD18**

On May 31, 2021, Ms. Loring messaged one of her customers, asking, "Do you need any or what." Gov't Ex. 110K. The customer responded that he was "trying to get rid of this ice," referring to methamphetamine, so the customer could "go see matty when he gets here." Ms. Loring replied that Matty wasn't coming, but Chinx was. Gov't Ex. 110K. Ms. Loring knew, based on previous conversations with this customer, that this customer regularly went to the Sanford Street apartment to get drugs from Mr. Corbett and Mr. Jackson.

Ms. Loring's text communications with Mr. Jackson further corroborate the finding that she conspired with Mr. Corbett and Mr. Jackson to distribute drugs they supplied. For example, on May 10, 2020, Ms. Loring texted Mr. Jackson, "Hey its shelby. Got a new phone so delete any number you have for me besides this one much love." A few hours later she texted Mr. Jackson again, "My loyalty runs deep and I've got mad love for my boys so you dont have to worry on my end I'll always hold you down."[11] Gov't Ex. 72A at 78.

Ms. Loring stopped dealing for Mr. Corbett and Mr. Jackson around September of 2020. Wayne Smith had stolen Ms. Loring's money that she was planning to use to buy drugs from Mr. Corbett and Mr. Jackson, thereby frustrating her relationship with them.

---

[11] The texts originate from a number ending in *1220, which Ms. Loring testified was hers. Ms. Loring sent those texts to Mr. Jackson at number *3939. *See supra* note 6.

**ADD19**

## C. Danielle McBreairty

Danielle McBreairty did not testify at this trial.[12] However, other evidence introduced at trial shows that Danielle[13] conspired with Mr. Corbett and Mr. Jackson to receive drugs from them, including methamphetamine and fentanyl, which she then distributed across northern Maine. Danielle sold large quantities of methamphetamine and fentanyl supplied by Mr. Corbett and Mr. Jackson during the course of this conspiracy. Danielle texted Mr. Corbett and Mr. Jackson about drugs and the money she owed them. Danielle also told Tommy Hammond and Sarah McBreairty that Chinx supplied drugs to Danielle. Mr. Corbett told Nikolas Raines that Danielle was "good" after Mr. Raines suggested Mr. Corbett stop supplying drugs to Danielle.

John Miller (who others referred to as "Indian" or "the Indian"), sold methamphetamine and fentanyl in the Caribou, Maine[14] area, for Danielle between 2019 and Danielle's August 2020 arrest. Aaron Rodgers sold methamphetamine and fentanyl Danielle fronted him over approximately the same period of time. Joshua Jerrell sold methamphetamine for Danielle. Joshua Young bought fentanyl from Danielle. James Valiante bought narcotics from Danielle.

On multiple occasions, police officers discovered Danielle in possession of methamphetamine and fentanyl, and other tools and indicia of the drug trade. For example, Orono police officer Adam Oko searched Danielle's vehicle on August 10, 2020,

---

[12] *See In re: Testimony of Danielle McBreairty*, 24-cr-00143 (D. Me. Dec. 17, 2024) (holding Danielle McBreairty in contempt of court for disobeying order to testify).

[13] To avoid confusion, the Court refers to Danielle McBreairty and Sarah McBreairty, who are sisters, by their first names.

[14] Caribou is in Maine's northernmost county, Aroostook County, which is often referred to as "the county."

10

**ADD20**

during a traffic stop. He found approximately $3,600 in $100 bills held together with elastic bands, approximately one gram of methamphetamine hidden inside a cigarette packet, and multiple cell phones. *See* Gov't Exs. 40–43, 43A–C.

On February 14, 2020, and February 27, 2020, agents working with the Maine Drug Enforcement Agency (MDEA) set up controlled buys using a confidential informant. Both times, the informant purchased methamphetamine from Danielle while under observation from MDEA agents. After the second buy, the agents searched Danielle and her vehicle and found a small quantity of methamphetamine, heroin, fentanyl, and a loaded gun. The agents also found a padlocked backpack, which they searched pursuant to a warrant, containing approximately four pounds of methamphetamine and half a pound of fentanyl, along with an envelope addressed to Danielle McBreairty and a digital scale. The agents arrested Danielle and seized a white phone belonging to her.

Text messages from this phone, and other phones Danielle used, support the Court's finding that Danielle conspired with Mr. Corbett and Mr. Jackson to sell drugs in northern Maine. For example, Government's Exhibit 36B shows a series of texts between Danielle and Mr. Jackson on February 22, 2020.[15] Danielle wrote, "Hey got stacks for ya. You guys should come here n grab it. I'm so exhausted." A "stack" is a $1,000 bundle of cash.

Another exhibit shows a text exchange between Danielle and Mr. Corbett beginning February 16, 2020.[16] Gov't Ex. 36C. Mr. Corbett told Danielle, "You gonna owe

---

[15] These texts are to Mr. Jackson's number at *3939. *See supra* note 6.

[16] These texts are to Mr. Corbett's number at *7140. *See supra* note 6.

**ADD21**

17," to which Danielle McBreairty replied, "I had 24.5 my bad I was counting on the car. I'll have another few stacks in morning for them." Gov't Ex. 36C at 3.

On February 26, 2020, Danielle sent a message on Facebook to an unidentified recipient with a photo showing large amounts of cash spread across a bed, with the caption superimposed, "Stackin for a trip whaaaaat." Gov't Ex. 118D.

On June 20, 2020, Danielle texted Mr. Corbett[17] stating, "I have 10 stacks." Gov't Ex. 73A at 11. Mr. Corbett responded, "Ok finding ride now," to which Danielle replied, "I got 15 stacks." Two days later, Danielle texted Mr. Corbett, "Hey yeah I'm good. 32oz is what was there," to which Mr. Corbett replied, "I know they doin it by the p now," in reference to two pounds (32 ounces) of methamphetamine. Gov't Ex. 73A at 30.[18]

Witness testimony further supports the conclusion that Danielle sold large amounts of drugs supplied to her by Mr. Corbett and Mr. Jackson. Sarah learned from another dealer named Tommy Hammond, who worked with Danielle, that Mr. Corbett supplied Danielle. Mr. Hammond told Sarah that Chinx was Danielle's "guy," meaning supplier. In a text message sent on August 10, 2020, Mr. Hammond texted Danielle, saying Mr. Hammond and Danielle had been "marked the biggest fentanyl dealers in the county." Gov't Ex. 74B at 16. Danielle also told Sarah directly that Chinx was her "guy." Nikolas Raines spoke with Mr. Corbett after Danielle was arrested. Raines told Mr.

---

[17] These texts are to Mr. Corbett's number at *6099. *See supra* note 6. The phone number for Danielle in this exchange ends in *0179. DEA Agent Brian Klutzaritz testified he identified this number as Danielle's during his investigation. Phone records for number *0179 show messages from Tommy Hammond referring to the user of *0179 as "Danielle." Gov't Ex. 73A at 22.

[18] Agent Klutzartiz testified that "p" refers to pounds, and that only methamphetamine is measured in pounds.

**ADD22**

Corbett he should "stop dealing with" Danielle because her arrest was suspicious, but Mr. Corbett assured Mr. Raines that Danielle was "good."

### D. Sarah McBreairty

When Sarah McBreairty moved to Bangor, Maine, in 2018 or 2019, she learned that her sister—Danielle—and Andrew Adams, who was an ex-romantic partner and co-parent of a child with Danielle, were selling methamphetamine and fentanyl out of their apartment at 89 5th Street. Sarah moved in nearby on 5th Street, and in time, she began helping her sister sell drugs—Sarah would pay Danielle's bills, rent vehicles, and "keep track of everybody." Eventually, Sarah began selling drugs on behalf of her sister.

When Danielle was arrested and detained in August 2020, several co-conspirators, including Mr. Corbett and Sarah, tried to collect money to pay her bail. During that period, Sarah had multiple phone conversations with Mr. Corbett about Danielle's bail money. Danielle and Mr. Corbett spoke several times about the efforts to get Danielle out of jail on bail, which were recorded.[19] Gov't Ex. 84–91. In those calls, Mr. Corbett told Danielle about his attempts to raise bail for her from various people, including Mr. Adams and Sarah. On August 20, 2020, Danielle gave Mr. Corbett Sarah's phone number. Gov't. Ex. 91. On August 22, 2020, Mr. Corbett told Danielle he had spoken with Sarah to collect bail money, but Sarah had disappeared and then refused to answer her phone. Gov't Ex. 90. The efforts to bail Danielle out of jail were unsuccessful.

A few weeks after Danielle's August 2020 arrest, Sarah met Mr. Corbett in person for the first time at her own house on 5th Street. Sarah called Mr. Corbett, who she referred to as Chinx, who arrived at Sarah's house with a friend, both wearing face masks.

---

[19] Danielle spoke with Mr. Corbett at his *6099 number. *See supra* note 6.

**ADD23**

Two weeks after that first meeting, Mr. Corbett and another person delivered to Sarah approximately 500 grams of fentanyl and two pounds of methamphetamine for Sarah to sell on "front." After that first occasion, Sarah continued receiving methamphetamine and fentanyl from Mr. Corbett for Sarah to distribute. Though Mr. Corbett was not always the person who delivered the drugs in hand to Sarah, Sarah always placed the initial order for drugs with Mr. Corbett. To request more drugs, Sarah used coded or slang language: For example, Sarah might text Mr. Corbett to say she "was good" to indicate she had money to buy more drugs. Mr. Corbett would respond to tell her someone was on the way to deliver. If Sarah had guests, she told the guests to leave to protect the drug deliverer's identity.

Typically, Mr. Corbett provided 1,000 to 1,500 grams of fentanyl and four to six pounds of methamphetamine to Sarah with each delivery—twice per month. In return, Sarah paid Mr. Corbett by handing cash, in $5,000 bundles held together with rubber bands and placed in plastic bags, to whoever delivered the drugs.

Sarah's credible testimony, corroborated by co-conspirators, establishes that Sarah conspired with Mr. Corbett to distribute methamphetamine and fentanyl from late August or early September 2020 until a few months before her arrest in February 2022. Over that period, Mr. Corbett delivered to Sarah at least $1 million of methamphetamine (at $10,000 per pound) and $1.5 million of fentanyl (at $5,000 per 100 grams).[20]

Sarah used a network of dealers to distribute the drugs across Maine, including John Miller, Joshua Jerrell, Aaron Rodgers, Matthew Catalano (also known as "Tampa"),

---

[20] Therefore, by Sarah's "low" estimate, Mr. Corbett delivered to her 100 pounds of methamphetamine and 30 kilograms of fentanyl.

**ADD24**

James Valiante, Blaine Footman, Nicole Footman, and Joshua Young. Sarah kept a whiteboard in her apartment to keep track of the money each dealer owed her.

The Court heard credible testimony from numerous witnesses regarding Sarah's drug dealing for Mr. Corbett. John Miller, also known as "Indian," sold drugs Sarah fronted to him.[21] Ultimately, Mr. Miller was over $100,000 in debt to Sarah for the fronted drugs. James Valiante bought drugs from both Sarah and Mr. Corbett. Sarah would tell Mr. Valiante when Mr. Corbett was coming to the area and would help coordinate "logistics" for Mr. Valiante to purchase drugs from Mr. Corbett. Joshua Young bought fentanyl from Sarah after Danielle went to jail. Mr. Miller, Mr. Valiante, and Mr. Young all lived in and distributed drugs in Aroostook County, in northern Maine.

Joshua Jerrell, who dated Sarah, also sold drugs with her. At one point, Mr. Jerrell delivered nine pounds of methamphetamine to Mr. Valiante on behalf of Sarah. Mr. Jerrell heard Sarah speaking on the phone with Mr. Corbett about bailing Danielle out of jail—Jerrell knew Sarah was speaking with Mr. Corbett because Sarah was using speakerphone and Mr. Jerrell could see a contact name reading "Chinx" on the phone screen.

Aaron Rodgers bought fentanyl and methamphetamine from Sarah after Danielle, whom he previously bought drugs from, went to jail. Mr. Rodgers used and also sold a small portion of the drugs he bought from Sarah. Blaine Footman bought fentanyl and methamphetamine from Sarah for about six months to one year before his arrest. Nicole Footman, who knew Sarah for approximately four years, also distributed drugs she purchased from Sarah.

---

[21] James Valiante also heard Sarah McBreairty talk about distributing drugs to "Indian."

15

**ADD25**

Government Exhibits 75B, 76B, 77B, 78B, and 79B are replete with messages that corroborate the finding of a drug conspiracy involving Mr. Corbett. One series of text exchanges demonstrates the drug pipeline from Mr. Corbett to Sarah to Aroostook County dealers. On November 30, 2020, Mr. Corbett reached out to Sarah by text.[22] Gov't Ex. 75B at 13–14. Sarah responded that she would call him "in a few" but needed "up," meaning methamphetamine. Immediately after this text exchange with Mr. Corbett, Sarah texted Mr. Miller, saying, "Hey so they just hit me up. Just need what's up there to see where Im at n put in order do lmk.. If I havd to comr to you I will." Mr. Miller responded, asking for "three towards the sky and one or two down low"—meaning Mr. Miller wanted Sarah to order three pounds of methamphetamine and one or two pounds of fentanyl.

In another exchange, Sarah told Mr. Corbett that "everyone's out of everything," and asked, "Can we make something, anything happen tonight/tomorrow?" Gov't. Ex. 76B at 8. Mr. Corbett responded, "As soon as I get it I'm coming." Sarah then asked Mr. Corbett for "3 ^ 2 down" on behalf of James Valiante, and "7, brown and white . whatever you wanna do"—meaning three pounds of methamphetamine and 200 grams of fentanyl, and seven 100-gram balls of either heroin ("brown") or fentanyl ("white").

John Miller tried to repay his drug debt to Sarah by giving her firearms. Joshua Young corroborated this finding when he testified he delivered guns from Mr. Miller to Sarah to help pay off Mr. Miller's drug debt. Sarah also sometimes acted as a middleman to move firearms between Mr. Corbett and Mr. Miller. Mr. Miller testified he gave six or seven guns to the people who delivered drugs to him, but he did not identify those people.

---

[22] These texts are with Mr. Corbett's number at *3337. *See supra* note 6.

**ADD26**

### E.  Justin Warman

Justin Warman first met Mr. Corbett in 2017 or 2018. An acquaintance of Mr. Warman's told Warman he could buy drugs at an apartment on Ohio Street in Bangor. Though Mr. Warman didn't see Mr. Corbett the first time Mr. Warman went to the Ohio Street apartment, Mr. Warman eventually met Mr. Corbett there on later dates. Mr. Warman's testimony establishes that he bought heroin, cocaine, and fentanyl at the apartment, sometimes directly from Mr. Corbett, once or twice per month. A year or so after first meeting Mr. Corbett, Mr. Warman met Mr. Jackson through Mr. Corbett. Mr. Warman bought drugs mostly for personal use, but also sometimes sold the drugs he bought from Mr. Corbett and Mr. Jackson in order to support his addiction.

Mr. Warman didn't always buy drugs from the Ohio Street apartment. He also bought drugs from Mr. Corbett and Mr. Jackson at Ron Spencer's "Shoes Off" apartment on Sanford Street, Carol Gordon's apartment on 1st Street, and an apartment on Warren Street. Sometimes, Mr. Warman texted Mr. Corbett and Mr. Corbett told Mr. Warman to go to a particular location where someone would hand over the drugs to Mr. Warman. Shelby Loring and Ms. Gordon were two of the people who gave Mr. Warman drugs on behalf of Mr. Corbett. Mr. Warman also bought fentanyl directly from Mr. Jackson. Sometimes Mr. Warman reached out to Mr. Jackson directly, and other times Mr. Warman texted Mr. Corbett but ended up getting the drugs from Mr. Jackson instead.

Mr. Warman would text Corbett in code to purchase fentanyl from him. Mr. Warman would ask Mr. Corbett if someone was "around" and if he could "stop by." If Mr. Corbett was around, Mr. Corbett would tell Mr. Warman the address where Mr. Warman could go to buy the drugs.

**ADD27**

For example, in one text exchange, Mr. Warman asked, "What's up u around only got hundo but will be in town shortly" and Mr. Corbett, after asking how Mr. Warman got his number, told Mr. Warman to "come by." Mr. Warman asked where Mr. Corbett was, and Mr. Corbett responded, "Same place." Mr. Warman replied, "no shoes" and Mr. Corbett confirmed, "Yea." Gov't Ex. 112 at 5.[23] "No Shoes" referred to the Sanford Street "Shoes Off" apartment, where Mr. Warman and others bought drugs from Mr. Corbett and Mr. Jackson.

Mr. Warman stopped purchasing drugs from Mr. Corbett and Mr. Jackson in late 2020.

### F. Carol Gordon

Carol Gordon first met Mr. Corbett, who she knew as Chinx, in the middle of 2019, at her own apartment at 67 1st Street, Bangor. The first time they met, Mr. Corbett told Ms. Gordon he wanted a place to stay and to sell drugs a couple of times per month. Mr. Corbett offered to give Ms. Gordon crack in exchange for the use of her residence to do this. Ms. Gordon agreed to let Mr. Corbett use her apartment to sell drugs from. The second or third time Mr. Corbett went to Ms. Gordon's apartment, Mr. Corbett brought Mr. Jackson, who Ms. Gordon knew as Matty, with him. Mr. Corbett and Mr. Jackson sold drugs—mostly crack and heroin, but eventually methamphetamine too—out of Ms. Gordon's apartment for two or three months.

When Mr. Corbett and Mr. Jackson sold drugs out of Ms. Gordon's apartment, Mr. Corbett told Ms. Gordon how to handle buyers who came to the apartment. Ms. Gordon usually answered the door to let buyers in. She would then go to the back room of her

---

[23] In this exchange, Mr. Corbett used the number *4537. *See supra* note 6.

18

**ADD28**

apartment to find either Mr. Corbett or Mr. Jackson, or sometimes both. Mr. Corbett or Mr. Jackson then either came out to meet the buyer or instructed Ms. Gordon to send the buyer to the back room.

On one occasion, Mr. Jackson arranged for Tamara Davis to deliver methamphetamine from Rhode Island to Ms. Gordon's apartment. Ms. Davis was in a relationship with Mr. Jackson in 2019. On September 21, 2019, at Mr. Jackson's request, Ms. Davis picked up a backpack containing two kilograms of methamphetamine in Central Falls, Rhode Island, on her way to visit Mr. Jackson in Maine. *See* Gov't Ex. 62. That afternoon, Mr. Jackson sent Ms. Davis his location in Maine, saying "I'm here." Gov't Ex. 31C. The location corresponds to Ms. Gordon's address at 67 1st Street, in Bangor, Maine. Ms. Davis was stopped by the police on the way to Mr. Jackson's location. During the stop she called Mr. Jackson to inform him what was happening.

Mr. Corbett and Mr. Jackson abruptly stopped selling from Ms. Gordon's house after police came to the house to investigate a 9-1-1 hangup call on October 18, 2019. Ms. Gordon answered the door. The investigating police officer, Michael Pina, saw someone else inside the apartment, who Ms. Gordon identified to him as "Matty." Officer Pina spoke with Matty, who identified himself as Daviston Jackson. Mr. Jackson produced several bank cards bearing his name and told Officer Pina he was from the "New Hampshire and Massachusetts area."

### G. James Valiante

James Valiante began buying fentanyl and methamphetamine from Danielle McBreairty soon after her February 27, 2020, arrest. Mr. Valiante sometimes reached out to Danielle to buy drugs. Other times Danielle simply "showed up" with fentanyl and methamphetamine. On at least one occasion, Danielle brought Tommy Hammond to Mr.

19

**ADD29**

Valiante's home and sold Mr. Valiante methamphetamine and fentanyl; Mr. Hammond was present during the sale.

Mr. Valiante met Andrew Adams through Danielle, and Mr. Adams and Mr. Valiante became friends. When Danielle remained in custody following her August 2020 arrest, Mr. Adams began to deal the drugs for Danielle. Mr. Adams later introduced Mr. Valiante to Mr. Corbett at Mr. Valiante's house in Aroostook County. Mr. Adams told Mr. Valiante that he and Mr. Corbett were in Aroostook County to sell dope (narcotics). Mr. Valiante bought methamphetamine and fentanyl from Mr. Corbett on that occasion and thereafter.

On September 6, 2020, Mr. Adams was arrested, and Mr. Valiante eventually began purchasing methamphetamine and fentanyl from Sarah McBreairty. He met Sarah when she came to his house to pick up a vehicle Danielle had left there. Mr. Valiante bought even more narcotics from Sarah than he bought from Danielle. As described above, Mr. Valiante understood that Mr. Corbett was Sarah's supplier. He occasionally saw Mr. Corbett while purchasing drugs at Sarah's 5th Street apartment and at the Sanford Street "Shoes Off" apartment. During the same period, Mr. Valiante also continued to purchase narcotics from Mr. Corbett directly.

On April 1, 2021, police stopped Mr. Valiante in Bangor and found 100 grams of fentanyl that Mr. Valiante had purchased from Sarah at 91 5th Street immediately prior. Mr. Valiante found the circumstances of the stop suspicious, so he largely ceased trafficking with Sarah and never heard from Mr. Corbett again. The stop was in fact orchestrated by DEA Agent Brian Klutzaritz, who had been surveilling the 5th Street apartment. Agent Klutzaritz saw a vehicle rented to Mr. Jackson parked near the apartment. He followed the vehicle briefly after it left. Agent Klutzaritz returned to the

20

**ADD30**

5th Street apartment, where he saw Mr. Valiante arrive and then leave after 45 minutes. At that point, Agent Klutzaritz called the Bangor Police Department and requested they stop Mr. Valiante's vehicle.

Mr. Valiante estimated that Danielle, Sarah, and Mr. Corbett collectively sold Mr. Valiante a total of ten pounds of methamphetamine and two pounds of fentanyl between February 2020 and April 2021.

## II.    Other Co-Conspirators

### A.  Blaine Footman

Blaine Footman lived with Sarah McBreairty at 91 5th Street until his May 5, 2021, arrest. He bought fentanyl and methamphetamine from Sarah to use and sell for six to twelve months before his arrest. He also helped Sarah deliver the drugs she sold to Aroostook County.

Sarah told Mr. Footman that she got her drugs from Chinx and "Z."[24] Usually, when Sarah's suppliers came to deliver, she told Mr. Footman to go upstairs so he would not meet them. Sarah usually received five to ten pounds of methamphetamine and 1,000 to 2,000 grams of fentanyl at a time from Mr. Corbett.

A few times per week, Sarah gave Mr. Footman 100 to 200 grams of fentanyl and one to two pounds of methamphetamine to sell. Mr. Footman also transported a few times per week approximately 1,000 grams of fentanyl and five to seven pounds of methamphetamine to John Miller and other dealers in Aroostook County for Sarah. After each trip to Aroostook County, Mr. Footman brought back between $70,000 and $125,000 that he had received from Mr. Miller and other Aroostook County dealers and

---

[24] Mr. Footman, Shelby Loring, and Sarah McBreairty all mentioned the name "Z" at trial, but the Government did not present evidence as to Z's identity.

21

**ADD31**

delivered the money to Sarah. Sarah paid Mr. Footman in cash or in drugs for making the deliveries.

## B. Nicole Footman

Nicole Footman first met Sarah McBreairty through Ms. Footman's brother, Blaine Footman. Beginning in late 2020 or early 2021, Sarah supplied Ms. Footman with fentanyl and methamphetamine, which Ms. Footman then sold. At the peak of Ms. Footman's dealing, Sarah fronted her 50 to 80 grams of fentanyl and two to three ounces of methamphetamine at a time. Ms. Footman had an understanding with Sarah as to how much she owed for the drugs Sarah fronted. On one occasion, Ms. Footman observed Sarah counting $180,000 in cash, secured by rubber bands.

Ms. Footman also shared an understanding with Sarah about the coded language Ms. Footman used in text messages to ask for more drugs. Text messages between Ms. Footman and Sarah corroborate Ms. Footman's testimony. *See* Gov't Ex. 79B.

Ms. Footman overheard Sarah talking about the people who supplied her with methamphetamine and fentanyl. Sarah referred to her suppliers using a racial slur and mentioned a person named Chinx. Ms. Footman stopped purchasing drugs from Sarah when Ms. Footman was arrested on July 8, 2021.

## C. John Miller

John Miller supplied methamphetamine and fentanyl on behalf of Danielle and Sarah McBreairty in the Caribou area in Aroostook County. Tommy Hammond, who lived near Mr. Miller, introduced Mr. Miller to Danielle. Mr. Miller began dealing for Danielle at some point after 2019. When Danielle was arrested in August 2020, Mr. Hammond asked Mr. Miller for money to bail Danielle out. Mr. Miller contributed approximately $30,000 that he had obtained from selling narcotics to help bail her out.

22

**ADD32**

After Danielle's arrest, Mr. Hammond introduced Mr. Miller to Sarah, and Mr. Miller began sourcing drugs from Sarah to sell. Sarah fronted the drugs to him. Sometimes Mr. Miller picked the drugs up directly from Sarah in Bangor and sometimes Sarah engaged other people, such as Mr. Footman, to transport the drugs to Mr. Miller in Aroostook County. Mr. Miller accumulated over $100,000 of debt to Sarah.

During the time Mr. Miller was dealing for Danielle and Sarah McBreairty, he also purchased handguns and gave the guns to Danielle and Sarah. When Mr. Miller was in debt to Sarah, he gave her six or seven handguns to pay off the debt he owed her for drugs; the Court finds those guns were traded as part of the drug conspiracy.

On May 20, 2021, Mr. Miller texted Sarah "Hey" to which she replied, "if ya can bring any toys that would be great." Gov't Ex. 79B at 20. "Toys" is slang for firearms. On June 1, 2021, Sarah texted Mr. Miller again, saying, "I do need them toys if you still have them.. I need them like yesterday.." Gov't Ex. 79B at 44. Mr. Miller responded, "OK Let me see what I can do in my car ride and I'll explain it to you when I get down there." Three hours later, Mr. Miller asked for an address, and Sarah sent her address at 91 5th Street, Bangor. Gov't Ex. 79B at 49.

When Mr. Miller was in jail after pleading guilty in this case, he met Mr. Corbett, who offered to pay for a lawyer for Mr. Miller.

### D. Joshua Young

Joshua Young grew up in Presque Isle, Maine, another town in Aroostook County. He moved away temporarily but returned to Presque Isle in December 2018. At the time he returned, he was addicted to heroin and alcohol and began buying his narcotics from Tommy Hammond. Mr. Hammond told Mr. Young that Danielle McBreairty supplied him.

23

**ADD33**

When Mr. Young had been buying from Mr. Hammond for four to six months, Mr. Hammond was arrested, and Mr. Young began purchasing fentanyl from Danielle directly. Danielle fronted to Mr. Young approximately 50 grams of fentanyl at a time, once per week.

After Danielle was arrested in August 2020, Mr. Young briefly bought fentanyl from another dealer before moving on to purchase drugs from Sarah McBreairty. At first, Mr. Young bought fentanyl directly from Sarah, but eventually purchased through Mr. Miller. Mr. Young sometimes also delivered drugs on Sarah's behalf. On at least ten occasions, Mr. Young delivered fentanyl he had received from Sarah in Bangor to Mr. Miller in Aroostook County and delivered money from Mr. Miller to Sarah in return. Mr. Young also delivered firearms from Mr. Miller to Sarah McBreairty to help pay off Mr. Miller's debt.

### E.  Aaron Rodgers

Aaron Rodgers sold narcotics with Danielle and Sarah McBreairty. Danielle fronted methamphetamine and fentanyl to Mr. Rodgers until her arrest in August 2020. At the peak of Mr. Rodgers's dealing with Danielle, she fronted him 20 to 30 grams of fentanyl and one or two ounces of methamphetamine at a time, once or twice per week. Mr. Rodgers heard Danielle refer to her supplier as Chinx.

After Danielle was arrested in August 2020, Mr. Rodgers began buying drugs from Sarah McBreairty. Sarah fronted to Mr. Rodgers slightly lower quantities of fentanyl and methamphetamine—20 grams of fentanyl and one ounce of methamphetamine, once every week or two. Mr. Rodgers also heard Sarah refer to her supplier as Chinx. Sarah told Mr. Rodgers she didn't know Chinx's real name.

24

**ADD34**

Mr. Rodgers was arrested on August 1, 2021, and has been incarcerated since then. Mr. Rodgers met Mr. Corbett for the first time while in jail. Mr. Corbett asked him whether he knew "this crazy girl Danielle." Mr. Rodgers said that he knew Danielle and Mr. Corbett claimed to have never met her.

### F.  Joshua Jerrell

Joshua Jerrell sold narcotics with Danielle and Sarah McBreairty. He moved to Maine in 2019. Danielle first gave Mr. Jerrell methamphetamine at her house in Glenburn, Maine, where she fronted him a half pound of methamphetamine. Mr. Jerrell sold the drugs Danielle supplied him to customers across Bangor and Brewer, Maine.

Mr. Jerrell later met Sarah on the dating app Tinder and began a romantic relationship with her. The first time they met in person, Mr. Jerrell went to Sarah's house, and they used methamphetamine Sarah supplied. Sarah told Mr. Jerrell she got the drugs from her sister. Sarah told Mr. Jerrell that she was her sister's bookkeeper.

Mr. Jerrell continued dealing methamphetamine for Danielle while dating Sarah. Danielle offered to front him fentanyl in addition to methamphetamine, but he declined. On one occasion, Mr. Jerrell helped Danielle count money from drug proceeds—Mr. Jerrell estimated they counted $500,000 to $1 million that day. Danielle told Mr. Jerrell she would give the money to "her people . . . down south."

After Danielle was arrested in August 2020, Mr. Jerrell went with Sarah to Danielle's house to recover at least $50,000 in cash that Danielle had hidden there.[25] Soon after, he overheard Sarah on the phone with Mr. Corbett discussing bailing Danielle out

---

[25] Mr. Jerrell testified it was $100,000. Others testified that it was only $50,000.

of jail. Sarah gave Mr. Jerrell $10,000 of the cash she and Mr. Jerrell took from Danielle's house and used the rest to buy drugs from Mr. Corbett.

Sarah continued to buy drugs from Mr. Corbett on other occasions after Danielle was arrested. Sarah told Mr. Jerrell she got her drugs from Chinx. Mr. Jerrell saw the drugs Sarah purchased from Mr. Corbett and estimated Sarah received ten pounds of methamphetamine and 1,000 grams of fentanyl at a time. He also dealt those drugs alongside Sarah. At Sarah's behest, Mr. Jerrell transported drugs to James Valiante and Mr. Jerrell also saw Mr. Valiante come to Sarah's house.

On June 1, 2021, Sarah asked Mr. Jerrell to purchase three firearms: one for Sarah, one for Mr. Jerrell, and one for Mr. Corbett. Mr. Jerrell was ultimately unable to purchase the firearms because his background check failed.

In January 2022, Mr. Jerrell and Sarah[26] were stopped by police in Newport, Maine. The police discovered methamphetamine and fentanyl in the vehicle, along with various paraphernalia such as spoons and scales that are indicative of the drug trade. *See* Gov't Ex. 65.

## CONCLUSIONS OF LAW

Defendants Corbett and Jackson were charged in Count One of the Indictment with conspiring to distribute and possess with intent to distribute 50 grams or more of methamphetamine and 500 grams or more of a substance containing methamphetamine and 400 grams or more of a substance containing fentanyl from January 1, 2018, to December 31, 2021, in the District of Maine, in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1), (b)(1)(A)(vi), (b)(1)(A)(viii).

---

[26] At the time, Mr. Jerrell was not supposed to have contact with Sarah due to a state court order.

**ADD36**

## I.   Conspiracy

In order to prove the conspiracy, the Government must prove three elements beyond a reasonable doubt: "(1) [T]he existence of a conspiracy, (2) [each] defendant's knowledge of the conspiracy, and (3) [each] defendant's knowing and voluntary participation in the conspiracy." *United States v. Guzman-Ortiz*, 975 F.3d 43, 47 (1st Cir. 2020) (quoting *United States v. Paz-Alvarez*, 799 F.3d 12, 21 (1st Cir. 2015)).

"A criminal conspiracy is an agreement between two or more persons to accomplish an unlawful purpose." *United States v. Dellosantos*, 649 F.3d 109, 115 (1st Cir. 2011). "[I]f, 'on the evidence adduced at trial, a reasonable jury could find more than one such illicit agreement, or could find an agreement different from the one charged,'" the Court must consider whether multiple conspiracies existed, thereby varying from the charged conspiracy. *United States v. Brandon*, 17 F.3d 409, 449 (1st Cir. 1994) (quoting *United States v. Boylan*, 898 F.2d 230, 243 (1st Cir. 1990)); *Dellosantos*, 649 F.3d at 116 ("A variance occurs when the crime charged remains unaltered, but the evidence adduced at trial proves different facts than those alleged in the indictment." (quoting *United States v. Mangual–Santiago*, 562 F.3d 411, 421 (1st Cir. 2009))).

"In determining whether the evidence supports the existence of a single conspiracy, [courts] ultimately look at the totality of the evidence" and consider three factors: "(1) [T]he existence of a common goal, (2) interdependence among participants, and (3) overlap among the participants." *Dellosantos*, 649 F.3d at 117 (quoting *Mangual-Santiago*, 562 F.3d at 421). The second factor has sometimes been formulated as "the interdependence of various elements in the overall plan." *United States v. Franco-Santiago*, 681 F.3d 1, 8 (1st Cir. 2012), *abrogated on other grounds by Musacchio v. United States*, 577 U.S. 237 (2016). Therefore, the Court cannot convict unless it finds

27

**ADD37**

beyond a reasonable doubt that "the conspiracy specified in the indictment, and not some other agreement or agreements, existed at or about the time or times specified in the indictment." *United States v. Bedini*, 861 F.3d 10, 17 (1st Cir. 2017). The Government must go beyond proving that "some type of conspiracy existed, even one involving some of the same alleged conspirators. The proof, rather, must persuade [the Court] that the conspiracy proved is in fact the one alleged in the indictment." *Id.*

To find Defendants knowingly and voluntarily participated in the conspiracy, "the evidence must establish that [each] defendant both intended to join the conspiracy and intended to effectuate the objects of the conspiracy." *Guzman-Ortiz*, 975 F.3d at 47 (quoting *Paz-Alvarez*, 799 F.3d at 21). That is, "the government must prove two kinds of intent: 'intent to agree and intent to commit the substantive offense.'" *Id.* (quoting *United States v. Gomez-Pabon*, 911 F.2d 847, 853 (1st Cir. 1990)). "Due to the clandestine nature of criminal conspiracies, the law recognizes that the illegal agreement may be either 'express or tacit' and that a 'common purpose and plan may be inferred from a development and collocation of circumstances.'" *United States v. Sanchez*, 917 F.2d 607, 610 (1st Cir. 1990) (quoting *United States v. Rivera-Santiago*, 872 F.2d 1073, 1079 (1st Cir. 1989).

Intent to "commit the substantive offense" can be satisfied by "intent to effectuate an underlying substantive offense." *United States v. Piper*, 35 F.3d 611, 613 (1st Cir. 1994). A defendant's mere association with co-conspirators or knowledge of illegal activity does not prove the defendant participated in the conspiracy. "[I]t is therefore essential to determine what kind of agreement or understanding existed as to each defendant." *Dellosantos*, 649 F.3d at 115 (quoting *Rivera–Santiago*, 872 F.2d at 1079).

28

**ADD38**

In a drug conspiracy, "[s]howing that the defendant had knowledge of generalized illegality is insufficient; the Government must show that the defendant knew the conspiracy involved a controlled substance, but need not show that the defendant knew the specific controlled substance being distributed." *United States v. Burgos*, 703 F.3d 1, 10 (1st Cir. 2012) (citations omitted). "[E]ven a single sale for resale, embroidered with evidence suggesting a joint undertaking between buyer and seller, could suffice." *United States v. Gomes*, 376 F.3d 42, 45 (1st Cir. 2004) (quoting *United States v. Moran*, 984 F.2d 1299, 1303 (1st Cir. 1993)).

Based on the factual findings above, the Court concludes beyond a reasonable doubt that a single conspiracy to distribute methamphetamine and fentanyl in Maine existed between 2018 and 2021, that both Mr. Corbett and Mr. Jackson knew of the conspiracy, and that both Mr. Corbett and Mr. Jackson knowingly and voluntarily participated in the conspiracy.

## A.  A Single Conspiracy Existed

The co-conspirators participated in a single conspiracy. Mr. Corbett and Mr. Jackson <u>shared the common goal of distributing illegal narcotics</u>—specifically fentanyl and methamphetamine[27]—with their co-conspirators. *United States v. Portela*, 167 F.3d

---

[27] "[T]he identification of a substance as a drug may be based upon the opinion of a knowledgeable lay person," such as a drug user whose experience with illicit drugs renders them competent to identify those drugs based on the drugs' effect. *United States v. Ocean*, 904 F.3d 25, 39 (1st Cir. 2018). The Court can also rely on circumstantial evidence such as the substance's price being consistent with the going rate for the drug. *United States v. Walters*, 904 F.2d 765, 771 (1st Cir. 1990). Here, the Court finds the following co-conspirator witnesses competent to identify fentanyl or methamphetamine based on their individual experiences as drug users and their testimony regarding the drugs' effects: Nikolas Raines, Shelby Loring, Sarah McBreairty, Justin Warman, Carol Gordon, James Valiante, Blaine Footman, Nicole Footman, Joshua Young, Aaron Rodgers, and Joshua Jerrell. The Court finds the testimony of those witnesses credible and finds they accurately identified the drugs Mr. Corbett and Mr. Jackson distributed to them.

29

**ADD39**

687, 695 (1st Cir. 1999) ("That each defendant had an interest in furthering the distribution of cocaine is also sufficient evidence that they shared a common goal with the other participants.").

The participants in the conspiracy were interdependent. Co-conspirators depended on Mr. Corbett and Mr. Jackson to supply unlawful drugs. *See Mangual-Santiago*, 562 F.3d at 422 (finding interdependence where drug distributors relied upon a central supplier to obtain the cocaine they sold). For example, Sarah McBreairty sold—and distributed to other co-conspirators to sell—at least $1 million of methamphetamine (at $10,000 per pound) and $1.5 million of fentanyl (at $5,000 per 100 grams) that Mr. Corbett supplied to her from late August or early September 2020 until a few months before Sarah's arrest in February 2022. James Valiante purchased the fentanyl and methamphetamine he used from both Mr. Corbett and Sarah, who was supplied by Mr. Corbett. Nikolas Raines, Shelby Loring, and Justin Warman regularly asked Mr. Corbett and Mr. Jackson to supply them with fentanyl, methamphetamine, or both to sell. Ms. Loring also expressed her "loyalty" to Mr. Jackson as her supplier. Carol Gordon agreed to allow Mr. Corbett and Mr. Jackson to sell drugs including methamphetamine out of Ms. Gordon's apartment in exchange for Mr. Corbett supplying her with crack. Other co-conspirators, including Blaine and Nicole Footman, John Miller, Joshua Young, Aaron Rodgers, and Joshua Jerrell purchased narcotics from dealers, such as Danielle and Sarah, supplied by Mr. Corbett and Mr. Jackson.

---

John Miller did not personally use fentanyl or methamphetamine. Nonetheless, the Court finds Mr. Miller accurately identified the drugs he bought and sold based on the testimony of Sarah McBreairty (who sold the drugs to Mr. Miller) and Blaine Footman and Joshua Young (who purchased the drugs from Mr. Miller).

The Court similarly considers the credible corroborating testimony of law enforcement officers who identified based on their experience drugs seized from co-conspirators as methamphetamine and fentanyl.

30

**ADD40**

Mr. Corbett and Mr. Jackson depended on co-conspirators to further sell the drugs they supplied for cash. *See Mangual-Santiago*, 562 F.3d at 422 (finding interdependence where a central drug supplier relied "upon the distributors . . . to sell the cocaine for cash"). Sarah McBreairty paid Mr. Corbett in stacks and bundles of cash for the fentanyl and methamphetamine he supplied to her to distribute. Sarah further distributed those drugs to co-conspirators in the greater Bangor and Aroostook County areas. Those co-conspirators, including Mr. Miller, Mr. Jerrell, Mr. Rodgers, Mr. Valiante, Mr. Footman, Ms. Footman, and Mr. Young used the drugs and sold the drugs to customers.

When Wayne Smith stopped paying Mr. Corbett for the drugs Mr. Smith had been distributing on Mr. Corbett's behalf, Mr. Corbett asked Ms. Loring to distribute drugs on Mr. Corbett's behalf instead. Mr. Corbett and Mr. Jackson sold to Ms. Loring, Sarah, and Danielle on "front," meaning Mr. Corbett and Mr. Jackson would provide the drugs, and Ms. Loring, Sarah, and Danielle would pay Mr. Corbett and Mr. Jackson back after selling the drugs. These dealers similarly fronted the drugs to other co-conspirators, all in exchange for cash.[28]

Mr. Corbett and Mr. Jackson depended on each other to effectuate the conspiracy. The evidence shows Mr. Corbett and Mr. Jackson worked together extensively to distribute fentanyl and methamphetamine. Together, Mr. Corbett and Mr. Jackson sold drugs including methamphetamine out of Ms. Gordon's apartment. Sometimes, when Mr. Warman texted Mr. Corbett to ask for drugs, Mr. Jackson would provide the drugs instead. When Mr. Raines bought drugs from Mr. Jackson, Mr. Raines would reach out to Mr. Corbett directly to resolve any problems. Furthermore, Ms. Loring sometimes used

---

[28] John Miller also paid some of his debt from fronting with guns.

31

**ADD41**

the name Chinx to refer to both Mr. Corbett and Mr. Jackson together. During the walled-off stop on September 12, 2022, Mr. Corbett and Mr. Jackson were apprehended together in a vehicle, which had been tracked using Mr. Corbett's cell phone, with approximately $57,000 in cash inside the vehicle.

The participants in the conspiracy overlapped. Mr. Corbett and Mr. Jackson worked together when selling methamphetamine and fentanyl. Mr. Corbett and Mr. Jackson sold methamphetamine and fentanyl directly to several co-conspirators including Mr. Raines, Ms. Loring, Danielle, Sarah, Mr. Warman, Ms. Gordon, and Mr. Valiante. Those co-conspirators further distributed the drugs Mr. Corbett and Mr. Jackson supplied to co-conspirators including Mr. Footman, Ms. Footman, Mr. Miller, Mr. Young, Mr. Rodgers, and Mr. Jerrell.

Therefore, considering the totality of the evidence including the findings described above, the Court finds beyond a reasonable doubt that a single conspiracy, and not multiple conspiracies, existed to distribute fentanyl and methamphetamine in Maine from 2018 through 2021.

## B. Mr. Corbett and Mr. Jackson Knew of the Conspiracy

The Court finds Mr. Corbett and Mr. Jackson knew of the conspiracy. As described above, Mr. Corbett played a central role in the conspiracy. Mr. Corbett sold methamphetamine or fentanyl multiple times directly to numerous co-conspirators. For several months during the conspiracy, Mr. Corbett sold drugs with Mr. Jackson from a single location—Ms. Gordon's apartment—where Mr. Corbett instructed Ms. Gordon on how to handle visitors who arrived to purchase drugs. In 2020, Mr. Corbett was present with co-conspirators Mr. Jackson, Ms. Loring, and Mr. Raines in the Sanford Street

32

**ADD42**

"Shoes Off" apartment where Mr. Corbett and Mr. Jackson dealt drugs—and where Ms. Loring, Mr. Raines, Mr. Warman, and Mr. Valiante purchased drugs.

As described above, Mr. Jackson also played a central role in the conspiracy. Mr. Jackson sold methamphetamine or fentanyl multiple times directly to numerous co-conspirators. For several months during the conspiracy, Mr. Jackson sold drugs with Mr. Corbett from a single location—Ms. Gordon's apartment—where Mr. Jackson arranged to have Tamara Davis deliver two kilograms of methamphetamine. In 2020, Mr. Jackson was present with co-conspirators Mr. Corbett, Ms. Loring, and Mr. Raines in the Sanford Street "Shoes Off" apartment where Mr. Jackson and Mr. Corbett dealt drugs—and where Ms. Loring, Mr. Raines, Mr. Warman, and Mr. Valiante purchased drugs.

### C. Mr. Corbett and Mr. Jackson Participated Voluntarily in the Conspiracy

The Court finds Mr. Corbett and Mr. Jackson each knowingly and voluntarily participated in the conspiracy. To that end, the Court finds Mr. Corbett and Mr. Jackson each intended to join the conspiracy and intended to effectuate the substantive offense of distribution and possession with intent to distribute of fentanyl and methamphetamine.

Mr. Corbett intended to join the conspiracy and intended to effectuate the distribution and possession with intent to distribute of fentanyl and methamphetamine. As the Court found above, Mr. Corbett sold fentanyl and methamphetamine directly to numerous co-conspirators. He also distributed massive quantities of drugs to co-conspirators like Sarah to further sell. He expected co-conspirators to whom he distributed fentanyl and methamphetamine to further distribute the drugs, indicated by the fact that he supplied those co-conspirators with quantities far exceeding reasonable

33

**ADD43**

personal use on front. He expected those co-conspirators to repay him after further selling the drugs to customers.

Mr. Corbett sold drugs with Mr. Jackson at the "Shoes Off" Sanford Street apartment where multiple co-conspirators purchased drugs. He introduced Ms. Loring and Mr. Warman to Mr. Jackson, who also sold drugs. He also formed explicit and implicit agreements with co-conspirators regarding various aspects of the conspiracy. For example, he explicitly agreed with Ms. Gordon to give her crack in exchange for Ms. Gordon allowing Mr. Corbett to sell drugs, including methamphetamine, from her apartment. He came to an implicit agreement with both Ms. Loring and Sarah when he "fronted' them fentanyl and methamphetamine to sell, thereby agreeing to be paid for the supply after Mr. Loring and Sarah further distributed it.

Mr. Jackson also intended to join the conspiracy and intended to effectuate the distribution and possession with intent to distribute of fentanyl and methamphetamine. As the Court found above, Mr. Jackson sold fentanyl and methamphetamine directly to numerous co-conspirators. Mr. Jackson sold drugs with Mr. Corbett at the "Shoes Off" Sanford Street apartment where multiple co-conspirators purchased drugs. When dealing drugs at Sanford Street or at Ms. Gordon's apartment on 1st Street, Mr. Jackson personally handed over drugs to co-conspirators, including Ms. Loring and Mr. Warman, on behalf of Mr. Corbett. When Mr. Raines bought drugs from Mr. Jackson, Mr. Raines would reach out to Mr. Corbett directly to resolve any problems he had with Mr. Jackson. Mr. Jackson met Ms. Loring and Mr. Warman through Mr. Corbett. Mr. Jackson also arranged for Ms. Davis to deliver two pounds of methamphetamine from Rhode Island to Ms. Gordon's 1st Street apartment, from where he and Mr. Corbett distributed drugs.

34

**ADD44**

Because both Mr. Corbett and Mr. Jackson intended to join the conspiracy and intended to effectuate the substantive offense of possession and distribution of fentanyl and methamphetamine, the Court finds beyond a reasonable doubt Mr. Corbett and Mr. Jackson each knowingly and voluntarily participated in the conspiracy.

Therefore, because the conspiracy charged in the Indictment existed, Mr. Corbett and Mr. Jackson each knew of the conspiracy, and Mr. Corbett and Mr. Jackson each knowingly and voluntarily participated in the conspiracy, the Court finds beyond a reasonable doubt Mr. Corbett and Mr. Jackson are each guilty of conspiring to possess and distribute fentanyl and methamphetamine.

## II.    Drug Quantity

For the purposes of sentencing calculations the Court must find beyond a reasonable doubt whether each Defendant knowingly or intentionally conspired to distribute methamphetamine or fentanyl "in a conspiracy that involved a total" of 50 grams or more of methamphetamine, 500 grams or more of a mixture containing methamphetamine, or 400 grams or more of a mixture containing fentanyl, "where at least [those same quantities] were foreseeable to the defendant."[29] *United States v. Pizarro*, 772 F.3d 284, 293–94 (1st Cir. 2014) (citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Alleyne v. United States*, 570 U.S. 99 (2013); and *United States v. Colon-Solis*, 354 F.3d 101 (1st Cir. 2004)). "[T]he conspiracy-wide quantity . . . governs the statutory maximum, [and] the individualized quantity, i.e., the quantity that is

---

[29] Though the Indictment charges the drug quantities in the conjunctive, because 21 U.S.C. § 841(b)(1)(A) is framed in the disjunctive the Government need only prove one of the charged quantities for the penalty provisions to apply. *United States v. Torres-Colon*, 790 F.3d 26, 34 (1st Cir. 2015).

35

**ADD45**

foreseeable to the defendant, . . . triggers the mandatory minimum." *Pizarro*, 772 F.3d at 293.

Based on the facts described above, the Court finds beyond a reasonable doubt the charged conspiracy involved a total of 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers. The Court also finds beyond a reasonable doubt the charged conspiracy involved a total of 400 grams or more of a mixture or substance containing a detectable amount of fentanyl.

The Court finds beyond a reasonable doubt the following drug quantities attributable or foreseeable to each Defendant:

First, the Court finds 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers are attributable or reasonably foreseeable to Mr. Corbett.

Second, the Court finds 400 grams or more of a mixture or substance containing a detectable amount of fentanyl are attributable or reasonably foreseeable to Mr. Corbett.

Third, the Court finds 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers are attributable or reasonably foreseeable to Mr. Jackson.

Fourth, the Court finds 400 grams or more of a mixture or substance containing a detectable amount of fentanyl are attributable or reasonably foreseeable to Mr. Jackson.

The Government did not present evidence concerning the chemical purity of the methamphetamine. Therefore, the Court cannot find the conspiracy involved a total of 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers. For the

36

**ADD46**

same reason, the Court cannot find 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers are attributable to either Mr. Corbett or Mr. Jackson.

## CONCLUSION

In view of the foregoing findings of fact and conclusions of law, the Court finds beyond a reasonable doubt that Defendants Daquan Corbett and Daviston Jackson are guilty of Count One, conspiracy to distribute 500 grams or more of a substance containing methamphetamine, and 400 grams or more of a substance containing fentanyl, from January 1, 2018, to December 31, 2021, in the District of Maine, in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1), (b)(1)(A)(vi), (b)(1)(A)(viii).

**SO ORDERED.**

Dated this 21st day of January, 2025.

/s/ Stacey D. Neumann
U.S. DISTRICT JUDGE

37

**ADD47**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

_____

UNITED STATES OF AMERICA,
       Plaintiff,

                               CRIMINAL NUMBER:

       -vs-

                               1:22-cr-00023-SDN

DAQUAN CORBETT,
         Defendant.               Sentencing
_____

    Margaret Chase Smith United States Courthouse
    202 Harlow Street
    Bangor, Maine 04401
    October 28, 2025

**B E F O R E:**         **THE HONORABLE STACEY D. NEUMANN**
                      **UNITED STATES DISTRICT JUDGE**

**A P P E A R A N C E S:**

DARCIE N. MCELWEE, UNITED STATES ATTORNEY
BY:  JOEL B. CASEY, ASSISTANT UNITED STATES ATTORNEY
 On behalf of the Government.

LAW OFFICE OF JOSEPH F. KROWSKI
BY:  JOSEPH F. KROWSKI, JR., ESQUIRE
On behalf of the Defendant Corbett.

RODWAY & HORODYSKI, ESQUIRES
BY:  PETER E. RODWAY, ESQUIRE
On behalf of the Defendant Corbett.

          Cathy J. Ford, Official Court Reporter
              cfordccr@gmail.com
              609.367.2777

Proceedings recorded by manual stenography; transcript
produced by computer-aided transcription.

THE DEPUTY COURT CLERK:  All rise.

The United States District Court is now in session. The Honorable Stacey D. Neumann presiding.

(Open court begins at 1:07 p.m.)

THE DEPUTY COURT CLERK:  Please be seated and come to order.

THE COURT:  Good afternoon, everyone.

MR. CASEY:  Good afternoon, your Honor.

MR. KROWSKI:  Good afternoon, your Honor.

THE COURT:  We are here in the matter of United States versus Daquan Corbett, Docket Number 22-cr-23-SDN.

We are here for sentencing.

Counsel, could you please note your appearances for the record.

MR. CASEY:  Good afternoon, your Honor.  Joel Casey for the government.

THE COURT:  Good afternoon.

MR. RODWAY:  Good afternoon, your Honor.  Peter Rodway for Mr. Corbett.

THE COURT:  Good afternoon.

MR. KROWSKI:  Attorney Joseph Krowski, Junior on behalf of Mr. Corbett.  Nice to see you.

THE COURT:  Nice to see you, good afternoon.

And good afternoon, Mr. Corbett.  Nice to see you.

THE DEFENDANT:  Good afternoon.

THE COURT: Attorney Casey, have you provided notice of this hearing to any victims of the offense as required by law?

MR. CASEY: Your Honor, based on my understanding of the relevant statutes, there are no victims to whom notice was required in this case. Thank you.

THE COURT: Thank you, Attorney Casey.

Mr. Corbett.

THE DEFENDANT: Yes.

THE COURT: So the overall purpose of this hearing is your sentencing hearing, and that's for me to sentence you based on your conviction.

Before I do that, I'm going to hear from the government's attorney, from your attorneys, any people you may have who wish to speak, and I'll also hear from you, if you want to speak.

And there's a couple of things that we need to make sure happen at the hearing this afternoon.

The first is that you have read and understand the revised presentence investigation report?

THE DEFENDANT: Yes, I went over that with my attorney, the PSR.

THE COURT: Yes, the PSR. And we'll go through that further.

The second is that there's nothing that interferes

with your ability to understand what's taking place this afternoon.

And third and most important is to make sure you understand the sentence I ultimately impose and the reasons for it, okay.

THE DEFENDANT: Yes.

THE COURT: And to that end, there's a couple of ground rules that are going to apply throughout the hearing this afternoon.

The first is, if I ask you a question, or anybody here says something that you don't understand, you just let me know and we'll make sure that it's rephrased so you do understand it. Okay.

THE DEFENDANT: Okay.

THE COURT: And the second is, if at any time you want to speak to your attorneys, Krowski and Rodway, you just let me know and I'll give you sufficient time to do so. Okay.

THE DEFENDANT: Yes.

THE COURT: Okay. So first, we're going to get into what we call competency. I have to make sure you're competent to be sentenced this afternoon.

Are you currently taking any medications?

THE DEFENDANT: No.

THE COURT: Are you currently prescribed any medications that you're not taking?

THE DEFENDANT: Yes.

THE COURT: And what's that?

THE DEFENDANT: I take Keflex that I got, but I haven't took it because Somerset doesn't provide the medicine so...

THE COURT: You haven't had it. For how long?

THE DEFENDANT: It's now going on 11 days now.

THE COURT: Does the fact that you're not taking it affect your ability to understand what's happening this afternoon?

THE DEFENDANT: No, no. Not at all, your Honor.

THE COURT: Does it make you in pain the fact that you're going without it?

THE DEFENDANT: Yes, there's pain but nothing that, you know, messes up what's going on. I fully understand everything that's going on today.

THE COURT: Okay. Have you taken any other drugs or alcohol in the last 24 hours?

THE DEFENDANT: No, your Honor.

THE COURT: Okay. And you have your GED; is that right?

THE DEFENDANT: Yes. I have my GED, yes.

THE COURT: Okay. Is there anything else that might interfere with your ability to hear and understand what's happening this afternoon?

THE DEFENDANT:  No, your Honor.

THE COURT:  Okay.  And Attorneys Rodway and Krowski, do you authorize your attorneys to act and speak on your behalf throughout the hearing this afternoon?

THE DEFENDANT:  Yes.

THE COURT:  Attorneys Rodway and Krowski, is there anything that has come to your attention that indicates that Mr. Corbett might not be competent to proceed with sentencing this afternoon?

MR. KROWSKI:  No.

MR. RODWAY:  There's nothing.

THE COURT:  Okay.  Having observed Mr. Corbett and seeing his demeanor and having heard his responses to my questions, I find that he is competent to proceed with sentencing this afternoon and he does not appear to be under the influence of any substances.

So, I'm not sure which one -- Attorney Rodway and Krowski, I'm speaking to you as a group.  Is one of -- I know both of you want to make sentencing arguments.  Is one of you going to be answering my questions or should I ask both of you?

MR. KROWSKI:  I think for expediency you could just ask it to either one -- pick one.  I'll answer the questions.

THE COURT:  Okay.

MR. RODWAY:  If he can't, I'll answer them.

THE COURT: And just so the record is clear, then, I'll ask Attorney Krowski; and if he can't answer, Attorney Rodway will answer. And if there's anything incorrect that Attorney Krowski says, I'm going to assume you'll speak up. If you don't, I will take your quietness as an agreement with Mr. Krowski. Fair enough?

MR. RODWAY: Fair enough.

THE COURT: Okay. Mr. Krowski, have you received a copy of the presentence investigation report or the PSR?

MR. KROWSKI: Yes.

THE COURT: And have you read it and discussed it with Mr. Corbett?

MR. KROWSKI: Yes.

THE COURT: Have you had sufficient time to do so?

MR. KROWSKI: Yes.

THE COURT: Are you satisfied he understands the report?

MR. KROWSKI: I am.

THE COURT: Okay. And, Mr. Corbett, I'm going to get to the specific objections in a moment, but have you received a copy of the PSR in your matter?

THE DEFENDANT: Yes.

THE COURT: And have you had enough time to review -- well, first of all, have you reviewed it with your attorneys?

THE DEFENDANT: Yes.

THE COURT: Have you had sufficient time to do so?

THE DEFENDANT: Yes.

THE COURT: And do you understand the report?

THE DEFENDANT: Yes, I understand it.

THE COURT: I know you disagree with some portions of it but you understand --

THE DEFENDANT: I disagree, but, yes, I do understand it.

THE COURT: Okay. So, Attorney Krowski, let's go over the objections to make sure we're all operating from the same set of circumstances here.

MR. KROWSKI: Your Honor, there's a little change to the procedure. Attorney Rodway actually filed the objections, so he's going to answer the Court's questions pertaining to them.

THE COURT: Okay, that sounds great. And again, we'll follow the same procedure.

Attorney Krowski, if you disagree with something Attorney Rodway says, I'll assume you will speak up, otherwise, I will take your lack of doing so as agreement with Attorney Rodway.

MR. KROWSKI: Thank you.

THE COURT: Attorney Rodway, I'm looking at the addendum to the revised presentence investigation report.

First, with respect to objections 1, 2, and 3, those

are factual objections, correct? And my determination on those won't affect the guideline calculation. Is that true?

MR. RODWAY: Judge, let me pull them up, I'm sorry.

THE COURT: Okay. I'll just go through them one at a time and make sure we're all on the same page and the record is clear. So let me know when you have them.

MR. RODWAY: Those are factual objections that don't have anything to do with the guideline calculation. That CS-33 traveled to Massachusetts. Shelby Loring purchased meth. And that paragraph 24 is incomplete in that it omits any mention of Danielle McBreairty's other drug suppliers.

THE COURT: Okay. And are you going to have any further argument on objections 1, 2, or 3?

MR. RODWAY: No.

THE COURT: Okay. Does the government wish to be heard further on objections 1, 2, or 3?

MR. CASEY: No, your Honor. Thank you.

THE COURT: I'm just going to go through them like this so we can focus our time on the matters that we need to.

The Court has made findings of fact as outlined in its order in which -- where it found facts beyond a reasonable doubt, so I'm not going to revisit those facts to the extent that objections 1, 2, or 3 contradict what I've already found, those objections are overruled.

And to the extent they don't and are separate from

issues that haven't been directly addressed from the Court, I'm not going to make a responsive filing at this time -- a responsive finding at this time.

Objection number 4, which is about drug quantity. Does that affect the sentencing calculation?

MR. RODWAY: Let's put it this way, we don't know what the drug quantity is. We're saying that it's overstated.

THE COURT: Okay.

Attorney Casey, do you wish to be heard any further on objection number 4?

MR. CASEY: No, your Honor. The government rests on its sentencing memo on the issue of drug quantity.

THE COURT: Okay. Again, the government -- pardon me. Again, the Court has made extensive findings of fact particularly related to drug quantity and so the drug quantity is supported by the findings of fact the Court made beyond a reasonable doubt, so those objections are overruled.

Objection number 5, Attorney Rodway, is that a factual objection?

MR. RODWAY: It is.

THE COURT: For the same reasons that I stated regarding the other objections related to factual objections, the Court's findings of fact determines those out outcomes.

Objection number 6 --

MR. RODWAY: That he told CS how to handle customers.

THE COURT: That's objection number 5, correct. You're objecting to that. And I'm saying that I've made that finding of fact relevant already.

Objection number 6 is that the defendant denied he saw anyone -- that he and Jackson saw anyone with firearms in any residence.

So objection number 6, are you still pressing the objection to the gun?

MR. RODWAY: We are not.

THE COURT: Okay.

MR. RODWAY: We are not.

THE COURT: Okay. So I'm going to turn to Mr. Corbett for a moment.

Mr. Corbett, do you understand that you're no longer pressing the objection to the gun enhancement?

MR. RODWAY: Judge, I spoke too soon. We are pressing the gun enhancement.

THE COURT: Okay. So then we'll get back to that one in a moment. So the substantive ones I'm going to save for a moment.

So that brings us to objection number 7 that's also related to drug quantity.

Is there anything further that you want to discuss with respect to drug quantity? As I previously said, I made findings of fact related to drug quantity in my order, but is

there anything else on that objection.

MR. RODWAY: There's nothing else on that objection. We just want to press that for the record.

THE COURT: Understood. And that objection is denied. Overruled.

Objection number 8, regarding suppressed evidence. The Court is not going to consider any evidence that had been suppressed in its sentencing.

MR. RODWAY: Thank you.

THE COURT: So that's granted. I understand the government isn't pressing for it either, but again, I have not considered anything related to that evidence with respect to sentencing.

Objection number 9, I understand that Mr. Corbett is pressing his objection to the leadership enhancement, correct?

MR. RODWAY: Yes.

THE COURT: Again, we'll hear more about that in a moment.

Objection number 10, as I understand it, Mr. Corbett is continuing to be pressing his objection for obstruction of justice, correct?

MR. RODWAY: Correct.

THE COURT: Okay. So, Mr. Corbett, just so we're clear, I have overruled the objections that relate to factual discrepancies and drug quantity arguments. I've made

extensive findings of fact on those matters, but we are -- you have preserved and I'm going to hear further argument on your objection to an enhancement for a gun -- possessing a gun, a proposed enhancement for a leadership role and a proposed enhancement for the obstruction of justice.

So now I'm going to turn to the government, because it is the government's burden to be heard on those proposed enhancements.

MR. CASEY:  Your Honor, the government previously addressed each of the enhancements referenced in objections 6, 9, and 10 in its memorandum in aid of sentencing, and we will rest on that memo.  Thank you, your Honor.

THE COURT:  Thank you, Attorney Casey.

Attorney Rodway or Krowski -- and while you're thinking about that, I do want the record to be clear that, in coming to the hearing today, of course, I've read and, of course I sat through the trial, and I made extensive findings of fact; I've read the revised presentence investigation report at ECF 980, the government's sentencing memorandum at ECF 1035, the defendant's sentencing memorandum at ECF 1055, the government's memorandum regarding various variants at ECF 1067, the defendant's submitted letters of support from Darren Howell, Cynthia Diggs, and Stewart Lotman.  So I have reviewed and considered all of those in preparation for this hearing.

Attorney Rodway or Attorney Krowski.

MR. RODWAY: The gun that was found in Brockton, during the Brockton stop, it's our position that that had nothing to do with this case and relevant conduct in this case and, therefore, the Court should find no gun enhancement.

THE COURT: Okay. So the record is clear, and there's a lot of individuals in the audience, so I want to make sure everyone understands what we're talking about.

Right now we're talking about a proposed enhancement under the sentencing guidelines, which are these guidelines that the Sentencing Commission has factored that I am required to consider so that's what we're arguing about now. And there's a proposed 2-level enhancement under -- under paragraph 99 under Section 2D1.1(b)(1), for a dangerous weapon possession. I understand the defendant's argument. I do believe that that enhancement is appropriately applied.

There's extensive testimony that there were numerous weapons involved in this conspiracy as articulated in my findings of fact so I am going to apply the 2-level enhancement.

What about paragraph 102, argument on the adjustment for role in the offense?

Anything further from the government? I think the government said it has nothing further for any of the objections, correct.

MR. CASEY: That's correct, your Honor.

THE COURT: Mr. Rodway.

MR. RODWAY: As we wrote in the sentencing memo, Danielle McBreairty's drug trafficking organization was up and running before she met Mr. Corbett. She had her sister involved with it, Sarah McBreairty. They were buying drugs from other suppliers.

Mr. Corbett came along, according to the evidence in this case, after at some point that this was operating. And it was operating on a large scale.

So our position is that Mr. Corbett didn't do anything to organize -- our argument is that Mr. Corbett did nothing to recruit people, to set up the operation. He didn't tell them how to price. He didn't tell them who to sell to. And when I say "them" I'm talking about Danielle McBreairty's drug trafficking organization with all the people who were under her.

He also didn't do that with Niko Raines and he didn't do that with Shelby Loring. He was a supplier, according to the evidence. Anyway, he supplied and that was all that he did. And so for those reasons, we believe that the role enhancement does not apply.

THE COURT: Okay. Thank you, Attorney Rodway.

I do find that the 4-level role enhancement does apply in this case.

As you all know, under 3B1.1A, there's basically two

requirements:  Number 1 that the individual be an organizer or a leader in an activity that involved five or more participants which could include the defendant.  There's significantly over -- the findings of fact made clear there's well over five individuals who participated in this conspiracy.  So that element, or that factor, has clearly been met here.

The second is that he acted as an organizer or leader of the enterprise.  The factors to consider, which are not exclusive, and certainly don't all need to be met, are things like, his ability to exercise a decision-maker authority, the nature and participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the nature and scope of the illegal activity, the ability to control and the authority expressed over others, and his participation or planning.  And it's also clear that there can be more than one organizer or leader in a criminal enterprise.  So the arguments with respect to Danielle McBreairty aren't particularly compelling against the enhancement role.

There's extensive factual findings as to Mr. Corbett's organization and leadership activity.  There's text messages where he's referred to as the boss.  You mentioned Niko Raines.  Niko Raines, I think himself testified, if there's a discrepancy or a problem, he would reach out to Mr.

Corbett. There's evidence that Mr. Corbett did structure the messages. There's extensive evidence that when Danielle McBreairty was incarcerated, Mr. Corbett talked about the other people involved and, in fact, did recruit Sarah McBreairty, among others, to take over in Danielle's place. So again, those are just some of the reasons, but they are much more clearly articulated in the extensive findings of fact. I do think the 4-level leadership enhancement role applies.

Now we turn to the last remaining objection; that is, obstruction of justice. The government has said it doesn't have any further argument.

Does the defense have any further argument, Mr. Rodway?

MR. RODWAY: That evidence that came from Josh Jerrell -- and the Court heard him testify and, perhaps, we're bias on this side, but we didn't think he was particularly credible.

The other part of that is that -- and this is sort of a fairness thing. We complained throughout the whole pretrial period about our client being housed with other people in this conspiracy.

If somebody had listened to us, Joshua Jerrell would not have had the opportunity to make that up. But as it stands, he did. And you know, people say things to help

themselves out in these cases, and we think that that's why he said that. We deny vehemently that Daquan Corbett threatened him.

The other person who talked about that, you know, with some sort of intimidation was Niko Raines. And we think the same thing about him. If you just remember Mr. Krowski's cross-examination of him, when he was talking about how he would take people who were buying drugs and sit them down and act like a doctor and make sure they were doing the right dosages and that type of thing. It just wasn't credible. You know, the evidence has got to be reliable in order for you, Judge, to impose these enhancements. And we suggest that evidence was completely unreliable, and the Court should not impose that enhancement.

We have a guideline issue with it. And I'm afraid that there's going to be a BOP issue with it, you know, later on down the line if the Court makes that finding, it's going to increase our client's security classification. The sentence is going to be bad enough as it is, okay. The Court does not have to make that finding. The Court would be perfectly within its discretion in hearing the evidence it did at trial to not make that finding, and we urge the Court not to.

THE COURT: I understand the arguments. I understand both the arguments. And again, Mr. Corbett, I'm sure you've

gone over this extensively with your counsel, but so, the audience is aware and the record is aware, this enhancement, if it applies, also won't affect your ultimate guideline range because your adjusted offense level, which we're about to get into, is going to be too high, higher than the guidelines even go, and so it's brought down to 43.

And I understand Attorney Rodway and Krowski's argument about the Bureau of Prisons' calculations and how this could affect your calculations. However, the burden of proof is on the government to prove, it is a preponderance of the evidence standard. I did hear those individuals testify at the trial. I did find them credible on those points, so I do think as a matter of law the obstruction enhancement does apply.

I've heard throughout the trial, and I understand the defendant's argument about they shouldn't be in a position for the claim to have been made, but, nonetheless, I find by a preponderance of the evidence, that Mr. Corbett did make those threats. He certainly wasn't required to make such threats just because an individual who was in his proximity who maybe shouldn't have been, but I do find that 2-level obstruction applies.

So anything further with respect to objections on the guidelines?

Anything from the government before I go through the

calculations?

MR. CASEY: No, your Honor. Thank you.

THE COURT: Anything from the defense before I go through the calculations?

MR. RODWAY: There's nothing further, Judge.

THE COURT: Okay. So let's do the guideline calculations.

And I'm here on page 25, starting at paragraph 98 of the PSR. We have a base offense level of 38. We have plus two levels for possessing a dangerous weapon applied.

We have plus two levels because the defendant engaged in the offense as a pattern of criminal conduct for his livelihood -- that's paragraph 100.

We have, at paragraph 2, four levels apply for the defendant's role in the offense.

At paragraph 103, two levels apply for an adjustment for obstruction of justice.

That gives us an adjusted offense level of 48.

Because the guidelines only go -- the highest offense level they go to is 43. The total offense level is reduced to a 43.

The defendant is a criminal history category 3 as outlined in paragraph 115.

And that gives us -- again, we're at paragraph 139, a total offense level of 43, and a criminal history category of

3 which leads us to a guideline imprisonment range of life.

Again, I know you object to the enhancements applying.

Any further objections to the guideline range as calculated?

MR. RODWAY:  No, your Honor.

THE COURT:  Any further objections, Attorney Casey?

MR. CASEY:  No, your Honor.  Thank you.

THE COURT:  I also want to note, so the record is clear, that if I had not applied any of the -- in other words, if I had granted all of the defendant's objections, that would have been an 8 level reduction for a guideline offense level of 40.

A guideline offense level of 40 and a criminal history category of 3 is 360 years (sic) to life.

Does the government agree with what I just said?

MR. CASEY:  Yes, your Honor.

THE COURT:  Does the defense agree with what I just said?

MR. KROWSKI:  360 months to life.

THE COURT:  To life, yes.  That would have been the guideline if I had granted all of your objections.

MR. KROWSKI:  We agree with that.

THE COURT:  Okay.  Anything further from the defense before we get into sentencing argument?  Of course, we'll be

starting with the government, but I want to make sure I address anything further with respect to the guidelines.

MR. RODWAY: Judge, nothing with the guidelines.

We do have a couple of people who will speak on our client's behalf.

THE COURT: Okay. Attorney Casey, do you wish to be heard on sentence?

MR. CASEY: Yes, your Honor. Thank you.

Your Honor, as the Court is aware from having presided over the two-week long trial in this case and having reviewed the thorough presentence investigation report in Mr. Corbett's case, Mr. Corbett stands convicted of conspiracy to distribute and possess with the intent to distribute methamphetamine and fentanyl. And his conviction stems from his central role in a drug conspiracy that stretched from Brockton, Massachusetts, all the way up to Aroostook County.

As you just calculated, his guideline range of imprisonment is life. It's what the advisory guidelines call for. The government is not recommending a life sentence in this case. It is recommending a variant sentence of 30 years or 360 months.

The government believes that that sentence is consistent with all the 3553(a) factors. In formulating this recommendation, your Honor, the government has considered all of the evidence introduced at trial, as well as the contents

# United States District Court
### District of Maine

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| DAQUAN CORBETT<br>*a/k/a "Chinx"* | Case Number: 1:22-cr-00023-SDN-1<br>USM Number: 86366-509 |

Joseph F. Krowski, Jr., Esq. & Peter E. Rodway, Esq.
_____
Defendant's Attorney

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____ which was accepted by the court.

☒ was found guilty on count(s) <u>1 of the Indictment</u> after a plea of not guilty.

**The defendant is adjudicated guilty of these offenses:**

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| <u>21 U.S.C. §§ 846</u>, 841(a)(1), 841(b)(1)(A) | Conspiracy to Distribute & Possess w/Intent to Distribute 500+ Grams of a Mixture or Substance Containing Methamphetamine & 400+ Grams or More of a Mixture or Substance Containing Fentanyl | 12/31/2021 | 1 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____.

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of material changes in economic circumstances.

October 28, 2025
_____
Date of Imposition of Judgment

/s/ Stacey D. Neumann
_____
Signature of Judge

Stacey D. Neumann, U.S. District Judge
_____
Name and Title of Judge

October 30, 2025
**ADD70** Date Signed

Case: 1:22-cr-00023-SDN Doc #: 465 Filed: 10/30/25 Page 2 of 7 Page ID 6764712 8638

AO 245B (Rev. 09/19) Judgment in a Criminal Case
Sheet 2 – Imprisonment

Judgment—Page   2   of   7

DEFENDANT:          DAQUAN CORBETT
CASE NUMBER:     1:22-cr-00023-SDN-1

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of <u>276 months.</u>

☒   The court makes the following recommendations to the Bureau of Prisons:
Placement at FCI Cumberland in Maryland.

☒   The defendant is remanded to the custody of the United States Marshal.

☐   The defendant shall surrender to the United States Marshal for this district:
   ☐         at _____ ☐ a.m. ☐ p.m. on _____ .
   ☐         as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons.
   ☐         before 2 p.m. on _____ .
   ☐         as notified by the United States Marshal.
   ☐         as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

   Defendant delivered on _____ to _____
a _____ ,  with a certified copy of this judgment.


_____
UNITED STATES MARSHAL


By _____
DEPUTY UNITED STATES MARSHAL


**ADD71**

AO 245B  (Rev. 09/19) Judgment in a Criminal Case
Sheet 3 – Supervised Release

Judgment—Page   3    of   7

DEFENDANT:         DAQUAN CORBETT
CASE NUMBER:       1:22-cr-00023-SDN-1

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of: 5 years.

## MANDATORY CONDITIONS

1.      You must not commit another federal, state or local crime.

2.      You must not unlawfully possess a controlled substance.

3.      You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two additional drug tests during the term of supervision, but not more than 120 drug tests per year thereafter, as directed by the probation officer.
        ☐ The above drug testing condition is suspended, based on the court's determination that you
           pose a low risk of future substance abuse. *(check if applicable)*

4.      ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a
           sentence of restitution. *(check if applicable)*

5.      ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

6.      ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901,
           *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in
           which you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

7.      ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments of this judgment.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B  (Rev. 09/19) Judgment in a Criminal Case
Sheet 3 – Supervised Release

**ADD72**

AO 245B (Rev. 09/19) Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page   4   of   7

DEFENDANT:     DAQUAN CORBETT
CASE NUMBER:   1:22-cr-00023-SDN-1

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

**U.S. Probation Office Use Only**
A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____ _____    Date _____

<b>ADD73</b>

AO 245B  (Rev. 09/19) Judgment in a Criminal Case
Sheet 3D – Supervised Release

Judgment—Page 5 of 7

DEFENDANT:          DAQUAN CORBETT
CASE NUMBER:     1:22-cr-00023-SDN-1

## SPECIAL CONDITIONS OF SUPERVISION

1) Defendant shall participate in mental health treatment, as directed by the supervising officer, until released from the program by the supervising officer. Defendant shall pay/co-pay for services during such treatment, to the supervising officer's satisfaction;

2) Defendant shall not use or possess any controlled substance, alcohol or other intoxicant; and shall participate in a program of drug and alcohol abuse therapy to the supervising officer's satisfaction. This shall include testing to determine if Defendant has used drugs or intoxicants. Defendant shall pay/co-pay for services during such treatment to the supervising officer's satisfaction. Defendant shall not obstruct or tamper, or try to obstruct or tamper, in any way, with any tests;

3) Defendant shall not own or possess any firearm or other dangerous weapon, or knowingly be at any time in the company of anyone known by the defendant to possess a firearm or other dangerous weapon; and

4) A United States probation officer may conduct a search of the defendant and of anything the defendant owns, uses, or possesses if the officer reasonably suspects that the defendant has violated a condition of supervised release and reasonably suspects that evidence of the violation will be found in the areas to be searched. Searches must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation of release;

5) Defendant shall report to the supervising officer any financial gains, including income tax refunds, lottery winnings, inheritances, and judgments, whether expected or unexpected. Defendant shall apply them to any outstanding court ordered financial obligations; and

6) Defendant shall provide the supervising officer any requested financial information.

**ADD74**

Case: 1:22-cr-00023-SDN  Doc #: 46  Filed: 11/12/25  Page: 6 of 7  PageID #: 712 8642

AO 245B  (Rev. 09/19) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties

Judgment—Page   6   of   7

DEFENDANT:        DAQUAN CORBETT
CASE NUMBER:      1:22-cr-00023-SDN-1

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Count | Assessment | Restitution | Fine | AVAA Assessment * | JVTA Assessment ** |
|---|---|---|---|---|---|---|
| | 1 | $100 | $0 | $0 | | |
| **Totals:** | | $100 | $0 | $0 | | |

☐ The determination of restitution is deferred until _____ .  An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| **TOTALS** | $ | $ | |

☐   Restitution amount ordered pursuant to plea agreement   $

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐   the interest requirement is waived for the     ☐ fine        ☐ restitution.

☐   the interest requirement for the     ☐ fine        ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**ADD75**

AO 245B  (Rev. 09/19) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments

DEFENDANT:       DAQUAN CORBETT
CASE NUMBER:     1:22-cr-00023-SDN-1

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

**A** ☒ Lump sum payment of $100 due immediately, balance due

☒ Any amount that the defendant is unable to pay now is due and payable during the term of incarceration. Upon release from incarceration, any remaining balance shall be paid in monthly installments, to be initially determined in amount by the supervising officer. Said payments are to be made during the period of supervised release, subject always to review by the sentencing judge on request, by either the defendant or the government.

☐ not later than                                        , or

☐ in accordance with    ☐ C,    ☐ D,    ☐            E,  or ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with    ☐ C,    ☐ D, or ☐ F below); or

**C** ☐ Payment in equal             (e.g., weekly, monthly, quarterly) installments of $          over a period of           (e.g., months or years), to commence            (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal             (e.g., weekly, monthly, quarterly) installments of $          over a period of           (e.g., months or years), to commence            (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within          (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate. |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**ADD76**